

## INVESTIGATION BUREAU OPENING REPORT

Date Assigned: 11/22/2010

Case Status: Active

Date: 11/23/2010

ADA Assigned: Patricia O'Connor; Jason Berland          Bureau: CITB; MECB

Room: 669; 831

Inv. Assigned: Jonathan Reid          Inv. Bur. Case #: 10/241

Crime: Grand Larceny 1

**SUBJECT INFORMATION:**          Name: George Castro          FBI: 263156X11

DOB: 02/23/62          NYSIS #: 06915490M

Business/Group Affiliation: IT Security Solutions, LLC

**COMPLAINANT INFORMATION:**

Name: Columbia University

Address: 615 West 131st Street, New York, NY

DETAILS: On Monday, November 22, 2010 the assistance of this bureau was requested to investigate an eform email that was sent to Columbia University on October 4, 2010 changing the process of how Columbia University pays one of their vendors. The web form requested to change Columbia Presbyterian's account receivable payment process to a TD Bank account. Once approved Columbia University's account payable would change the process of paying Columbia Presbyterian via paper check to paying Columbia Presbyterian via automated clearing house (ACH) to the aforementioned TD Bank account.

The TD Bank account in question belongings to IT Security Solutions, LLC, located at 115 East 57th Street, 11th Floor, New York, NY, and was opened in July 2010 by George Castro (SSN: 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) of 109 Admiral Lane, Bronx, NY. The TD Bank statement for the month of October 2010 shows approximately 3.4 million dollars being deposited from Columbia University. In addition the TD Bank statement to date for the month of November 2010 shows approximately over 2.0 million dollars being deposited bringing the amount in larceny to be in the range of 5.7 million dollars.

1

**D1**

## INVESTIGATION BUREAU OPENING REPORT

Assistant District Attorney Patricia O'Connor requested the undersigned to conduct surveillance on the business located at 115 East 57th Street, 11th Floor, New York, NY to gain intelligence on what type of business is located therein, and what if any employees work at IT Security Solutions, LLC.

Investigation is active.

Investigator

Supervisor

Chief Investigator

2

**D2**

## INVESTIGATIONS BUREAU FOLLOW-UP REPORT

Date: 11-26-10

Case Status: Active

ADA Assigned: Patricia O'Connor

Bureau: Cyber Crime

Room: 669

Reporting Investigator: Michael Wigdor

Inv. Bur. Case #: 10-241

Subject: Apprehension of George Castro

1. On November 24, 2010 at approximately 0530 hours the undersigned along with Investigator Reid, Investigator Ahdout, Investigator Figueroa, Investigator Barometre and Investigator Malone commenced a surveillance operation in the vicinity of 109 Admiral Lane Bronx New York regarding the target of this investigation George Castro. The target was observed by Investigator Reid and Figueroa exiting 109 Admiral Lane at approximately 0800 hours. The target was stopped by the undersigned and aforementioned Investigators and placed under arrest. The target was carrying a small cardboard package as well as a backpack. The target was yelling Ma at the time of apprehension and the target's common law wife Denise Diaz exited 109 Admiral Lane. The target was placed in the rear of DA Vehicle #501. Ms Diaz identified herself to the undersigned as a Sergeant assigned to the 024/PCT. Ms Diaz allowed the undersigned, Investigator Reid, and Investigator Figueroa into her home where 2 children were also present. Ms Diaz was visibly upset and crying. The undersigned explained to Ms Diaz that George Castro was being investigated for stealing 5 Million Dollars. The undersigned attempted to calm Ms Diaz and informed her that the DA'S Office was preparing a search warrant for her home 109 Admiral Lane. Ms Diaz stated that she and George Castro were separated since August and the only reason he was there was to assist with child care that George was living with his mother. Ms Diaz made a call to family friends Ricardo Rodriguez and Josephine Rodriguez. The undersigned spoke with Ricardo Rodriguez and requested he come to the location to assist Ms Diaz. Ricardo Rodriguez informed the undersigned he and Josephine were godparents to the children and were 10 minutes away and en route, Ricardo's cell # is 917-604-4317. The undersigned and Investigator Reid escorted George Castro back to the D.A'S Office while Investigator's Figueroa, Ahdout, Barometre and Malone stayed at the location.

2. The undersigned drove vehicle 501 while Investigator Reid sat in the backseat with George Castro. The undersigned informed George Castro that he had a big problem and that he should be concerned about his wife and children and that we would talk when we arrived at the DA Office. George sat silent for a few minutes then stated can we talk. George stated that one day he was checking his bank account and that he discovered 1 million dollars had been deposited. George stated he started taking the money out to help his business. George stated that he had $400,000.00 in the cardboard box and backpack. George also stated that he bought the Audi with the money. The undersigned asked if he was involved with anyone and this was a conspiracy and George stated, "No." George stated his wife had no idea where he got the money from and she wouldn't ask about

**D3**

it. George stated he came from a family of Police Officers. George sated he has had IT Technologies for 3 years and has rented office space on 57th Street for the past year. George stated he sub contracts and sometimes has friends work for him. George stated he gave a proposal to Columbia University some years ago but has no connection with them now. George stated he had one friend Tony that works for him George hesitated on giving the last name. George also stated he purchased equipment for his business with the money. George stated before the money was deposited in his account the business was not doing great but he was able to pay his bills. George also stated he made wire transfers with the money.

3.   The undersigned Investigator Reid and George Castro arrived at the Investigation Bureau at approximately 0900 hours 11-24-10. The undersigned and Investigator Reid placed George Castro in the Bureau Holding Pen where he was searched. At approximately 0920 the undersigned and Investigator Reid placed George Castro in the Interview Room and advised him of his Miranda Rights. George Castro waived his rights and signed the Miranda Warnings Sheet and initialed his responses. George stated again that he has had IT Solutions for 3 years and has been at 57th Street for the past year and rents 1 room. George stated the room is on the 11th Floor and is marked 1709. George stated when he 1st started the company he worked out of 2160 Seward Ave Apt#6C. George stated he had a couple of other employees. At this time it was approximately 0924 hours and George requested to speak with an attorney before further cooperating. The interview ended and George was placed back in the holding cell. George was provided with an egg and cheese sandwich as well as water and bathroom breaks upon his request. The undersigned and Investigator Adler lodged George Castro at approximately 1700 hours 11-24-10 with Department of Corrections to await arraignment.

4.   CASE ACTIVE...


_____

Investigator


Supervisor _____

ACSI  Chief Investigator

**D4**

## INVESTIGATION BUREAU FOLLOW-UP REPORT

Case Status: Active

Date: November 26, 2010

ADA Assigned: DBC Patricia O'Connor

Bureau: Cybercrime and Identity Theft                    Room: 669

Reporting Investigator: Erika Figueroa

Inv. Bur. Case #: 10/241

Subject: Search Warrant at 109 Admiral Lane, Bronx, NY

On Wednesday, November 24, 2010, a court ordered search warrant signed by the Hon. C Berkman, Judge of the Supreme Court, was executed by investigators of the NY County District Attorney's Office. The search warrant was for a residential property at 109 Admiral Lane, Bronx, NY 10473. Police Officers from the 43 PCT were also present during the execution of the search warrant.

The following persons participated in the execution of the warrant:
Supervisor Jose Flores (DANY)
Senior Investigator Frank Connolly (DANY)
Senior Investigator Robert Muldoon (DANY)
Senior Investigator Donato Siciliano (DANY)
Investigator Erika Figueroa (DANY)
Investigator Reginald Barometre (DANY)
Investigator Jason Malone (DANY)

The following persons were also present during the execution of the warrant:
IAB Sgt. Chon Kim (NYPD)
IAB Sgt. Kevin Roughneen (NYPD)
Sgt. Anthony Borelli (NYPD- SBA rep)

Details of search:
At approximately 1530 hours, the above mentioned DANY investigators entered the above mentioned residential property and secured the facility with out incident. The reporting investigator took entry and exit photographs of the entire property. Investigator Malone sketched a diagram of the location (attached).

The evidence seized pursuant to the warrant included one computer desktop, one fax machine, one laptop, two cell phones and various business documents and financial records (copies of inventory are attached).

At approximately 1735 hours, the search of 109 Admiral Lane, Bronx, NY was completed. Copies of the inventory receipts (which list all the evidence that was seized) and the house keys were given to Sgt. Anthony Borelli.

10/241                                                                                          1

**D6**

All of the evidence seized was secured in the Investigations Bureau cell in room 738.

Attached to this memorandum:
- Copy of the Search Warrant for 109 Admiral Lane, Bronx, NY
- Sketches of the location
- Search Warrant Inventory Receipts
- Search Warrant sign in/out sheet

Investigation is active.

Erika Figueroa
Investigator

Supervisor

Chief Investigator

PSG

2

**D7**



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IN THE MATTER OF AN APPLICATION FOR A

WARRANT TO SEARCH THE PREMISES LOCATED AT

109 ADMIRAL LANE, A TWO FLOOR SINGLE FAMILY HOME,

BRONX, NEW YORK, 10473 ("TARGET PREMISES 1"), THE

OFFICES OF IT & SECURITY SOLUTIONS LLC AT 115 EAST

57TH STREET, 11TH FLOOR, NEW YORK, NEW YORK

("TARGET PREMISES 2"), A WHITE AUDI BEARING NY

STATE PLATE FFW1351 ("TARGET VEHICLE 1"), AND A VAN

BEARING THE WORDS "IT SECURITY SOLUTIONS" BEARING

NY STATE PLATE 78835JX ("TARGET VEHICLE 2").

927/10

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

Jon Reid, being duly sworn, deposes and says:

1.      I am a detective investigator, shield #113, assigned to the Investigations Division of
the New York County District Attorney's Office, and as such I am a public servant of the kind
specified in CPL 690.05(1). I have been a detective investigator for over 2 years. I have executed
and participated in more than 20 search warrants.

2.      This affidavit is submitted in support of an application for a warrant to search 109
Admiral Lane, a single family home with two floors, Bronx, New York ("Target Premises 1"), and
the Offices of IT & Security Solutions LLC at 115 East 57th Street, 11th Floor, New York, NY
("Target Premises 2"), a 2011 White Audi New York State Plates: FFW1351, Vehicle
Identification Number ending in 2284 ("Target Vehicle 1"), a van bearing the words "IT Security
Solutions WE ARE THE BUSINESS INTELLIGENCE PROVIDERS 212-939-7262 115 EAST
57TH STREET NEW YORK, NY" bearing NY state plate 78835JX ("Target Vehicle 2"), and the
persons of George Castro and Denise Diaz, if present therein, where there is reasonable cause to
believe that property, proceeds, and evidence of the commission of the below crimes, among
others, and an attempt and conspiracy to commit the below crimes, may be found:

- Grand Larceny in the First Degree (P.L. §155.42 et. seq.)
- Identity Theft (P.L. §190.78 et. seq.)
- Criminal Possession of Stolen Property (P.L. §165.40 et. seq.)

3.     The property, proceeds, and evidence of the commission, participation or involvement in the above crimes which may be found at Target Premise 1 and 2 and Target Vehicle 1 and 2, includes, but is not limited to:

a.  Notes, photographs, forms, recordings and other records and documents, whether contained on paper in handwriting, typed, photocopy or printed form, or stored on computer printouts, or within computer storage media including, but not limited to, hard drives, USB devices, flash cards and drives, magnetic tape, CD ROM's, disks, diskettes, photo-optical devices, handheld computer devices, or any other medium, of or related to:

(i) names, dates of birth, addresses, social security numbers, credit card account numbers, debit card account numbers, and any and all other personal identifying information as defined in P.L. §190.77;

(ii) accounts, subscriptions, permissions and any and all other arrangements or agreements related to the usage of the internet, whether through internet service providers or other means;

(iii) financial transfers derived from the possession of cash currency, money orders, bank receipts, stocks, bonds, bills and any other financial receipts or records that may be stored in computers, hard drives, USB devices, flash cards and drives, magnetic tape, CD ROMs, disks, diskettes, photo-optical devices, handheld computer devices or any other medium;

b.  Any documents or banking information including but not limited to any and all account statements and transaction details from, related to, or between Columbia University, Columbia Presbyterian Hospital, TD Bank, Sovereign Bank, Chase Bank, First Bank of Omaha, ETrade, Capital One,  George Castro, Denise Diaz, Walter L. Stephens, Andre Mitchell, Jeremy Dieudonne, Dieudonne Partners, Cochise Quinones, Rosalina Diaz, Julio Acosta, IT & Security Solutions LLC, and Ryan Daelyn Technology Corp; currency, a safe, any container or lockbox that could contain currency, clothing, receipts for goods and services and merchandise from the following merchants, including but not limited to: Apple, PC Richards and Son, Staples, and Home Depot.

c.  Any identification documents including, but not limited to, social security cards, resident alien cards, passports, credit/debit cards and drivers' licenses, whether counterfeit or authentic;

d.  Electronic communication equipment including, but not limited to, telephone bases and handsets; cellular telephones; any device capable of sending or receiving electronic communication including, but not limited to, e-mail and text messages; answering machines; paging devices; related items to all such equipment including,

but not limited to, auxiliary batteries, chargers, software and wiring; and any stored information, data, and images contained on or in said communication equipment including, but not limited to, stored names and numbers and recorded messages;

e. Evidence of ownership and use of Target Premises 1 and 2 and the Target Vehicles 1 and 2, or the use of property located therein by any person, including, but not limited to, keys, telephone bills, bank statements, leases, deeds, or rent receipts related to the Target Premises or other documents bearing the address of either George Castro, Denise Diaz or the Target Premises 1 and 2 and the Target Vehicles 1 and 2, identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, or personal papers.

f. Any and all financial documentation, including, but not limited to, statements for bank accounts, credit or debit cards, checks (blank or fully- or partially-completed), or credit reports in any name, or any other documentation bearing, or associated with, the name Columbia University, Columbia Presbyterian Hospital, TD Bank, Sovereign Bank, Chase Bank, First Bank of Omaha, E*Trade, Capital One, George Castro, Denise Diaz, Walter L. Stephens, Andre Mitchell, Jeremy Dieudonne, Dieudonne Partners, Cochise Quinones, Rosalina Diaz and Julio Acosta, IT & Security Solutions LLC, and Ryan Daelyn Technology Corp.

4.      It is also requested for evidentiary purposes that this Court grant authorization for law enforcement personnel to videotape and photograph the interior of Target Premises 1 and 2; to process Target Premises 1 and 2 and Target Vehicle 1 and 2; and to analyze, test, and in any way scientifically process the Target Premises 1 and 2 and the Target Vehicles 1 and 2 and all items seized therein.

5.      With respect to the stored electronic communications, data, information and images contained in computer disks, CD ROMs, hard drives and other data storage devices and media described above, it is also requested that this Court grant permission to search and retrieve the above-described communications, data, information, and images, and print them or otherwise reproduce them by converting them or copying them into storage in another device.

6.      It is specifically requested that the search warrant authorize the seizure and removal of any and all electronic storage devices, cellular telephones and other electronic communication devices, related accessories and software for off-site searching. Based upon my training and experience, the examination of such devices can be a time-consuming process due to the constantly changing universe of technologies, models, operation systems, and types of content stored.   Because of the volume of evidence and technical requirements of forensic examination, I am aware that searching and seizing information from such devices often requires police officers to seize most or all such devices (along with related peripherals) and software to be searched later by a qualified person in a laboratory or other controlled environment.

7.      It is also requested that the warrant be deemed executed once any electronic communication equipment, computer disks, CD ROMs, hard drives and other data storage devices seized have been seized, and that further analysis of these items be permitted at any time thereafter.

8.   As set forth below, there is reasonable cause to believe the above described property has been used, or is possessed for purpose of being used to commit or conceal the commission of an offense, and the above described property constitutes evidence or tends to demonstrate that an offense was committed or that a particular person participated in the commission of said offense.

My basis for believing that the property is in Target Premises 1 and 2 and Target Vehicles 1 and 2 is as follows:

a.   I have been investigating the theft of monies from a Chase Bank account owned and operated by Columbia University, where over the past month and a half several million dollars have been diverted to several bank accounts I believe are owned and operated by, or affiliated with, an individual named George Castro.

b.   On or about November 23, 2010, I was informed by Kenneth Finnegan, director of Investigations and Technology Projects, Columbia University Department of Public Safety, that someone had accessed their accounts payable system and changed information relating to a payee. According to Director Finnegan, on or about October 4, 2010, a change request was sent to and processed by Columbia University. This request pertained to a vendor account belonging to Columbia Presbyterian Hospital. According to Director Finnegan, Columbia University has a relationship with Columbia Presbyterian Hospital (hereinafter, CPH), and financial payments for services were regularly sent to a bank account affiliated with CPH. This October 4th request changed the payee information from CPH's legitimate account to a new account: a bank account affiliated with TD Bank, account number 4252828434. A review of JP Morgan Chase account records for the Columbia account showed that after the October 4th change form was processed, over $5 million dollars was sent to the TD Bank account 4252828434, without knowledge or permission or authority by Columbia University.

c.   I am further informed by Jerry Donnelly a Fraud Investigator at TD Bank, that account number 4252828434 was opened on or about July 8, 2010, in the name IT Security Solutions LLC. The name listed on the signature card for said account is George Castro, date of birth 2/23/1962, and the account owner's address is 115 E 57th Street, 11th Floor, New York, NY [Target Premises 2]. Based on a review of subpoenaed records from said TD Bank account, I observed over $3.4 million dollars in credits deposited into said account from the aforementioned Columbia University account between October 4, 2010 and present. Based on my conversations with Director Finnegan, those deposits correspond to monies debited from Columbia's Chase account. Further review of said TD Bank records and conversations with TD Bank show that on numerous dates between October 4, 2010 and present, over $3 million dollars was either transferred to other bank accounts via check or wire transfer or withdrawn in cash. Based upon a review of the records and conversations with TD Bank, monies were ultimately transferred to other banks and banking institutions including: Sovereign Bank, First National Bank, Capital One Bank, and E*Trade. The names of the accounts monies were wired into include, but are not limited to: Dieudonne Partners & Co, IT Security Solutions, Andre J. Mitchell, Walter L. Stephens, Jr. A further review of said TD Bank accounts show that numerous large cash withdrawals totaling over $350,000 occurred during the month of October, and occurred at 500 Park Avenue, New York, NY and 2831 Broadway, New York, New York. Also, a review of the records and information from TD Bank shows that said monies transferred out of the account via

online wire transfers. Further review of the TD Bank records between the October 4, 2010 and present indicate purchases at the following locations: Apple, PC Richards and Son, Staples, and Home Depot.

d.       I am further informed by Peter D'Angelo, an external fraud investigator at Captial One Bank. Investigator D'Angelo has reviewed several accounts affiliated with IT & Security Solutions LLC. Based upon that review, those conversations, as well as my own review of subpoened documents from Capital One, I have observed the following: at least three accounts exist at Capital One in the name of IT & Security Solutions. The account numbers for said accounts are: 7047081291, 7142855350, 7047081534 (hereinafter, the Capital One Accounts"). A review of the account information for each account shows that the address of IT & Security Solutions is 115 East 57th Street 11th Floor, New York, NY ("Target Premises 2"). A further review of account information shows that the signator for these business accounts is George Castro, address 109 Admiral Lane, Bronx, New York ("Target Premises 1"). Further review of transaction detail from said Capital One accounts shows hundreds of thousands of dollars being deposited into said accounts between October, 2010 and present. Based on my discussions with TD Bank and review of their records, these transactions correlate with withdrawals and wire transfers from the above referenced TD Bank account. Further review shows that numerous cash withdrawals were made from the Capital One Accounts. On many of the withdrawal slips, the driver's license identification number 485150946 and letters "NYSDL" were written onto each slip. I am informed that when a withdrawal is made, it is common banking practice to have the drawer present his drivers license or other identification and write down that information onto the withdrawal slip. Based on that information, and the ID number and the indication that the ID was a New York State Drivers License ("NYSDL"), I believe the person making all such withdrawals on the Capital One Accounts is the owner of NYSDL 485150946. Furthermore, the name on each of the withdrawal slips lists the drawee as IT & Security Solutions LLC. As stated above, the address for this company on the Capital One Bank Accounts, as well as the TD Bank accounts, is 115 East 57th Street, 11th Floor, New York, NY (Target Location 2). Further review of the Capital One Accounts show that several checks were issued from the account to individuals and corporations. A review showed checks processed on the following dates and amounts: 10/19/10: $80,000 paid to Rosalita Diaz, 11/5/10: $60,000 to Andre Mitchell, 11/12/10: $60,000 paid to Julio Acosta, 11/16/10: $1,254 paid to Allstate, 11/18/10: $60,000 paid to Denise Diaz, 11/22/10: $20,000 paid to Cochise Quinones. All such checks listed the word "loan" in the notes section, except for the Allstate check.

e. I have reviewed checks drawn upon the above Capital One accounts in the name IT Security Solutions, and compared the signature on those checks with the signature card from the TD Bank account 4252828434, in an account IT Security Solutions. Based upon this comparison, I observed the signatures look the same, and believe the same person opened and operates both accounts.

f.       I have reviewed New York State Department of Motor Vehicle driver license information for George Castro. My review shows that an individual named George Castro has a New York State driver's license, ID number 485150946, date of birth February 23, 1962, address 109 Admiral Lane, Bronx, New York.

g. I have performed and reviewed a CLEAR background check on George Castro and the Target Premises 1 – 109 Admiral Lane, Bronx New York. My review of the background search on

109 Admiral Lane shows the owner as Denise Diaz. Further review of common addresses where George Castro lived recently showed a possible relative as Cochise Quinones. Based upon this information, I believe George Castro is paying large sums of monies stolen from Columbia University, transferred via the TD Bank account and into the Capital One Accounts, to his friends and relatives.

h.      On November 23, 2010 I went to 115 East 57th Street, New York, New York (Target Premises 2). I observed the building is a commercial building, and an office directory in the lobby showed a company "IT & Security Solutions, LLC" listed as residing on the 11th floor.

i. Overall, based on the information listed above, my conversations with bank representatives, review of banking documents, and discussions with officials from Columbia University and review of their Chase banking accounts, I believe that George Castro, who lives at the Target Address 1, is utilizing several bank accounts to steal money from Columbia University and transfer it to himself and other affiliates via bank accounts at Capital One, Sovereign, TD Bank, and E*Trade. I believe once the money has been transferred into the illegally positioned TD Bank account, it is almost immediately transferred or wired out, or withdrawn, in an effort to hide and disburse funds. As George Castro is listed as the signator on the initial TD Bank account, listing his business address as 115 East 57th Street, 11th floor, New York, NY, I believe that this address is being utilized as a business address where millions of dollars in stolen funds have been funneled. Furthermore, as this is a business location I verified, and several withdrawal transactions occurred at TD Bank branches in nearby locations to the 115 East 57th Street location, I believe monies or evidence of these transactions may be found at the offices of IT & Security Solutions LLC at 115 East 57th Street, 11th Floor, New York, NY (Target Premises 2). Based on the above information from TD Bank and Columbia University, I believe that numerous transactions involving the fraud – from the initial bank transfer to the wire transfers – all occurred online. Based on my training and experience as a detective in over 20 fraud and computer cases, I know that evidence of online transactions and internet communications will remain on a computer hard drive for a long period of time – sometimes indefinitely – on the main memory or file slack, even if the user attempted to delete such evidence it may remain on file slack on the computer hard drive and be able to be retrieved via use of forensic software and analysis.

j. On November 24, 2010 I went to Target Premises 1 and observed George Castro exit Target Premises 1 and attempt to enter Target Vehicle 1. Upon apprehension of George Castro, defendant admitted to having several thousands of dollars in US Currency on him, as well as an Apple computer, and stated in substance THE MONEY JUST APPEARED IN MY ACCOUNT. I GOT GREEDY. I BOUGHT THE CAR WITH MONEY FROM THE ACCOUNT AND MADE OTHER PURCHASES. Based upon the context of the defendants' statements, defendant was referring to the Audi – Target Vehicle 1. I then recovered a backpack and envelope from defendant, as well as keys to the Target Premises 1 and 2 and Target Vehicles 1 and 2, and a receipt for Target Vehicle 1. The receipt shows Target Vehicle 1 was purchased on November 12, 2010 for $81,267. Based on my training and experience as a detective and my experience in executing search warrants, I know people commonly keep evidence of crimes including but not limited to documents and receipts in their vehicles. As this case involves two vehicles – one of which is registered to a company that is being utilized to embezzle funds and the other we believe was purchased with proceeds of the crime as it was purchased during the time frame of the fraud and

there were large cash withdrawals from both the business and personal accounts of George Castro and IT Security Solutions, LLC, I believe that evidence of the crimes may be found in both Target Vehicle 1 and 2. Furthermore, I believe and am requesting that Target Vehicle 1 and 2 be seized as either evidence or proceeds of the aforementioned crimes.

k. On November 24, 2010 I observed in the vicinity of Target Premises 1 two vehicles – Target Vehicle 1 and Target Vehicle 2. I reviewed records from the New York State Department of Motor Vehicles which revealed that Target Vehicle 1 is owned by George Castro, 109 Admiral Lane, Bronx, New York, and Target Vehicle 2 is registered to IT Security Solutions at 115 East 57th Street, New York, NY. Based on the proximity of the vehicles to Target Premises 1, as well as the registration, I believe both vehicles are owned and operated by George Castro, and evidence of the above crimes may be found therein.

WHEREFORE, deponent respectfully requests that the court issue a warrant and order of seizure in the form annexed (i) authorizing a search of Target Premises 1 and 2 and Target Vehicle 1 and 2 and of the persons of George Castro and Denise Diaz, for the above described property, and (ii) directing that if such evidence is found, it be brought before the Court.

It is also requested that the Court specifically authorizes Law Enforcement to conduct the search in the manners as specifically requested in this affidavit.

No previous application has been made in this matter to any other Judge, Justice, or Magistrate.

Detective Jon Reid

Patty O'Connor
APPROVED: Assistant District Attorney

Sworn to before me this

Judge

921/10

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

IN THE NAME OF THE PEOPLE OF THE STATE OF NEW YORK
TO ANY POLICE OFFICER IN THE CITY OF NEW YORK

Proof by affidavit having been made this day before me by Jon Reid, Shield #113 of the

Investigations Division of the New York County District Attorney's Office, (i) that there is

reasonable cause to believe that certain property, to wit:

a.  Notes, photographs, forms, recordings and other records and documents, whether
contained on paper in handwriting, typed, photocopy or printed form, or stored on
computer printouts, or within computer storage media including, but not limited to,
hard drives, USB devices, flash cards and drives, magnetic tape, CD ROM's, disks,
diskettes, photo-optical devices, handheld computer devices, or any other medium,
of or related to:

(i) names, dates of birth, addresses, social security numbers, credit card
account numbers, debit card account numbers, and any and all other
personal identifying information as defined in P.L. §190.77;

(ii) accounts, subscriptions, permissions and any and all other arrangements
or agreements related to the usage of the internet, whether through internet
service providers or other means;

(iii) financial transfers derived from the possession of cash currency, money
orders, bank receipts, stocks, bonds, bills and any other financial receipts or
records that may be stored in computers, hard drives, USB devices, flash cards
and drives, magnetic tape, CD ROMs, disks, diskettes, photo-optical devices,
handheld computer devices or any other medium;

b.  Any documents or banking information including but not limited to any and all
account statements and transaction details from, related to, or between Columbia
University, Columbia Presbyterian Hospital, TD Bank, Sovereign Bank, Chase Bank,
First Bank of Omaha, ETrade, Capital One, George Castro, Denise Diaz, Walter L.
Stephens, Andre Mitchell, Jeremy Dieudonne, Dieudonne Partners, Cochise
Quinones, Rosalina Diaz, Julio Acosta, IT & Security Solutions LLC, and Ryan
Daelyn Technology Corp; currency, a safe, any container or lockbox that could
contain currency, clothing, receipts for goods and services and merchandise from the
following merchants, including but not limited to: Apple, PC Richards and Son,
Staples, and Home Depot.

g.  Any identification documents including, but not limited to, social security cards,

resident alien cards, passports, credit/debit cards and drivers' licenses, whether counterfeit or authentic;

c.  Electronic communication equipment including, but not limited to, telephone bases and handsets; cellular telephones; any device capable of sending or receiving electronic communication including, but not limited to, e-mail and text messages; answering machines; paging devices; related items to all such equipment including, but not limited to, auxiliary batteries, chargers, software and wiring; and any stored information, data, and images contained on or in said communication equipment including, but not limited to, stored names and numbers and recorded messages;

d.  Evidence of ownership and use of Target Premises 1 and 2 and the Target Vehicles 1 and 2, or the use of property located therein by any person, including, but not limited to, keys, telephone bills, bank statements, leases, deeds, or rent receipts related to the Target Premises or other documents bearing the address of either George Castro, Denise Diaz or the Target Premises 1 and 2 and the Target Vehicles 1 and 2, identification bearing the name or photograph of any person, telephone books, address books, date books, calendars, or personal papers.

e.  Any and all financial documentation, including, but not limited to, statements for bank accounts, credit or debit cards, checks (blank or fully- or partially-completed), or credit reports in any name, or any other documentation bearing, or associated with, the name Columbia University, Columbia Presbyterian Hospital, TD Bank, Sovereign Bank, Chase Bank, First Bank of Omaha, E*Trade, Capital One, George Castro, Denise Diaz, Walter L. Stephens, Andre Mitchell, Jeremy Dieudonne, Dieudonne Partners, Cochise Quinones, Rosalina Diaz and Julio Acosta, IT & Security Solutions LLC, and Ryan Daelyn Technology Corp.

may be found at 109 Admiral Lane, a single family home with two floors, Bronx, New York

("Target Premises 1"), or on the persons of George Colon or Denise Diaz if present therein, and

(ii) there is reasonable cause to believe that the above-described property constitutes evidence and

tends to demonstrate that an offense was committed, that a particular person participated in the

commission of such offense, and has been used, or is possessed for the purpose of being used, to

commit or conceal the commission of an offense,

YOU ARE THEREFORE COMMANDED, between 6:00 a.m. and 9:00 p.m., to enter and

to search Target Premises 1, and the persons of George Colon or Denise Diaz, if present therein, for

the above described property, and if you find such property or any part thereof to bring it before the

Court without unnecessary delay.

Further, this Court authorizes law enforcement personnel to videotape and photograph the interior of Target Premises 1; to process Target Premises 1 for fingerprints; and to analyze, test, and in any way scientifically process Target Premises 1 and all the items seized.

Additionally, with respect to the stored electronic communications, data, information and images contained in electronic communication equipment, computer disks, CD ROMs and hard drives, and other data storage devices and media described above, this Court authorizes that such stored electronic communications, data, information and images may be reproduced by printing or converting or copying them into storage in another device.

It is specifically authorized that the search of any electronic communication equipment, computers and computer related equipment will be deemed executed at the time those devices' hard drive(s) or storage devices have been seized, and that further analysis of these items may be undertaken at any time thereafter.

It is specifically authorized that any computer(s), cellular telephone(s), electronic communication device(s) and related equipment may be seized and removed for off-site examination.

This warrant must be executed within 10 days of the date of issuance.

_____
Judge of the Supreme Court

**Hon. C. Berkman**

PT. 71   NOV 2 4 2010

Dated: New York, New York

11/24/10
1:10 pm



ORIGINAL                                    1

1

2      UNITED STATES DISTRICT COURT
       SOUTHERN DISTRICT OF NEW YORK
3      ----------------------------------------X

       DENISE DIAZ,
4
                                    PLAINTIFF,
5
                 -against-          Case No.:
6                                   13CV8281

7      CITY OF NEW YORK, JOSE FLORES, individually
       and in his official capacity as
8      Investigator for the New York County
       District Attorney's Office, JOHN DOE 1,
9      individually and in his official capacity
       as Police Officer in the NYPD and JOHN DOE
10     2, individually and in his official
       capacity as an Officer in the NYPD or the
11     New York County District Attorney's Office,

12                                  DEFENDANTS.
       ----------------------------------------X
13

14                      DATE:  August 6, 2015

15                      TIME:  10:15 A.M.

16

17              DEPOSITION of the Plaintiff,

18     DENISE DIAZ, taken by the Defendants,

19     pursuant to a Court Order and to the

20     Federal Rules of Civil Procedure, held at

21     the office of New York County District

22     Attorney's Office, 80 Centre Street, New

23     York, New York 10013, before Gary Merola, a

24     Notary Public of the State of New York.

25

```
 1

 2     A P P E A R A N C E S:

 3

 4     RICARDO A. AGUIRRE, ESQ.
         Attorney for the Plaintiff
 5       DENISE DIAZ
         644 Soundview Avenue, Suite G
 6       Bronx, New York 10473
         BY:  RICARDO A. AGUIRRE, ESQ.
 7

 8

       NEW YORK COUNTY DISTRICT ATTORNEY'S
 9     OFFICE
         Attorney for the Defendants
10       CITY OF NEW YORK, JOSE FLORES,
         individually and in his official capacity
11       as Investigator for the New York County
         District Attorney's Office, JOHN DOE 1,
12       individually and in his official capacity
         as Police Officer in the NYPD and JOHN
13       DOE 2, individually and in his official
         capacity as an Officer in the NYPD or the
14       New York County District Attorney's
         Office
15       80 Centre Street
         New York, New York 10013
16       BY:  ELIZABETH N. KRASNOW, ESQ.
                    -and-
17            PATRICIA J. BAILEY, ESQ.

18

19                *         *         *

20

21

22

23

24

25
```

```
1                       D. DIAZ
2      tell you right now.  I was assigned to the
3      40th Precinct.  In 2004, it may have been
4      somewhere in the fall was in the evidence
5      collection, Bronx evidence collection and I
6      left there in 2009, March of 2009.
7           Q.    What is that?
8           A.    I was promoted to sergeant in
9      March 2009.  And 2009 I was assigned to the
10     24th Precinct.  November 2010, I was
11     modified and placed at Viper 6.
12          Q.    Did there come a time when you
13     were moved from Viper?
14          A.    At one point Viper was now all
15     three Vipers into one on Frederick Douglas
16     Boulevard.  Right now I cannot recall the
17     year.  But I know in July 2012 or 2013 I
18     was assigned to -- it was the same Viper,
19     it just moved to another building.
20          Q.    Did there come a time when you
21     were taken out of Viper entirely or are you
22     still in Viper?
23          A.    March 2014 I was taken out of
24     Viper, no charges, no time taken and
25     assigned back to full duty at the 49th
```

```
 1                      D. DIAZ
 2        Q.    And then in March 2009, you
 3   were promoted to sergeant?
 4        A.    Correct.
 5        Q.    When you were promoted to
 6   sergeant, does that require that you move
 7   commands?
 8        A.    Yes.
 9        Q.    So, at that point you moved to
10   the 24th Precinct?
11        A.    Correct.
12        Q.    What were your responsibilities
13   as a sergeant within the 24th Precinct?
14        A.    I was a patrol supervisor.
15        Q.    What does that entail?
16        A.    I am in charge of the platoon
17   outside in the field.  I respond to any
18   serious crimes, burglaries, emergencies.
19        Q.    As a sergeant, do you verify
20   arrests?
21        A.    I verify arrests, I'm in charge
22   of the squads.  As I said before, I respond
23   to anything that is serious emergencies
24   which an arrest would constitute that, a
25   police officer hurt, a crime scene.
```

```
 1                    D. DIAZ
 2        Q.    To your knowledge, what was the
 3   result of the investigation?
 4        A.    Unsubstantiated to my
 5   knowledge, but I never mentioned that to
 6   you.
 7        Q.    I'm sorry, I thought you did.
 8        A.    Never.
 9        Q.    As a result of the
10   investigation concluding that is when you
11   were restored to full duty, right?
12        A.    Correct.
13        Q.    So you are familiar with IAB,
14   correct?
15        A.    Yes.
16        Q.    What is your understanding of
17   the purpose of IAB?
18        A.    Internal Affairs Bureau is
19   there to investigate allegations.  It can
20   be allegations of corruption, it can be
21   allegations of sexual assault, domestic
22   violence.  Allegations in itself.
23        Q.    Allegations against who?
24        A.    The officer.
25        Q.    Police officer?
```

```
 1                    D. DIAZ
 2         A.     Any member of the department.
 3    It can be a civilian also.
 4         Q.     Sergeant, would you agree that
 5    it's important for the NYPD to have an
 6    internal mechanism to investigate its
 7    officers?
 8         A.     Yes.
 9         Q.     For example, the NYPD received
10    information that an officer was fixing
11    tickets.
12                Would you think it is important
13    for the department to investigate that
14    officer?
15         A.     Yes.
16         Q.     Have you ever been a witness in
17    connection with a complaint that was
18    against another police officer that was
19    investigated by IAB?
20         A.     Not that I recall, ma'am.
21         Q.     Do you recall at the Viper Unit
22    being involved with an incident with an
23    officer by the name of Shwantey Smith?
24         A.     Yes.
25         Q.     So you recall being part of the
```

1                         D. DIAZ

2          A.    The missing jewelry allegation

3     and that was unsubstantiated and the George

4     Castro incident with Deborah Walker which

5     was unsubstantiated.   It was three

6     incidents that I saw there.

7          Q.    Sergeant Diaz, I think we spoke

8     briefly before about RDOs.

9                Do you recall that?

10         A.    Yes.

11         Q.    What does RDO stand for?

12         A.    Regular day off.

13         Q.    That is a NYPD term?

14         A.    Yes.

15         Q.    To denote a date that an

16    officer does not have to report to work?

17         A.    Correct.

18         Q.    What is tour?

19         A.    Tour is the tour that you're

20    working.  Your actual hours.

21         Q.    So, that is another NYPD term,

22    correct?

23         A.    Correct.

24         Q.    And a tour is normally seven

25    hours; is that right?

```
1                        D. DIAZ
2          A.    No.
3          Q.    How long is a tour?
4          A.    For a sergeant it is eight
5     hours and fifty-seven minutes.  A regular
6     on duty sergeant.  Not an administrative,
7     not a modified.  A regular duty sergeant.
8          Q.    What about a modified sergeant?
9          A.    Eight hours and twenty-three
10    minutes.
11         Q.    What about a regular patrol
12    officer?
13         A.    Eight hours and
14    thirty-five minutes.
15         Q.    As of November 24, 2010, would
16    you have been considered a regular sergeant
17    with a tour of eight hours and
18    fifty-seven minutes?
19         A.    No.
20         Q.    What was your tour?
21         A.    823s.
22         Q.    So, that was after you were
23    modified, right?
24         A.    Once I was modified, yes.
25         Q.    Before you were modified was
```

```
 1                      D. DIAZ
 2    your tour eight hours and
 3    fifty-seven minutes?
 4          A.    Yes.
 5          Q.    In November 2010, before you
 6    were modified did you have regular RDOs?
 7          A.    Yes.
 8          Q.    What were your RDOs?
 9          A.    I do not know.  There is a
10    chart.  You would have to go back and look.
11    I was assigned to, I can't recall my squad
12    and they rotated my days off.
13          Q.    So, your RDOs rotated then?
14          A.    Correct.
15          Q.    What document would that be
16    reflected in, if I wanted to go look?
17    Would it be in the roll call for the 24th
18    Precinct if I wanted to know what your
19    tours were for that month?
20          A.    You would have to get in touch
21    with the Department.  I don't know.
22          Q.    You don't keep track of your
23    tours?
24          A.    No, I don't.
25          Q.    You go to roll call before you
```

                         D. DIAZ

1

2          Q.     And does that document have the

3    tour hours on them?

4          A.     It does.  I go through the list

5    of who has patrol.  Not everyone on the

6    roll call.  Everyone in the command is

7    listed on the roll call.  I just go to

8    wherever is patrol functions.  I'm not

9    concerned with everyone else.

10         Q.     And that document that you are

11   looking at, does that have the hours of the

12   tour?

13         A.     Yes.

14         Q.     Would your name be listed on

15   that document as well as the supervisor?

16         A.     Yes.

17         Q.     In November 2010, before you

18   were modified, on days that you were

19   working, did you work the same hours each

20   day?

21         A.     My hours can change.  I could

22   have had a detail.  I could have had to

23   cover another tour.  But before I was

24   modified I was out sick.

25         Q.     So, before you went out sick.

```
1                       D. DIAZ

2     around the clock then?

3          A.    Correct.

4          Q.    And I believe you already

5     testified that the Police Department could

6     change your tour?

7          A.    On any day, yes.

8          Q.    Could they also change your

9     RDO?

10         A.    The needs of the Department.

11    They did do what they want.

12         Q.    If something went on like say

13    an event, the marathon, New Year's Eve, the

14    Police Department could change officer's

15    tours or change their RDOs to ensure that

16    enough officers are on duty, correct?

17         A.    Correct.

18         Q.    When an officer is told to

19    report to work on his or her RDO, is that

20    officer paid overtime?

21         A.    Yes.

22         Q.    And similarly, if an officer is

23    told to work beyond their regularly

24    scheduled tour, do they also receive

25    overtime?
```

```
1                    D. DIAZ
2         A.    No.
3         Q.    Sergeant Diaz, you are familiar
4    with an individual named George Castro,
5    correct?
6         A.    Yes.
7         Q.    What is the nature of your
8    relationship with Mr. Castro?
9         A.    Mr. Castro is the father of my
10   children.
11        Q.    Did you ever consider yourself
12   to be in a common law marriage with Mr.
13   Castro?
14        A.    Yes.
15        Q.    What is your understanding of a
16   common law marriage?
17        A.    My understanding is, the NYPD's
18   understanding when you have children and
19   you live in the same household you are
20   considered common law.
21        Q.    Is it your understanding that
22   the couple has to live together for a
23   certain period of time before they would be
24   considered common law husband and wife or
25   just the fact that they have children and
```

```
1                      D. DIAZ
2    live together?
3         A.     The fact that they have
4    children and live together.
5         Q.     And you mentioned that that's
6    the NYPD's definition of a common law
7    marriage as well?
8         A.     That is what my understanding
9    is, yes.
10        Q.     What is that understanding
11   based on?
12        A.     What the NYPD has informed us.
13        Q.     Did you see that written down
14   anywhere?
15        A.     It's written.  You can find
16   that in the patrol guide.  It's the NYPD
17   expanded definition.
18        Q.     Do you recall reading the
19   definition of a common law marriage in the
20   patrol guide yourself?
21        A.     Yes.
22        Q.     When is the last time you
23   reviewed that section?
24        A.     Sometime last year when I
25   studied for the test.
```

```
1                        D. DIAZ
2        Q.     When did you first meet Mr.
3   Castro?
4        A.     Sometime in 1998.
5        Q.     Under what circumstances did
6   you meet him?
7        A.     I met him on my job.
8        Q.     While you were working?
9        A.     Yes.
10        Q.     And where were you working at
11   the time?
12        A.     At the hub, 149th Street.
13        Q.     How did you come to meet Mr.
14   Castro?
15        A.     He used to go inside one of the
16   stores that I would speak to the merchants
17   frequently.
18        Q.     And at some point did you start
19   dating Mr. Castro?
20        A.     Yes.
21        Q.     How long was that after you
22   first met him?
23        A.     Sometime in 1999.  I'm sorry, I
24   met Castro in 1999.  And then sometime
25   after I started dating him.
```

```
1                    D. DIAZ
2        Q.    Do you remember how much time
3   passed between when you first met him and
4   you started dating?
5        A.    The end of '99, early 2000.  I
6   don't know.
7        Q.    Where was Mr. Castro living
8   when you first met him?
9        A.    2160 Seward Avenue.
10       Q.    Who did he live with at the
11  time, if anyone?
12       A.    That I know of, his mother.
13       Q.    At what point did you consider
14  Mr. Castro to be your common law husband,
15  what year was that?
16       A.    2001.  Well, actually 2002 when
17  I gave birth to my son R███.
18       Q.    At that point were you and Mr.
19  Castro living together?
20       A.    Yes.
21       Q.    Where were you living?
22       A.    181 West 238th Street,
23  apartment 52.  In the Bronx.
24       Q.    When did you first move in with
25  Mr. Castro?
```

```
 1                    D. DIAZ
 2         A.    He moved in with me.  That was
 3   my residence.  After I was pregnant with
 4   Ryan.  Exactly what month he moved in, I
 5   don't know.
 6         Q.    And R███ is your oldest child?
 7         A.    Yes.
 8         Q.    Did there come a time that you
 9   ended your relationship with Mr. Castro?
10         A.    Yes.
11         Q.    When was that?
12         A.    Sometime in 2008.  After
13   Deborah Walker, there was a lot of
14   bickering and to find out that he was
15   actually previously married and there was
16   other children, we decided to go our
17   separate ways.
18              Mr. Castro stayed in the house
19   for the sake of G█████ and R██.  Then in
20   2009 August we got into a very big fight
21   and that's when I took his things out of
22   the house and he left.
23         Q.    2009 August or 2010 August?
24         A.    I'm sorry, 2010.
25         Q.    That's okay.  You mentioned
```

D. DIAZ

2    that there was a large fight in August of

3    2010 that precipitated Mr. Castro moving

4    out?

5        A.    Yes.

6        Q.    What was that fight about?

7        A.    Maybe about a week ago I saw,

8    he stopped by, we had, I thought it was an

9    iPad, so I went out the night before and we

10   slept in separate rooms, but for some

11   apparent reason he must have put the phone

12   in his drawer.

13            His drawer was in my room and I

14   hear a phone.  So, it wasn't my ringer.

15   So, I get up and I, I get up from my bed,

16   it was in the morning and I discovered the

17   phone that I thought was an iPod was

18   actually an iPhone.

19            When I saw the name it was

20   Deborah Walker calling him.  So, how was it

21   that Deborah Walker had your number and I

22   didn't and that's what started the whole

23   fight.

24        Q.    You testified earlier that you

25   first started having problems with Mr.

1                    D. DIAZ

2    Castro in 2008, right?

3        A.    No. With the problems with

4    Deborah Walker, whatever date she called on

5    me and I called, that's when the problems

6    originated from that point.  And they

7    continued on.

8              Until finally Mr. Castro and I

9    had separate lives.  He was there, he slept

10   in Gabriel's room and I slept in my room.

11       Q.    And when you say there, you are

12   referring to the house?

13       A.    To 109 Admiral Lane.

14       Q.    Over what period of time did

15   you live together a 109 Admiral Lane, but

16   lived separate lives was as you described,

17   for how many years?

18       A.    Somewhere the ending of 2008

19   into 2009.  It was fast.  Because we just

20   couldn't get along.  Everything was a

21   fight.

22            Deborah Walker continued with

23   wanting for her son to come over and then I

24   found out that he was actually married once

25   before and it was more children.  I just

1                        D. DIAZ

2      didn't want to be involved with any of

3      that.

4           Q.     During that time period that

5      you were living together at 109 Admiral

6      Lane, but you considered yourself

7      separated, did you still consider him to be

8      your common law husband?

9           A.     No.  He was my children's

10     father.

11          Q.     Were you in a relationship with

12     Mr. Castro continuously from when you first

13     started dating and I believe you said it

14     was some point in 2000 until you began to

15     lead separate lives around 2008?

16          A.     Yes.

17          Q.     You testified earlier that the

18     first time that you lived with Mr. Castro

19     is when he moved in with you to the

20     apartment at 181 West 238th Street,

21     correct?

22          A.     Correct.

23          Q.     Did you live in any other

24     apartments or homes with Mr. Castro prior

25     to moving into the house at 109 Admiral

```
1                        D. DIAZ

2    Lane?

3        A.     Besides 182nd and Admiral Lane,

4    that is it, two residence.  182 and 109

5    Admiral Lane.  Nowhere else.

6               Well, I did move once for about

7    four days and then I moved back into 181

8    West 238th Street.  I can't even recall.

9    It was somewhere in Parkchester.  I had

10   gotten a ground apartment and I moved in on

11   a Friday and I moved out on a Monday.  So,

12   I don't consider that.  They gave me back

13   my money and everything.

14       Q.     When you were living with Mr.

15   Castro at apartment at 181 West 238th

16   Street, did you rent or own?

17       A.     I rented.

18       Q.     Who paid the rent?

19       A.     I did.

20       Q.     Did Mr. Castro contribute to

21   the rent?

22       A.     No, he contributed to the

23   household.

24       Q.     In what manner did he

25   contribute to the household?
```

                        D. DIAZ
2          A.      There was food, the light bill,
3     the phone bill, the cable.  My rent wasn't
4     much.
5          Q.      Approximately how much was the
6     rent?
7          A.      It was in the five hundreds.
8          Q.      High five hundreds, low 500?
9          A.      520, 530.
10          Q.      For how many years did you live
11     there?
12          A.      A couple of years.  I started
13     in that apartment in 1996.  Until I
14     purchased Admiral Lane.
15          Q.      When was that?
16          A.      2003.  November 2003.
17          Q.      Between 1996 and 2003, did your
18     rent go up at all?
19          A.      I started out actually at 425
20     or 450 and my final rent was probably 520,
21     530.
22          Q.      You testified earlier that Mr.
23     Castro contributed to household expenses,
24     correct?
25          A.      Correct.

                         D. DIAZ

1

2        Q.      And over the course of the time

3   that you lived in the house, did you make

4   periodic payments to your mortgage?

5        A.      Yes.

6        Q.      Did Mr. Castro ever contribute

7   towards these payments?

8        A.      No.

9        Q.      And to date, I think you

10  already testified that you still live at

11  the 109 Admiral Lane address, right?

12       A.      Correct.

13       Q.      And has your mortgage been paid

14  off in full?

15       A.      Yes.

16       Q.      When did you make the last

17  payment on the mortgage?

18       A.      I don't know the date.  I would

19  have to look at it.  I couldn't tell you

20  off the top of my head.

21       Q.      Was it before or after Mr.

22  Castro was arrested on November 24, 2010?

23       A.      It was before.

24       Q.      To your knowledge, what is Mr.

25  Castro's educational background?

1                    D. DIAZ

2          Q.    And the other period of time

3    that you can recall when Mr. Castro was not

4    working?

5          A.    No.

6          Q.    Over the course of time that

7    you spent with Mr. Castro, did he have the

8    same job?

9          A.    What do you mean by the same

10   job?

11         Q.    You were together with him for

12   several years, correct?

13         A.    Yes.

14         Q.    And he was self-employed for

15   that entire period?

16         A.    Correct.

17         Q.    What was your understanding of

18   the nature of his work?

19         A.    Surveillance cameras, alarm

20   systems, magnetic doors.

21         Q.    So, he was working in security

22   then?

23         A.    Correct.

24         Q.    Was it your understanding that

25   he had his own company?

```
1                    D. DIAZ
2        A.    Yes.
3        Q.    What was the name of that
4   company?
5        A.    When I met him R███ Daylen.
6        Q.    Do you mind spelling Daylen?
7        A.    I believe it is D-A-Y-L-E-N.
8        Q.    Did the name change at some
9   point?
10        A.    It did because part of the
11   argument was that Deborah Walker stated
12   that Daylen was her son's middle name.  So,
13   that is the reason the problems started and
14   that's why it changed then to IT Security.
15             R███ is my son's name and then
16   Daylen is the other one that he never said
17   that he had.
18        Q.    When did he change the name?
19        A.    I don't know.
20        Q.    So, for the whole time that you
21   were together it was your understanding
22   that he was self-employed in the security
23   business, correct?
24        A.    Correct.
25        Q.    What is your understanding of
```

```
 1                    D. DIAZ
 2    the specific nature of his business?
 3              So, for example, did he
 4    manufacture surveillance cameras and
 5    magnetic doors, did he install surveillance
 6    cameras and magnetic doors?
 7         A.    Installation of security
 8    features.
 9         Q.    Did he have any business
10    partners that you know of?
11         A.    Not that I know of.
12         Q.    Did he have an office that he
13    worked out of?
14         A.    At the time I didn't know.  I
15    found out after the trial for him to have
16    an office, no, he worked out of the home.
17         Q.    He worked out of your home?
18         A.    Yes.
19         Q.    Did he have a computer that he
20    would use?
21         A.    His laptop or the house
22    computer.
23         Q.    Did you share the house
24    computer with him?
25         A.    I really don't go on computers.
```

1                   D. DIAZ

2    If he used a computer, it was to print out

3    something.  He would use his laptop and

4    then use the computer.  I really didn't go

5    on computers.  So, it was just basically

6    his computer.

7         Q.    Who purchased the computer?

8         A.    Well, the first one he did.

9    The second one I did because once R████

10   started growing up, there were certain

11   projects that he needed to do so I

12   purchased it.

13        Q.    When you purchased the second

14   computer, did you get rid of the first

15   computer or did you keep it?

16        A.    George got rid of it.  I

17   didn't.

18        Q.    And would George use the

19   computer that you had purchased for his own

20   business purposes?

21        A.    He wasn't there long once I

22   purchased that computer.  So, if he went on

23   it when I wasn't there I couldn't tell you.

24        Q.    As far as you are aware, what

25   would Mr. Castro earn on an annual basis

```
 1                      D. DIAZ
 2          Q.    What do you mean the security
 3     business is against NYPD?
 4          A.    It is in the patrol guide.  If
 5     you want off-duty employment, installing
 6     burglar alarms, you are not authorized
 7     anywhere.  Knowing that he installed
 8     burglar alarms, magnetic doors, I just
 9     didn't want no part of it.  That was his
10     business, it is how I met him, it is my
11     children's father.  I can't tell him to
12     change.
13                As long as I had no dealings
14     with his business that is all that
15     mattered.
16          Q.    Does the patrol guide say
17     anything about, whether or not, an officer
18     can date or be married to individuals who
19     are in the security business or does it say
20     that the officers themselves can't work in
21     the security business outside of their
22     employment with NYPD?
23          A.    It says the officers cannot
24     work in installing burglar alarms or a
25     locksmith.  There is a whole list.  So
```

```
1                         D. DIAZ
2      since burglar alarms are on there and that
3      is what he did.  I just didn't involved in
4      his business period.
5               George took care of his own
6      business.  Another thing, George never
7      allowed for me to know anything of what he
8      was doing.  He was very adamant about that.
9           Q.    What do you mean anything about
10     what he was doing?
11          A.    He didn't like for me to look
12     at any papers, to ask questions.
13          Q.    What type of papers would he
14     try to keep away from you?
15          A.    I never even saw a tax return.
16     I don't know if he filed at my address.  I
17     don't know if he used someone else's
18     address.  I don't know what income he
19     reported.  I don't know whether he got back
20     a return, nothing.
21          Q.    How did that make you feel?
22          A.    Honestly, it didn't bother me
23     because he didn't know anything about me.
24     I kept my business, my papers, everything.
25               When I purchased my place, I
```

1                          D. DIAZ

2      did it on my own.  He didn't know that I

3      was buying anything.  Until the last day

4      when I took him with me.

5          Q.     When you bought the house at

6      Admiral Lane?

7          A.     When I bought the house on

8      Admiral Lane.

9          Q.     Did he ever ask you how much

10     you were making with your job at NYPD?

11         A.     No.

12         Q.     So, you never talked about each

13     other's finances, ever?

14         A.     No.

15         Q.     You testified earlier, I

16     believe that you have two children with

17     him?

18         A.     Correct.

19         Q.     The oldest is R█████?

20         A.     Correct.

21         Q.     And he was born in 2002?

22         A.     March 30, 2002.

23         Q.     And then your second child was

24     a daughter, correct?

25         A.     G█████████.

```
1                      D. DIAZ

2         Q.      When was she born?

3         A.      December 5th of '06.

4         Q.      After your children were born,

5    did Mr. Castro contribute financially to

6    your family?

7         A.      Yes.

8         Q.      In what manner?

9         A.      The minimum he would give me a

10   month, if it was a slow month was 800 to

11   $1,000.

12        Q.      Would he write you a check or

13   would he give you cash?

14        A.      Cash.

15        Q.      And you would then deposit it

16   in your personal bank account?

17        A.      No, I would pay the lights, the

18   food, whatever was needed in the household.

19        Q.      So, besides the lights and the

20   food, what else would you use the cash that

21   Mr. Castro would give you each month to

22   purchase?

23        A.      Diapers.  I had two children.

24   So the cable bill, whatever had to be paid.

25        Q.      Did the money that Mr. Castro
```

                            D. DIAZ

1
2    So I would just pay it out.

3        Q.    I think you just testified the

4    most he ever gave you at one time was five

5    thousand dollars?

6        A.    Yes.

7        Q.    Did you keep any records of the

8    money that he was giving you?

9        A.    No.

10       Q.    So, you didn't consider that to

11   be income?

12       A.    No, he already in the

13   household.  How can it be income.  It is

14   expenses.

15       Q.    Did you understand it to be

16   income from his job?

17       A.    Yes.

18       Q.    You testified earlier that Mr.

19   Castro had other children besides R██ and

20   G█████, that there were other woman?

21       A.    Correct.

22       Q.    How many other children did he

23   have?

24       A.    I believe four.

25       Q.    Were they all with the same

```
 1                      D. DIAZ

 2     woman?

 3          A.    No.

 4          Q.    But one of them at least is

 5     with Deborah Walker?

 6          A.    Yes.

 7          Q.    How many children did Mr.

 8     Castro have with Deborah Walker?

 9          A.    One.

10          Q.    Did you testify earlier that

11     child's name was Daylen?

12          A.    His first name is George also.

13     George Daylen.

14          Q.    And what about Mr. Castro's

15     other three children, who are their mother

16     or mothers?

17          A.    One of them was a SBA in the

18     NYPD in the 49th.  Her name is Kimberly.

19     Her last name, I don't know.  She is the

20     eldest.

21          Q.    What is an SBA?

22          A.    A senior police administrative

23     assistant.

24          Q.    That is not a uniform member of

25     service?
```

```
1                         D. DIAZ
2     true.  It is a misunderstanding.  I'll fix
3     it.  I waited for him to leave and he had a
4     bag in Gabriella's room with a lot of
5     papers and that's when I discovered the
6     divorce papers there.
7          Q.   Did you confront him with the
8     fact that he had previously been married?
9          A.   Yes, I confronted him and he
10    was irate that I went through his things
11    and that is when we started fighting.
12         Q.   So you didn't acknowledge that
13    it was wrong for him to have lied to you?
14         A.   No, to him it was okay to lie
15    to him.  I was wrong for going through his
16    personal papers.
17         Q.   Did he specifically lie to you
18    about how many children he had, right?
19         A.   Yes.
20         Q.   And he specifically lied to you
21    about, whether or not, he had been married
22    before, right?
23         A.   Correct.
24         Q.   You mentioned earlier that you
25    found a letter that he had paid to pay the
```

```
 1                      D. DIAZ
 2            a discrepancy.  She needs to refresh
 3            her recollection about an interview
 4            she had with one of your colleagues.
 5            Q.    Sergeant Diaz, do you remember
 6     who paid the bill?
 7            A.    No, I don't remember any more.
 8            Q.    Sergeant Diaz, I'm directing
 9     your attention to November 24, 2010, right?
10            A.    Yes.
11            Q.    And that's the date that Mr.
12     Castro was arrested for stealing millions
13     of dollars from Columbia University,
14     correct?
15            A.    That was the day he was
16     arrested.  What he was arrested for that
17     day I do not know.  So, that was the day he
18     was arrested, yes.
19            Q.    As you sit here today, do you
20     know what he was charged with?
21            A.    Yeah, I learned that after he
22     was charged with grand larceny, money
23     laundry and the other charge, I don't know.
24            Q.    And the charges arose from the
25     alleged thefts of millions of dollars from
```

1                         D. DIAZ

2     the Columbia University, correct?

3          A.     Correct.

4          Q.     And Mr. Castro is arrested

5     outside your home on Admiral Lane; is that

6     right?

7          A.     He was arrested a couple of

8     homes down, a couple of doors down from

9     where I lived at.

10         Q.     Do you recall what day of the

11    week November 24, 2010 was?

12         A.     It was a weekday.  What day

13    exactly, I don't know.

14         Q.     As of that date you were a

15    sergeant with the NYPD, correct?

16         A.     Yes.

17         Q.     And you were assigned to the

18    24th Precinct, correct?

19         A.     Yes.

20         Q.     What was your shield number in

21    November of 2010?

22         A.     1179.

23         Q.     Does the shield number change

24    over the course of a police officer's

25    career?

1                    D. DIAZ

2          A.      As a police officer you are

3    assigned one shield.  A sergeant you are

4    assigned a new shield.  As a lieutenant

5    there is no shield number, just a shield

6    and a captain is just a shield.  There are

7    no more numbers.

8          Q.      So, the 1179 number you were

9    assigned, is that when you were promoted to

10   sergeant?

11         A.      Yes.

12         Q.      And your house on Admiral Lane,

13   that is within the confines of the 43rd

14   Precinct, correct?

15         A.      Yes.

16         Q.      In the Bronx?

17         A.      Yes.

18         Q.      So the 43rd Precinct would be

19   considered your resident precinct, right?

20         A.      Yes.

21         Q.      And your 24th Precinct was your

22   assigned command, correct?

23         A.      Yes.

24         Q.      In November of 2010, what were

25   your RDOs?

1                    D. DIAZ

2         A.    I don't recall.  I was out

3    sick.

4         Q.    As of November 24, 2010, you

5    were out sick, correct?

6         A.    Prior to November 24, 2010, I

7    was out sick.

8         Q.    When did you go out sick?

9         A.    Sometime during the weekend.  I

10   went out sick from the hospital.  I was at

11   Westchester Square.

12        Q.    Let me show you something to

13   try and refresh your recollection and see

14   if that works.

15             MS. KRASNOW:  Mark this

16        document, please.

17             (Whereupon, the aforementioned

18        personnel profile report Bates stamp

19        D-315 to D-319 was marked as

20        Defendant(s)' Exhibit E for

21        identification as of this date by the

22        Reporter.)

23        Q.    Sergeant Diaz, I'm showing you

24   what has been marked as Exhibit E which is

25   your personnel profile report.  It is a

```
 1                    D. DIAZ
 2    document that was previously produced as
 3    D-315 through D-319.
 4              Please take a minute to review
 5    the document and let me know when you are
 6    done.
 7         A.    Okay.
 8         Q.    Have you had a chance to review
 9    the documents?
10         A.    Yes.
11         Q.    Sergeant, is there anything on
12    that document that refreshes your
13    recollection as to the date that you went
14    out sick in November of 2010?
15         A.    Yes.
16         Q.    Can you refer me to the page
17    and line that refreshes your recollection
18    and what the documents reflect?
19         A.    D-317 and on the top it has
20    11/20/2010 and 1135 hours.  That would be
21    the time that I went out sick.
22         Q.    Is there a difference between
23    going out sick and being on sick leave?
24         A.    It is the same thing, going
25    sick, being out sick.
```

1                          D. DIAZ

2          Q.     On this particular occasion on

3     November 2010, why were you on sick leave?

4          A.     I was at Westchester Square

5     Hospital with gastroenteritis, I stood in

6     the ER for a couple of hours.  I went sick

7     from the ER.

8          Q.     Could you just explain to me

9     how sick leave works within the NYPD?  For

10    example, do you have to request to be

11    placed on sick leave and then get a

12    doctor's note?  What is the procedure?

13         A.     You can request to go sick.

14    Regular sick is never defined.  That is

15    what I went regular sick.  I went sick from

16    the hospital, Westchester Square.

17               I was waiting for the duty

18    captain to come by to verify that I was

19    there.  I was discharged later on that

20    evening.  What time I don't know.  I was

21    given some type of medication.

22               A day later or a day or two

23    later I had to go back to the doctor.  I

24    had kidney stones.  So, they put me on

25    another painkiller and the medication they

```
1                    D. DIAZ
2     and myself.
3          Q.    And George Castro, I believe
4     you testified no longer lived there?
5          A.    Correct.
6          Q.    When he moved out of the house
7     at 109 Admiral Lane, where did he move?
8          A.    To my knowledge, his mother's
9     house, 1680 Monroe Avenue in the Bronx.
10         Q.    And that is a different address
11    then, I think it was something like Seward
12    Street that you gave earlier.
13         A.    The mother left Seward and she
14    moved over to Monroe.
15         Q.    So, 1680 Monroe in the Bronx?
16         A.    Apartment 2.  It was on the
17    second floor.
18         Q.    Was that close to your house at
19    190 Admiral Lane?
20         A.    No.
21         Q.    How far away was that if you
22    were driving, to get from point A to point
23    B?
24         A.    About twenty minutes,
25    twenty-five minutes.
```

```
 1                    D. DIAZ
 2          Q.     Did Mr. Castro spend the night
 3   at your house on November 13, 2010?
 4          A.     Yes, he did.
 5          Q.     Why did he spend the night?
 6          A.     Because I was out sick and I
 7   was on heavy medication and I had no one to
 8   take care of the kids.
 9          Q.     Between the time that Mr.
10   Castro moved out in August 2010 and the
11   November 24th incident that we are here to
12   talk about today, were there any other
13   nights besides November 23rd that he spent
14   the night at your house on Admiral Lane?
15          A.     Mr. Castro would stay, since I
16   work four to twelve, he would take care of
17   the children in the afternoon.  He picked
18   them up from where he had to.  It was after
19   school.
20                 R███ and G█████████ were at the
21   baby-sitter or both of them and then he
22   would take care of the kids in the
23   afternoon until I got home.  If I got stuck
24   on a job, a burglary and robbery, anything,
25   Mr. Castro would stay and then he would
```

1                    D. DIAZ

2     report to the medical division at such and

3     such time at such and such date.  That is

4     the end of it.

5          Q.    Before Mr. Castro left the

6     house on the morning of November 24th, did

7     you have any conversations with him?

8          A.    Not to my knowledge.  I was

9     upstairs.  I know he was going out to get

10    the car.  It was almost 8:00 and the kids

11    started school at 8:05.  We live

12    approximately five minutes from the school.

13         Q.    So, it was 8:00 that he left --

14         A.    No, it was before.  It was

15    almost.  It wasn't 8:00.  About 7:50-ish.

16    The kids, they start school at 8:05.

17               So, normally he would drop them

18    off at about 8:00.

19         Q.    So, at about 7:50 Mr. Castro

20    left to go get his car?

21         A.    Correct.

22         Q.    What car was he driving as of

23    November 24, 2010?

24         A.    He had a white car, an Audi.

25         Q.    When did he get that Audi?

```
1                     D. DIAZ
2          A.    Sometime in November.
3          Q.    So, earlier that month?
4          A.    Yes.
5          Q.    Do you know anything about the
6     circumstances surrounding the purchase of
7     that vehicle?
8          A.    To my knowledge the car was
9     leased.  Nothing about a purchase.
10         Q.    Did Mr. Castro tell you that he
11    had leased it?
12         A.    He was asking me questions
13    about leasing and that is what I assumed,
14    to my knowledge the car was leased. Mr.
15    Castro and I were no longer together so
16    there was no reason for me to review
17    anything or ask questions.
18         Q.    So, you don't know how much the
19    lease cost Mr. Castro?
20         A.    No.
21         Q.    Before that time had you ever
22    known Mr. Castro to have a car?
23         A.    He had his van.  When I met him
24    he had a car.
25         Q.    What car did he have when you
```

1                    D. DIAZ

2          A.    Right.  So, I just -- I'm not

3    sure this is his bag or not.  I thought it

4    was all black.  I never noticed blue.

5          Q.    But it looked similar to a ball

6    that you had seen him with before?

7          A.    Yes.

8          Q.    Do you know if Mr. Castro had

9    his backpack with him when he left the

10   house on November 24th?

11         A.    No.

12         Q.    What happened after Mr. Castro

13   left the house?

14         A.    I know Mr. Castro left because

15   I heard the door slam.  I was in

16   G██████'s room in the back getting

17   something for G██████ before we left.

18         I hear a lot of commotion, but

19   I didn't think anything of it.  But

20   Gabriella's room is way back and for me to

21   hear like some yelling going on, I couldn't

22   hear what it was.

23         So, I just came down and now I

24   see G██████ looking out the window.  Our

25   windows face the street.  So, I decided, I

```
 1                    D. DIAZ
 2    said maybe somebody got hit by a car.  This
 3    is me thinking.
 4                When I look out, maybe three
 5    doors down I see a line of cars.  I see
 6    someone detaining Mr. Castro.  And I see
 7    them sort of struggling.  I went outside
 8    with no shoes.  I had on my socks.
 9         Q.    If it is okay can I stop you
10    there and just follow up on some details of
11    what you have already testified to and then
12    we will talk about what happened after you
13    went outside.
14         A.    Sure.
15         Q.    You mentioned that you heard a
16    commotion; right?
17         A.    Yes.
18         Q.    Could you hear anything
19    specifically that was being said while you
20    were inside the house?
21         A.    Something to, "ma, ma", and I
22    kept hearing that over and over.
23         Q.    Did Mr. Castro call you that?
24         A.    Yes, because the kids call me
25    ma.  So, it was known to call me ma.  He
```

                         D. DIAZ

1

2   wouldn't call me Denise.

3        Q.   So, you heard Mr. Castro

4   calling for you, "ma, ma", correct?

5        A.   Yes.

6        Q.   And you look out the window and

7   you saw a line of cars you mentioned?

8        A.   G█████████ was looking out the

9   window.  This is my window and my door is

10  next to.  So, I opened to see what was

11  going on and when I looked outside I saw

12  the line of cars along Mr. Castro and I see

13  them holding him.  He is fighting them.

14       Q.   The window that your daughter

15  was looking out of, was that on the second

16  floor or the first floor?

17       A.   The first floor next to the

18  entrance door, it is three-pane window.

19       Q.   You went to the door at which

20  point you saw a line of cars, correct?

21       A.   The minute I opened the door

22  everything was.

23            MR. AGUIRRE:  What?

24       A.   Was there.  You saw the line of

25  cars as I looked.  This is my front window.

```
1                    D. DIAZ
2    jeep, were there other cars there?
3         A.    There were other cars there.
4    Did I take notice of the color, no, I
5    didn't.
6         Q.    You open the door and you see
7    someone detaining George, right?
8         A.    Yes.
9         Q.    What did the individual look
10   like who was detaining George?
11        A.    Male white.  Kind of heavyset.
12   Between five-seven and five-nine, white
13   blondish hair.
14        Q.    Did you come to learn this
15   person's name?
16        A.    Yes, I did.
17        Q.    What is his name?
18        A.    Detective Wigdor.
19        Q.    How did you come to learn his
20   name?
21        A.    I went over to the scene.  I
22   said what's going on.  And then the
23   detective said mind your business, this has
24   nothing to do with you, go back.
25        Q.    Wigdor said that to you?
```

                              D. DIAZ

1

2        A.      Yes.

3        Q.      What happened?

4        A.      I said no, that my children's

5    father, I'm a New York City police officer

6    and I want to know what is going on.

7              When I said that he looked at

8    me in disbelief.  He said where is your

9    I.D.  My I.D. is back in my house.  My

10   purse was hanging on the door because I was

11   already going to the surgeon.  So, I go

12   with Wigdor and myself we go back in.

13       Q.      Into your house?

14       A.      Into my house.  And I show him

15   my I.D.

16       Q.      You mentioned that Mr. Castro

17   was resisting arrest, correct or he was

18   struggling with Wigdor?

19       A.      Mr. Castro was like get off of

20   me, what is going on.  I couldn't hear the

21   whole conversation.  It was just a couple

22   of doors down when I ran out.

23              As Wigdor is trying to speak to

24   him I want to know what is going on and

25   that's when he told me mind your business,

1                    D. DIAZ

2          A.    He is a male black.  Medium

3     complexion.  About five-eight, five-nine, a

4     slim build.

5          Q.    What about Investigator

6     Figeroa?

7          A.    He was my complexion.

8          Q.    How would you describe that

9     though?

10         A.    She is light brown, black hair,

11    she is about my height, five-five.

12         Q.    What about build?

13         A.    Like a small to medium frame.

14         Q.    You said when you went inside

15    to get your I.D., did any other law

16    enforcement personnel come with you besides

17    Wigdor?

18         A.    At first it was just Wigdor and

19    myself.

20         Q.    So, what happened after you and

21    Wigdor got inside the house?

22         A.    I showed him my I.D.  I asked

23    him what's going on.  After showing him my

24    I.D., I don't know if he called the DA

25    after.  He said something oh, shit, we got

```
 1                      D. DIAZ
 2     a cop.
 3          Q.     Who did he say that to?
 4          A.     When he looked at my I.D. he
 5     got on the phone.  On the other line he was
 6     talking to Patricia O'Connor.  He said we
 7     got to get a search warrant, we got a cop.
 8                  But before that I asked him
 9     what's going on.  He tells me to calm down,
10     relax.  That George was involved in
11     something that had to do with a large sum
12     of money and that he knows that George
13     didn't do it, but George had to know who
14     did it.
15          Q.     Wigdor told you that?
16          A.     Yes.
17          Q.     What happened next?
18          A.     After that I went hysterical in
19     my house.  Investigator Figeroa, she was
20     trying to console me and calm me down.
21     Then he got on the phone and said oh, we
22     got to get a search warrant.  That is when
23     he called Patricia O'Connor.
24          Q.     How do you know that he was
25     speaking to Patricia O'Connor?
```

```
 1                    D. DIAZ
 2    Borough Bronx and have the duty captain
 3    respond.
 4                 That is where evidence
 5    collection turned out of.  I didn't know
 6    what was going on and they weren't
 7    divulging anything.
 8         Q.    So, at this point you know from
 9    Wigdor that George is suspected of being
10    involved in the theft of a large sum of
11    money and that the DA's office intends to
12    get a warrant to search your home, correct?
13         A.    Yes.
14         Q.    At that point you called the
15    bureau?
16         A.    Correct.
17         Q.    Is that different from the 43rd
18    Precinct?
19         A.    Yes.  The patrol bureau is the
20    central of the Bronx.  So it wouldn't be
21    the 43rd who is going to respond.  Whoever
22    is the duty captain, that is the person who
23    is going to respond.
24         Q.    When you call the bureau, who
25    did you speak to?
```

```
 1                     D. DIAZ
 2   unable to get a hold of the duty captain?
 3        A.    I called my commanding officer
 4   at the 24th.
 5        Q.    Who is that?
 6        A.    Now she is Chief Kathleen
 7   O'Reilly.  At first I tried to get in touch
 8   with my delegate and he didn't pick up.
 9        Q.    Who is that?
10        A.    Joe Fabio.  I think he is
11   retired by now.  He used to work at the
12   24th.  It went to voicemail.  And then
13   right after that I called Chief O'Reilly
14   and I told her what was going on.  She told
15   me to calm down, that she would make the
16   notification to everyone and to stay put,
17   that she would call me back.
18        Q.    When you called the duty
19   captain, did you leave a voicemail?
20        A.    No.
21        Q.    When you called Joe Fabio, did
22   you leave a voicemail?
23        A.    No.
24        Q.    And you testified that you told
25   the commanding officer of the 24 what
```

1                     D. DIAZ
2    happened.   What exactly did you tell her?
3         A.     I can't remember from memory
4    right now what I told her, but I did tell
5    her the sum that my children's father was
6    arrested and that the district attorney
7    wanted to do a search warrant in my house.
8              She told me all right, stay
9    put, I will make all the notifications for
10   you.   I was very frantic on the phone.
11             After that I knew that I needed
12   a delegate.   I called a friend of mine at
13   the outdoor lane, Anthony Carlucci.
14             I asked him to find me a
15   delegate.  Because I knew of a delegate
16   that actually worked at the range.
17        Q.     And the range is in your house?
18        A.     No, that is in the 45th, by
19   City Island.  And Anthony got in touch with
20   a Sergeant Benevolent Association delegate
21   somehow.
22              I don't know how and gave him
23   my number and Anthony Borrelli called me
24   and actually he was passing through my
25   house when all this happened.  He was on

```
1                      D. DIAZ
2   the Bronx River on his way to work.
3        Q.    So, what time was it that you
4   started making these phone calls to get a
5   delegate?
6        A.    Right after.  Right after I
7   made the call to Inspector O'Reilly.
8              First the minute George got
9   arrested and I knew of the search warrant,
10  I called Fabio, no response.  I called the
11  Patrol Bureau, no response from the duty
12  captain.  Who I called first, I don't
13  remember right now the order, but I know
14  that I called them.  And the third person I
15  had called was Chief O'Reilly.  She told me
16  that she would call the 43rd and make all
17  the notations in which she did.
18             After that I called Carlucci
19  and I found Anthony Borrelli.
20       Q.    What time did you make a phone
21  call to try and find a delegate.  We know
22  George went out of the house at 7:50.  We
23  know in between that time period you went
24  to the door, you then went outside and even
25  came back inside.
```

```
 1                    D. DIAZ
 2              So, what time is this
 3    approximately that you are starting to make
 4    these phone calls?
 5         A.    I didn't look at a clock, but
 6    it is definitely somewhere about eight-ish.
 7    It is right after I found out what Wigdor,
 8    whatever time he went in, whatever I found
 9    out and that's when I started.
10         Q.    Why were you trying to get a
11    delegate?
12         A.    At that time I had what
13    sixteen years, whenever there is anything
14    you always have a delegate present.  Any
15    type of investigation with the Police
16    Department or any other agency you always
17    get a delegate present.  It is common
18    practice.
19         Q.    What is the purpose of the
20    delegate?
21         A.    In case someone wants to
22    question me on anything.  If there is an
23    investigation, a delegate is supposed to be
24    there to make sure that no one -- what they
25    are questioning you is actually legit.  If
```

```
 1                    D. DIAZ
 2    there is a GO 15.  It is just common
 3    practice in the Police Department to have a
 4    delegate.
 5        Q.    Does the delegate come through
 6    your union?
 7        A.    Yes.
 8        Q.    At this time, that would be the
 9    Sergeant's Benevolent Association?
10        A.    That is what I said.
11        Q.    In sum and substance, the
12    purpose of asking the delegate is so that
13    you have someone to represent you, where
14    you foresee it is going to be some sort of
15    investigation into you, correct?
16        A.    No.  When there is just an
17    issue period.  You can request a delegate.
18    In case there is an investigation, you have
19    someone there with you.
20        Q.    So what happened after you were
21    able to speak to Carlucci?
22        A.    Carlucci gave my number to
23    Borrelli, Sergeant Borrelli.  Sergeant
24    Borrelli got in touch with me and once I
25    told he got in touch with the attorney
```

1                           D. DIAZ

2      Andrew Quinn and then Borrelli was in my

3      house.

4            Q.      What time did Borrelli arrive?

5            A.      I don't know.  The last thing I

6      was looking at was a clock.

7            Q.      How long was it after you spoke

8      to, just approximately if you can, after

9      you spoke to Carlucci that Borrelli

10     arrived?

11           A.      Between fifteen to

12     twenty minutes.  I can't tell you.  When

13     you are going through something like that

14     everything seems forever.

15           Q.      So, what happened as you were

16     waiting for Borrelli to arrive?

17           A.      It was people from DANY inside

18     my house.

19           Q.      Who was inside your house from

20     DANY?

21           A.      I remember Figeroa and two

22     other gentlemen.  Wigdor left.  Where he

23     went I don't know.  Then various people

24     started coming in.

25           Q.      Did you come to learn any of

```
 1                    D. DIAZ
 2   their names?
 3        A.    I came to learn of Investigator
 4   Flores, Jose Flores.
 5        Q.    At what point did you first
 6   notice Investigator Flores?
 7        A.    When he walked in with a trench
 8   coat.  I was sitting by my steps, the
 9   landing going up the stairs which is
10   opposite the kitchen and it faces the
11   dining room also.  Not too far from the
12   entryway and he had introduced himself that
13   he worked in the NYPD in the capacity as a
14   captain before and now he was with the
15   agency.
16        Q.    With DANY?
17        A.    Yes.
18        Q.    So, he introduced himself to
19   you?
20        A.    I don't know if Borrelli was
21   next to me and he made the introduction to
22   let him know who.
23              Nothing else was said after
24   that.  Minutes later the duty captain came
25   in from the 45th.  I didn't get his name.
```

```
 1                    D. DIAZ
 2    I know he was a male white.  Right after
 3    that the platoon commander came in.
 4         Q.    What is that person's name?
 5         A.    I didn't get that name either.
 6    Everything would be on the 49 that they
 7    generate from the incident.  He came in.
 8    From the 43rd, I don't know if it was the
 9    ICO that was with him or the ICO assistant.
10              Everyone was talking among
11    themselves.  Then Borrelli and I sat in the
12    living room.  My children were still there.
13         Q.    Where were your kids?
14         A.    Erica, Investigator Figeroa,
15    she was actually playing with them.  R█████
16    was asking questions as to what happened to
17    his father.
18              Who are those men that were
19    with him.  I came up with a story that a
20    cousin was sick and that they had to take
21    away to his cousin right now.  So, I called
22    my godmother on the phone, Josephine
23    Rodriguez to come over.
24              I didn't know what was going
25    on.  I needed someone there.  I don't know
```

```
1                    D. DIAZ
2   how long it took her to get there.
3   Josephine came with C███████ Rodriguez, her
4   son.
5              As they are there you had more
6   than people from DANY stopping by.  There
7   were at least twenty people in my house.
8              I asked, I don't know if it was
9   me who asked Ricardo to take the kids or
10  Josephine made the suggestion.  The kids
11  were in their school uniform.  I wanted to
12  get them some clothing to change and I
13  wanted to go upstairs and Investigator
14  Flores didn't want me to go upstairs.  He
15  didn't want me to contaminate the scene
16  because they were waiting on a search
17  warrant.
18              So, Carlos Rodriguez left with
19  my children and Josephine stood behind with
20  me.  Also everyone is waiting, Quinn called
21  me back and he's like I tried to get in
22  touch with Patricia O'Connor and somebody's
23  given me my information as to what is going
24  on, to get everybody out of your house.
25              But before Quinn called, the
```

1                         D. DIAZ

2    duty captain and Investigator Flores were

3    holding their own conversation  in the

4    kitchen and then they went into the dining

5    room and while sitting on the steps in the

6    landing, opposite the kitchen and the

7    dining room, it is opened, Investigator

8    Flores stands and he goes "ha, you were

9    associating where a known felon."

10            I said, "what the fuck do you

11   mean I was associating with a known felon.

12   What is it that you are telling me.  I

13   don't know George Castro to be a known

14   felon."  I'm not saying that he is a

15   perfect person.

16        Q.    Just to be clear, is that what

17   you said in response to Investigator

18   Flores?

19        A.    "What the fuck do you mean that

·20   he's a known felon", that was my response

21   to him.

22        Q.    And what happened next?

23        A.    Investigator Flores didn't give

24   me any rebuttal.  He didn't say anything.

25   He just looked at me.  I wanted to know

```
1                    D. DIAZ
2    what is it that you mean by a known felon.
3              My children's father got
4    arrested.  I don't know of anything else of
5    him for you to tell me that he is a known
6    felon.
7              After that, I believe Quinn
8    called me and he said they are not giving
9    me any information and they don't want to
10   tell me why they want a search warrant in
11   your house, don't let them search, get
12   everyone out of your house.
13             I said why don't you just tell
14   them.  I put him on speaker and he went
15   over the phone and he asked for everyone to
16   get out of the house.
17             So, since they didn't want me
18   to contaminate the scene, I also had to
19   leave.  I wanted to know why I have to
20   leave.  If you are doing a search warrant
21   in my house I want to know what the search
22   warrant is.  Nobody said anything to me.
23             If I'm not mistaken, Anthony
24   Borrelli was last, the duty captain went
25   out first, Josephine was second and I left,
```

```
1                      D. DIAZ
2    Flores was behind me.
3                 There is a landing and two
4    steps and then the little sidewalk in my
5    own house.  And there is a tree by my
6    house.
7                 As the duty captain is standing
8    by the tree facing the doorway and he looks
9    at Flores, Borrelli was last, I believe he
10   was the one that was locking the door.  And
11   he goes like what is going on.
12        Q.    Who said that?
13        A.    The duty captain talking to
14   Flores, like what's going on.  Flores said
15   oh, "she's under."  I turned around and
16   said, "what the fuck do you mean I'm under.
17   What did I do that I'm under."  Anthony
18   Borrelli was like, "calm down, Denise."
19                 No, now I'm crying even more.
20   Because George just got arrested, you want
21   to do a search warrant in my home, you are
22   not telling me was going on and I'm under.
23   Under for what.  Borrelli drives Josephine
24   and myself to the 43rd.  It is about 8:50
25   now when we get there, approximately.
```

```
1                    D. DIAZ
2                When I enter the 43rd, I make a
3     left and they stick me in a room in the
4     back.  I'm still crying un controllably.
5     Borrelli and Josephine are trying to
6     console me.  The duty captain is there.
7          Q.   In the room?
8          A.   Outside the room.  By the 24
9     room.  Where they take their complaints.
10    Where the PA's are at.  It is an open area.
11    There is the room, this is 43rd, as you
12    walk in, you make a left and the room is
13    right here.  It is not very big.
14         Q.   Does the room have a door?
15         A.   The room has a door, but at
16    this time it is open.  It is also in
17    someone's office.  They needed to place me
18    in somebody's office.  Whose office, I
19    don't know.
20         Q.   And the door is opened and you
21    are sitting in the room --
22         A.   I'm sitting right outside.
23         Q.   With Borrelli?
24         A.   With Borrelli and Josephine.
25         Q.   Continue, what did you
```

1                          D. DIAZ

2    overhear?

3         A.    I see the duty captain talking

4    to somebody else and it is going back and

5    forth and I got very upset.  I said ",I'm

6    calling you for help and you are treating

7    me like a perp, not once did you talk to

8    me."

9              All the conversations are going

10   back and forth between him and Flores.

11   Then I turned around and I said can I see

12   the CO from the 43rd because the Charles

13   Ortiz is related to George Castro and the

14   duty captain looked at me like did I have

15   three heads.  I said yes.

16              So he went back looking for

17   Inspector Ortiz, but Inspector Ortiz

18   couldn't come over and talk to me because

19   apparently he was at a search warrant.

20        Q.    At a search warrant, but not at

21   your house?

22        A.    Another search warrant.  That

23   is what they said to me, he couldn't come

24   over.  So, then they sent in another female

25   that I knew from evidence collection

```
 1                    D. DIAZ
 2   because I worked in 43rd collection
 3   evidence there to come and talk to me and
 4   try to find out the series of events that
 5   happened that day and I looked at her and I
 6   told her, "get the fuck out of the room
 7   right now."
 8         Q.   Who was this person?
 9         A.   I don't know.  She was good
10   friends with Charles.  If I recognize her I
11   would know her.
12         Q.   She is another officer?
13         A.   She is another officer and that
14   day she was in the station doing what I do.
15   I know she was like hi, what is happening
16   today.
17              I said, "you know what, get the
18   fuck out of here.  After I told her that
19   they moved me out of that room alone,
20   Josephine, she told her to go home, she can
21   no longer stay with me and they took me to
22   the second floor.
23              There is a room right next to
24   the detective squad that had a table and a
25   chair.  They told me to sit in that room
```

```
1                    D. DIAZ
2    and my delegates had to sit with me there.
3    He had to baby-sit me.  Made sure that I
4    went nowhere.
5              IAB came somewhere between ten
6    and twelve.  Exactly what time it was I
7    don't know.  It was a female sergeant and a
8    male sergeant.
9         Q.    Can we just stop for one second
10   and go back over some of the details what
11   you have said and we will pick up when IAB
12   came.
13             It that all right?
14        A.    That is fine.
15        Q.    So, you testified earlier that
16   you first saw Investigator Flores when he
17   walked into your house and he was wearing a
18   trench coat, correct?
19        A.    I remember that of him.  It was
20   a beige coat.
21        Q.    What does Investigator Flores
22   look like?
23        A.    A male Hispanic.  He is kind of
24   tall.  Almost the same hair style as my
25   attorney.
```

1                        D. DIAZ

2        Q.      So, close cut, dark hair?

3        A.      It was dark.  He could have the

4   grays in it.  It wasn't completely dark.  A

5   mustache.

6        Q.      When you spoke to Investigator

7   Torres, he introduced himself, correct?

8        A.      That he worked in the NYPD

9   before as a captain.

10       Q.      To the best of your

11   recollection what was Investigator Flores'

12   build?

13       A.      Slim, tall.  Back then.  I

14   don't know how he looks now.

15       Q.      I'm asking on the date of the

16   incident when you saw him?

17       A.      He was a tall individual.

18       Q.      And when did you first notice

19   the duty captain on the scene?

20       A.      The duty captain was there

21   after everyone came.  Exactly what time he

22   came, I don't know.  After the duty captain

23   arrived, the lieutenant and I don't know if

24   it was the ICO assistant or the ICO from

25   the 43rd, they arrived after that.

```
1                    D. DIAZ

2          Q.     Did the duty captain arrive

3    before or after Flores?

4          A.     If I'm not mistaken, to the

5    best of my recollection, Flores was already

6    there.

7          Q.     I believe you testified earlier

8    that when Flores came up to introduce

9    himself, Sergeant Borrelli was already with

10   you?

11         A.     If I'm not mistaken, Borrelli

12   was next to me when Flores introduced

13   himself.

14         Q.     And you mentioned the platoon

15   commander from the 43rd Precinct, but you

16   don't remember that person's name?

17         A.     No, but he was a male white

18   with glasses.  I have seen him before in

19   the 43rd from working in evidence

20   collection.

21         Q.     Also the ICO the ICO assistant?

22         A.     Correct.  Normally when there

23   is a case like that, the ICO is working or

24   the ICO assistant is the department that

25   they show up and see what is going on.
```

1                    D. DIAZ

2          Q.      Did you ever come to learn that

3    person's name?

4          A.      No, if I see him, I will know

5    who he is.  He kind of has a deda.  Eye

6    greenish brown eyes and salt and pepper

7    hair.

8               If I was to see him I would

9    know who he is.  The ICO or the ICO

10   assistant.

11              Like I said, when I worked

12   evidence collection, I was familiar with

13   some of the faces there.

14         Q.      Was the duty captain the first

15   PD representative that you saw that day or

16   had other officers come first?

17         A.      Borrelli was the first

18   representative from the PD that was there.

19              After that I believe it was the

20   duty captain and the two individuals from

21   the 43rd. There was no other PD.

22         Q.      How about Lieutenant Timothy

23   Burke, are you familiar with that

24   individual?

25         A.      The individual that came from

```
 1                      D. DIAZ
 2    the 43rd was a lieutenant.  What is his
 3    name I don't know.  Could that be him.
 4         Q.     You testified earlier that
 5    everyone was talking amongst themselves,
 6    correct?
 7         A.     Correct.  And then you have
 8    Investigator Flores as a duty captain.
 9    What the nature of the conversation was I
10    didn't know.  Because the conversation was
11    amongst themselves away from me.
12         Q.     So, you couldn't hear what they
13    were talking about?
14         A.     No.  Was I trying to, yes.
15         Q.     Who was the conversation with?
16         A.     The conversation was between
17    them.
18         Q.     Just between Flores and the
19    duty captain?
20         A.     I'm trying to find out what is
21    going on because I got the perception that
22    it was actually Flores who was taken over
23    the investigation once Wigdor left.
24         Q.     I'm sorry, taken over DANY's
25    investigation?
```

D. DIAZ

2    A.    Of the investigation of what

3    was happening.  You had other investigators

4    come in.  They would say something to him

5    and then they left right away.  Quinn asked

6    me over the phone how many people do you

7    have there.  I told him if you come here,

8    it's like a party.  I have them in my

9    living room, dining room, in the hallway,

10   people were just standing.

11           So, that is when Quinn said no,

12   you know what, get everyone out.  I told

13   him let me just put you on speaker.

14   Q.    You testified earlier that you

15   had to leave the house because of this

16   search warrant, correct?

17   A.    I had to leave the house

18   because Flores didn't want me to

19   contaminate the scene.

20   Q.    Did somebody tell you to leave

21   the house?

22   A.    The duty captain.

23   Q.    What did the duty captain say

24   to you?

25   A.    He said well, you are now on

1                       D. DIAZ

2      the clock.  He didn't know that I was

3      outside.  He thought that I was off.  That

4      it was my day off.  He didn't know that I

5      was sick.

6           Q.    Was this the first time that

7      you spoke directly to the duty captain this

8      conversation you are talking about?

9           A.    I don't know if he asked me

10     anything.  Like I said, I was trying to

11     find out.  This conversation was amongst

12     themselves.  No one ever asked me anything

13     about who, what, where, when and how.  That

14     is what made me angry because I called my

15     CO to help me so once you come and ask me

16     like what's going on, thinking that we're

17     cops, you are going to come to me first,

18     but that isn't what happened.

19          Q.    So, the duty captain came up to

20     you and told you that you had to leave your

21     house?

22          A.    It was best for me to leave my

23     house.  His words` exactly, I don't

24     remember.  It was to the sum I wasn't

25     accused of anything.

D. DIAZ

1
2      Like moving anything or trying
3  to hide anything. And since DANY couldn't
4  stay in my house then no one should stay in
5  my house.
6      Q.    You mentioned that he also said
7  you're on the clock?
8      A.    You're on the clock because he
9  was under the impression it was my day off.
10     Q.    When he said you are on the
11  clock, what did you understand that to
12  mean?
13     A.    That whatever time it was I'm
14  on the clock, my tour started.
15     Q.    So he essentially put you on
16  duty?
17     A.    On duty.
18     Q.    Even though you were sick?
19     A.    Later on he claimed that he
20  didn't know that I was out sick.
21     Q.    What time was it that he told
22  you you were on duty?
23     A.    It was inside my house before I
24  left.
25     Q.    So, after the duty captain

D. DIAZ

2    asked you to leave the house and told you

3    that you were on duty, you did in fact

4    leave the house, correct?

5         A.    Yes.

6         Q.    And it was as you were exiting

7    that you overheard the conversation between

8    Flores and the duty captain, where Flores

9    said in sum and substance, "she's under"?

10        A.    Correct.

11        Q.    And then you went to the 43rd

12   Precinct, correct?

13        A.    Right.

14        Q.    Why did you go to the 43rd

15   Precinct?

16        A.    Because the duty captain

17   ordered me to go to the 43rd Precinct and

18   Borrelli had to drive me there.

19        Q.    When the duty captain ordered

20   you to go to the 43rd Precinct, was that

21   part of the same conversation where he told

22   you that you had to leave your house and

23   put you on duty?

24        A.    That was inside my house.

25        Q.    And so you drove to the

```
 1                         D. DIAZ
 2    precinct with Sergeant Borrelli and
 3    Josephine, I believe you testified?
 4            A.    Yes.
 5            Q.    Who was driving the car?
 6            A.    We went in Borrelli's car.
 7            Q.    At that point what is his name,
 8    Ricardo, the gentleman who took your
 9    children?
10            A.    Yes.
11            Q.    They were no longer with you?
12            A.    Correct.
13            Q.    When is the last time that you
14    saw Investigator Flores?
15            A.    That morning after he said I
16    was under outside my house.
17            Q.    Is that the last time you saw
18    him?
19            A.    Yes.
20            Q.    Other than the conversation
21    where Flores said in sum and substance
22    she's under, did you overhear any other
23    conversations between Flores and the duty
24    captain?
25            A.    No.  I was transported to the
```

```
 1                    D. DIAZ
 2   come and speak to you?
 3        A.    Yes.
 4        Q.    How do you know the duty
 5   captain told her to come and speak to you?
 6        A.    They were right in front of me.
 7        Q.    What did the duty captain say?
 8        A.    I couldn't hear, but he said
 9   something to her and told her to go.
10        Q.    Did he point in your direction?
11        A.    Yes, she didn't know what was
12   going on.  She was standing, being nosy,
13   looking, I don't know she may have said I
14   know her because we do know each other by
15   face, hello and good-bye.
16              I was frantically crying, I was
17   screaming, I was cursing everyone out.  I
18   was very irate in that precinct.  I don't
19   know if she volunteered, she would calm me
20   down or what but when they came in she
21   started asking me questions and I told her
22   to get the fuck out.
23        Q.    You mentioned that Josephine
24   was asked to leave, right?
25        A.    Yes.
```

```
 1                    D. DIAZ

 2        Q.    Who asked Josephine to leave?

 3        A.    I don't know.  Because before

 4   they asked Josephine to leave they took me

 5   out.  Then I asked Borrelli what is going

 6   oh, no, Josephine can't stay with you.

 7        Q.    Who took you out of the room

 8   that you were in?

 9        A.    I don't remember.  The duty

10   captain was still standing there.  I don't

11   remember if he told Borrelli to take me

12   upstairs or who it was, but Borrelli and I

13   went upstairs to the second floor near the

14   squad.

15        Q.    At some point a representative

16   of IAD came.

17        A.    Two sergeants from IAD came.

18        Q.    What were their names?

19        A.    It was a male white and a

20   female.  One of them could have been

21   Sergeant Cruz, I'm not sure if that's her

22   name.  I had a male white and a female.

23   They did introduce themselves to me, but at

24   that moment, I'm not thinking.

25        Q.    What did the female look like?
```

1                    D. DIAZ

2       A.      White, black hair, very pale.

3  Maybe five-six, five-five.  The frame

4  wasn't big.  I seen her before.

5       Q.      What happened next?

6       A.      They told me that I couldn't

7  use a phone.  That I had to stay in the

8  room.  Borrelli was the only one that could

9  stay with me.  I turned around and I picked

10  up my cell phone and I called the chief

11  twice, Robert Boyce, he is the chief of

12  detectives.

13              I said chief, I don't know

14  what's going on, but I need your help.

15  Back then he was the chief of gangs.  He

16  was like Denise, I'm going to send somebody

17  to find out.  I'm going to send you some

18  help.

19              The sergeant came back there.

20  She said you are not allowed to talk to

21  anyone.  If I see you on your phone again

22  I'm going to take it from you.

23       Q.      The female IAD sergeant?

24       A.      Yes.  I wouldn't stop crying.

25  I got into it with her and yes, I cursed

1                      D. DIAZ

2    restroom and the male sergeant took me to

3    the bathroom.  He escorted me.

4              He waited for me and then he

5    escorted me back there and I sat in that

6    room.  Maybe 6:00 to 7:00 at night Borrelli

7    walks in and he says, "come on, let's go."

8         Q.    During the whole time that you

9    were there, did anybody interview you?

10        A.    No.  At 1340, I believe, the

11   female sergeant tells me that I have to

12   advise you that you are being modified.

13             For what, I don't know.  I said

14   modified for what, what did I do.  Just for

15   the good of the department until we find

16   out what is going on.

17             No interview took place.  I

18   started crying.  She said well, at least

19   you are not suspended, you are still

20   getting paid.  About 3:00 or so, Borrelli

21   came back to tell me that they had the

22   search warrant.  I asked can I go.  He said

23   no, they don't want you there.

24             The search warrant is

25   conducted, a couple of hours later, I'm

D. DIAZ

2  it is a regular day, I'm on the way to the

3  surgeon, I'm out sick, George is arrested.

4        I don't know what the hell is

5  going on, the search warrant is going to be

6  performed in my house and now I'm modified.

7        Q.   You also testified that you

8  couldn't leave, correct?

9        A.   Correct.

10       Q.   Did you ask anybody if you

11 could leave?

12       A.   They told me to sit there.

13       Q.   Who told you to sit there?

14       A.   The IAB sergeant, they put me

15 in that room.  I wasn't allowed to talk to

16 anyone and I couldn't go anywhere.

17       Q.   Were you on duty?

18       A.   Yeah, as per the duty captain.

19 Then he realized he couldn't put me on duty

20 because I'm out sick.  Borrelli told him

21 did you know that she was out sick.  He

22 thought it was just my RDO.

23       Q.   When was that conversation?

24       A.   That was right before I went

25 upstairs to the 43rd.

1                    D. DIAZ

2        A.    Yes, by a department surgeon.

3    He's the one who's authorizing you.

4    Because you're outside.  There is actually

5    something wrong with me.  I went to a

6    doctor.  I was at a hospital.  I'm under

7    medication.  So, only a surgeon could tell

8    me you go back.

9        Q.    So, essentially the duty

10   captain should have contacted the surgeon

11   to put you on duty?

12       A.    I don't know, but I assume.  I

13   think.

14       Q.    But nonetheless, he went ahead

15   and put you on duty anyway?

16       A.    Correct.

17       Q.    So, you left the precinct at

18   approximately 7:00 p.m., correct?

19       A.    Approximately 7:00 p.m. I left.

20       Q.    Have you ever seen Investigator

21   Flores since November 24, 2010?

22       A.    I don't recall seeing him right

23   now.

24       Q.    Did you have any conversation

25   with him other than what we already

1                          D. DIAZ

2    discussed today?

3          A.    Not to my recollection.

4    Whenever I spoke to DANY there were

5    numerous investigators.  Could he have been

6    present, maybe.  Did I have a conversation

7    with him, I had a conversation with one

8    person and everyone else sat in.

9                MS. KRASNOW:  Can you mark

10              this, please.

11              (Whereupon, the aforementioned

12              photograph was marked as

13              Defendant(s)' Exhibit G for

14              identification as of this date by the

15              Reporter.)

16         Q.    Sergeant Diaz, I'm showing you

17   a photograph that's been marked as Exhibit

18   G.

19              Do you recognize the individual

20   who appears in that photograph?

21         A.    No.

22         Q.    Have you ever seen him before?

23         A.    No.

24              MS. KRASNOW:  Can you mark

25              these as H-1 and H-2.

1                    D. DIAZ

2           (Whereupon, the aforementioned

3       two photographs were marked as

4       Defendant(s)' Exhibits H-1 and H-2

5       for identification as of this date by

6       the Reporter.)

7      Q.    Sergeant, I'm showing you two

8 photographs which have been marked as

9 Exhibits H-1 and H-2.

10       Looking at first Exhibit H-2,

11 do you recognize any of the items depicted

12 in that photograph?

13     A.    I recognize the mini shield and

14 an SBA card.

15     Q.   Do you recognize the mini

16 shield as your own?

17     A.    Well, in this photograph I

18 can't see the number, but it's similar to

19 what I have.

20     Q.   Looking at Exhibit H-1, does

21 that appear to be a close-up photograph on

22 the mini shield that is depicted in H-2?

23     A.    Yes.

24     Q.   Looking at H-1, are you able to

25 identify that as your mini shield?

D. DIAZ

2      A.     Yes.

3          Q.     And Exhibit H-1 says it is

4    family member, correct?

5          A.     Correct.

6          Q.     Is that something that you gave

7    to Mr. Castro?

8          A.     Yes.

9          Q.     When did you give it to him?

10         A.     Maybe after I got promoted.

11   What month I don't know.   Sometime in 2009

12   after I got promoted.

13         Q.     Does the NYPD issue members of

14   service shields to give to their family

15   members?

16         A.     No, you can purchase these.

17         Q.     Where do you purchase them?

18         A.     At F & J's.  It is a police

19   equipment store.  I believe at 161st off of

20   Melrose, between Melrose and Courtlandt.   F

21   & J's is in the Bronx.

22         Q.     So, you purchased the shield

23   depicted in Exhibit H-1 for Mr. Castro?

24         A.     Yes.

25         Q.     What was the purpose of giving

1                        D. DIAZ

2    Mr. Castro the mini shield?

3         A.    It is a courtesy shield that

4    officers give to their family members.

5    That is all it is.

6         Q.    What is it supposed to be used

7    in connection with, if anything?

8         A.    It is a courtesy shield.

9    That's all it is.  God forbid, you know, if

10   he is in an accident or anything and you

11   open his wallet, you can track me down by

12   this number, 1179.  You know that a member

13   of the service related to him somehow.

14        Q.    So, it's for him to use if he

15   has any encounters with law enforcement

16   essentially?

17        A.    Anyone.  Like I said if he is

18   in an accident, if anything happens.  It

19   means the police respond and you can give

20   him this and you need to make a notation,

21   you call operations, who has shield number

22   1179.

23        Q.    Looking back at Exhibit H-2,

24   you testified earlier that you saw an SBA

25   card?

1                    D. DIAZ

2        A.     Correct.

3        Q.     Can you please point to me

4    where in the photo?

5        A.     Here, next to my shield.

6        Q.     In the middle of the photograph

7    to the right of the shield and it appears

8    to have some red, white and blue banner on

9    the card; is that correct?

10       A.     And it has a shield on it also.

11       Q.     What is an SBA card?

12       A.     It is a sergeant benevolent

13   association card.  Letting anyone know that

14   that person is related to a sergeant.

15       Q.     Did you give that card to Mr.

16   Castro?

17       A.     Yes, I did.

18       Q.     And it serves essentially as

19   the same purpose as the mini shield you

20   gave to Mr. Castro?

21       A.     Right.

22       Q.     Looking at the top middle of

23   the photograph there is a black backpack.

24              Do you recognize that as Mr.

25   Castro's backpack?

                    D. DIAZ

1
2        A.     Possible.  I don't see the top
3    on there.  It was cut off.
4        Q.     The photograph is cut off.
5        A.     When they took the photograph
6    they didn't take the complete bag.
7    Possibly could it be Castro's, yes.
8        Q.     Does it look similar to the
9    backpack that you knew Mr. Castro to carry
10   in November of 2010?
11       A.     Possible.
12       Q.     Sergeant Diaz, we talked
13   earlier about overtime, correct?
14       A.     Yes.
15       Q.     And the circumstances under
16   which an officer can request overtime,
17   right?
18       A.     Correct.
19       Q.     Did you request overtime in
20   connection with the events of November 24,
21   2010?
22       A.     Yes.
23       Q.     How did you go about making
24   that request?
25       A.     I was advised from Anthony

1                          D. DIAZ

2    mentioned that would be able to figure all

3    this out you are referring to --

4          A.    I see this report here.

5          Q.    State the exhibit number

6    please.

7          A.    Exhibit E.  You see how you

8    have a copy.  This was given into you on

9    the same date as the incident.  If you get

10   a new sick report, you will see, you will

11   see that I didn't go back until December.

12              It will tell you exactly how

13              many days I was out sick since the

14              20th and it is going to give you

15              approximately two tours, ten days.

16              Because I only worked five and five,

17              but technically I was out for the

18              fourteen days.

19         Q.    We will follow-up and see if we

20   can get the report.

21              Thank you for your explanation.

22              I only have one more topic which is

23              pretty brief.

24              Sergeant Diaz, in the month leading

25              up to his arrest, George Castro

1                    D. DIAZ

2         issued you a series of checks,

3         correct?

4         A.      Correct.

5         Q.      And you deposited those checks

6    in your personal bank account?

7         A.      Correct.

8         Q.      As you sit here today, do you

9    recall the dates and amounts of those

10   checks?

11        A.      I don't recall the dates and

12   amounts, but the information is with your

13   office.

14        Q.      Sergeant, do you recall that

15   our office had initiated a civil assets

16   forfeiture procedure against you in an

17   attempt to recover the value of the checks

18   that George Castro gave you?

19        A.      Yes.

20             MS. KRASNOW:  Can you you mark

21        this, please.

22             (Whereupon, the aforementioned

23        summons was marked as Defendant(s)'

24        Exhibit I for identification as of

25        this date by the Reporter.)

```
 1                     D. DIAZ
 2        Q.     Sergeant Diaz, I show you what
 3   I just had marked as Exhibit I.  Take a
 4   look at it and let me know when you are
 5   done.
 6               Did you have a chance to review
 7   the document?
 8        A.     Somewhat, yes.
 9        Q.     Do you recognize the document?
10        A.     Yes.
11        Q.     What is it?
12        A.     A civil forfeiture that DANY
13   went against me.
14        Q.     Do you see that the first two
15   pages of the exhibits are the summons and
16   then the remainder of the exhibit is the
17   actual body of the complaint?
18        A.     Now I could, yes.
19        Q.     Do you recall being served with
20   a copy of Exhibit I?
21        A.     Yes, I do.
22        Q.     Who served you with a copy of
23   Exhibit I?
24        A.     Detective Wigdor and another
25   gentleman.
```

```
1                          D. DIAZ

2           Q.      Sergeant Diaz, I want to direct

3    your attention to paragraphs 30 through 40

4    of the exhibit which are on pages D-629 to

5    had 630.

6                   Can you read those paragraphs,

7    please.

8           A.      Okay.

9                   MS. KRASNOW:   Can you mark this

10          as Exhibit J.

11                  (Whereupon, the aforementioned

12          document on the letterhead of Ricardo

13          Aguirre, Bates stamp D-79 to D-88 was

14          marked as Defendant(s)' Exhibit J for

15          identification as of this date by the

16          Reporter.)

17          Q.      Sergeant Diaz, I'm showing you

18   what has been marked as Defendants' Exhibit

19   J.

20                  Can you take a moment to review

21   the document and let me know when you are

22   done.

23                  Sergeant Diaz, did you have a

24   chance to review Exhibit J?

25          A.      Yeah, somewhat briefly.
```

```
 1                    D. DIAZ

 2        Q.    Do you recognize it?

 3        A.    Yes.

 4        Q.    What is that?

 5        A.    That is the Answer to the

 6   summons and I signed it in the back.

 7        Q.    So, that it your Verified

 8   Answer to the summons and complaint from

 9   the assets forfeiture proceeding?

10        A.    Correct.

11        Q.    Turning to the page Exhibit J

12   marked D-86.

13              Do you see your signature under

14   the verification?

15        A.    Yes.

16        Q.    By signing the verification you

17   swore that your responses to the complaint

18   set forth in your Answer were true,

19   correct?

20        A.    Yes.

21        Q.    And if you look at paragraphs

22   30 to 34 of your Verified Answer, please.

23              Sergeant Diaz, does reviewing

24   the allegations in paragraphs 30 to 34 of

25   the asset forfeiture complaint and your
```

D. DIAZ

1
2   Verified Responses to those allegations
3   reflect your recollection as to the number
4   of checks that you received from George
5   Castro and the value of each check?
6           MR. AGUIRRE:  I don't recall
7       her being asked how many checks she
8       was issued.
9           MS. KRASNOW:  I didn't ask.  I
10      believe off the top of her head she
11      could not recall exactly how many
12      checks there were.  That is why I
13      went through the trouble of showing
14      her the document.
15      A.      When did I ask that?  I don't
16  recall you asking that.
17      Q.      After reviewing --
18      A.      I don't recall you asking that.
19  You can go back.
20      Q.      We don't necessarily have to.
21  I can just ask you are your responses to
22  the allegations contained in paragraphs 30
23  through 34 accurate?
24      A.      Yes.
25      Q.      As you sit here today, do you

1                          D. DIAZ

2    receiving it and depositing it, correct?

3          A.    Correct.

4          Q.    Between October and November of

5    2010 then George Castro issued you a series

6    of checks totaling $310,000 which you

7    deposited into your personal bank account,

8    correct?

9          A.    Correct.

10         Q.    Did you deposit these checks

11   prior to Mr. Castro's arrest on November

12   25, 2010?

13         A.    Yes.

14         Q.    What was your understanding of

15   the purpose of the checks that Mr. Castro

16   was writing you?

17         A.    The checks were cashier's

18   checks.  To my knowledge, I thought they

19   were all cashier checks with the exception

20   of the Ameritrade.  One of them was to pay

21   me back for everything that I had done for

22   him, his loans which when they took my

23   credit card bills, his equipment he would

24   put on my credit card.

25                That was the first one and that

```
1                           D. DIAZ
2       they took notes of it and I explained to
3       them exactly each and every single one.
4                   There was one that I do not
5       account for and that I do not recall
6       getting it.  But yes, it has my signature.
7           Q.    So, what did you do with the
8       $310,000 that Mr. Castro gave you?
9           A.    I paid my mortgage, and the
10      rest of the money I left it.
11          Q.    Where?
12          A.    In my account.  In my bank
13      account.
14          Q.    How much of the money did you
15      spend on paying off your mortgage?
16          A.    Approximately 130.  It was 129
17      and some change.
18          Q.    Did you have any conversations
19      with Mr. Castro about where all this money
20      was coming from?
21          A.    Yes.
22          Q.    What did he tell you?
23          A.    He assured me that everything
24      was legit.  That that was the stocks that
25      he had sold.  I said George, you know the
```

1                          D. DIAZ

2                          Quinn went back and spoke to

3          the DA and they said it wasn't true.

4          Finally George admitted over the phone that

5          just $60,000 of that money was actually

6          from Columbia.  I turned around and I told

7          the DA exactly what he told me.  But he

8          said that the rest of the money had nothing

9          to do with Columbia.

10              Q.    George told you that?

11              A.    George told me that the rest of

12         the money had nothing to do with Columbia

13         and that conversation was clearly recorded

14         because he was calling me from Rikers

15         Island.

16              Q.    At some point you wrote the DA

17         office a check for $180,000, correct?

18              A.    Whatever was left in the

19         account that I didn't touch, I was told by

20         my attorney that I had to give it back

21         against my wishes.

22              Q.    So, this would be what was left

23         after you finished the payments on the

24         mortgage?

25              A.    Yes.

1                        D. DIAZ

2          Q.     But it is your understanding

3     that only 60,000 of that 180,000 is part of

4     the funds that were stolen from Columbia?

5          A.     Correct.

6          Q.     Sergeant Diaz, did you ever use

7     a phone number 917, 863-8736?

8          A.     Yes, that is my number.

9          Q.     That is your cell phone number?

10         A.     That is my cell phone number.

11                MS. KRASNOW:   Mark this,

12          please.

13                (Whereupon, the aforementioned

14          pages 249 to pages 299 consisting of

15          phone messages were marked as

16          Defendant(s)' Exhibit J for

17          identification as of this date by the

18          Reporter.)

19         Q.     Sergeant Diaz, did you have an

20    opportunity to look over Exhibit J?

21         A.     Yes, I did.

22         Q.     Do you recognize it?

23         A.     I recognize it is a some

24    messages from my phone.  But as I told the

25    prior ADA, there was a conversation prior

1                    D. DIAZ
2    to this that we were talking about a whole
3    body make over that for a doctor to make
4    over my body it would take more than 80s.
5             I was questioned on this and I
6    told her, if you look at the records, we
7    were already talking on the phone and the
8    joke continued.  It was nothing meant
9    towards anything.
10        Q.    Let's step back for a second
11   because I wasn't part of that conversation.
12            So, Exhibit J is a series of
13   text messages exchanges between you and
14   George Castro; is that correct?
15        A.    Correct.
16        Q.    And in those exchanges you are
17   talking about a birthday present for you,
18   right?
19        A.    Correct.
20        Q.    And these exchanges are dated
21   October 4, 2010, correct?
22        A.    Correct.
23        Q.    At this point you considered
24   yourself separated from Mr. Castro,
25   correct?

1                      D. DIAZ

2        A.     Yes.  He said yes, girlfriend,

3    I'll get it for you.  You deserve a great

4    birthday present for being a great woman,

5    mother and friend.

6        Q.     For being the greatest mom and

7    friend, deserve just to be precise.  So the

8    exchange continues and you are speaking

9    about the present, correct?

10        A.     Yes.

11        Q.     And you write to Mr. Catro you

12    need at least 80 Gs?

13        A.     Correct.

14        Q.     What were you referring to?

15        A.     A body make over.

16        Q.     Plastic surgery?

17        A.     Yes.

18        Q.     So, you were asking Mr. Castro

19    to give you $80,000 for your birthday so

20    you could get plastic surgery?

21        A.     This was a joke that we were

22    saying --

23              MR. AGUIRRE:  Answer yes or no.

24        A.     No, it was a joke what we were

25    saying.  Mr. Castro said oh, wouldn't you

**Diamond Errata Sheet**

Plaintiff(s): _Denise Diaz_

Defendant(s): _City of New York_

| Page | Line | Correction | Reason for Correction |
|------|------|------------|-----------------------|
| 15 | 9 | Line of Duty | wrong statement |
| 21 | 7 | Altograft | |
| 21 | 10 | its missing words | → |
| 27 | 12 | DEED | wrong spelling |
| 28 | 16,17 | DEED | " |
| 40 | 12 | Voided | |
| 47 | 9 | from I to You | |
| 51 | 23 | V are | |
| 53 49 | 19 | I went | |
| 60 | 16 | en Manc | |
| 63 | 25 | omit on | |
| 64 | 11 | Missing words to Statement | |
| 66 | 6 | Notification | wrong statement |
| 68 | 6 | "at" omitted | omitted word |
| 68/69 | 7 | should read Four Four | |
| 72 | 25 | missing words | |
| 73 | 19 | wrong statement written | |
| 74 | 22 | missing words to statement | |
| 74 | 25 | they's an Investigation | wrong statement |
| 75 | 18 | missing statement | missing words |
| 77 | 2 | conspections or | wrong statement |
| 77 | 24 | Took should read made | |
| 88 | 9 | Insshould read Inclusion | |
| 88 | 15 | In any way | |
| 94 | 13 | should read dept. locker | |
| 97 | 15 | will sign the book with | wrong statement |
| 105 | 19 | Gabriela | missed spelled |
| 104 | 8 | He had what I thought | wrong statement |
| 104 | 9 | iPod | |
| 107 | 3 | 181 | wrong number |
| 107 | 4 | S/A/A | |
| 108 | 3 | omitted get | missing word |

Date: _9/15/15_

Name of Witness: _Denise Diaz_

Signature: _____

Subscribed and sworn to before me

This _15th_ of _September_ 20_15_

_____ Notary Public

ANA I. RODRIGUEZ
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01RO6027770
QUALIFIED IN BRONX COUNTY
COMMISSION EXPIRES JULY 12, 20

| Page number | Line Page | |
|---|---|---|
| 124 | 25 | of the |
| 128 | 12 | He lived |
| 129 | 18 | SPAA |
| 134 | 15 | to me. |
| 138 | 17 | SPAA |
| 142 | 2 | Oh, yes |
| 150 | 14 | is never denied. |
| 151 | 3 | Ryan + Gabriela |
| P.156 | 3 | wrong date  Should read 23 |
| 156 | 21 | Missing words |
| 172 | 7 | She |
| 174 | 14 | slept |
| 175 | 19 | Patrol borough. |
| 176 | 6 | Borough |
| 180 | 8 | Happening to me. |
| 181 | 10 | Joe Favia |
| 182 | 13 | out door range |
| 189 | 3 | Ricardo Rodriguez |
| 189 | 18 | Ricardo |
| 189 | 22 | No one is giving me |
| 195 | 2 | Collecting |
| 195 | 20 | was told to go home. |
| 199 | 5 | Dead eye |
| 200 | 8 | and the Duty Captain |
| 200 | 22 | Who had |
| 202 | 3 | out sick |
| 206 | 19 | Never said got a fine. |
| 208 | 6 | On. |

| Page | Line | |
|------|------|--|
| 268 | 16 | I AB |
| 315 | 4 | Because you're out |
| 319 | 20 | Them this |
| 334 | 15 | When did you ask |
| 341 | 16 | Don't Recall that statement |

Denise Dm
D. G



SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK



CYRUS R. VANCE, JR.,
DISTRICT ATTORNEY of the
COUNTY OF NEW YORK,

       Plaintiff-Claiming Authority,

       -against-

DENISE DIAZ,

       Non-Criminal Defendant.

SUMMONS

Index No. 451128/2013

To Denise Diaz, the Non-Criminal Defendant named above:

    YOU ARE HEREBY SUMMONED to answer the verified complaint in this action and to serve a copy of your verified answer on the plaintiff's attorney at his address stated below.

    If this summons was personally served upon you in the State of New York, the verified answer must be served within 20 days after the service of this summons, exclusive of the day of service. If this summons was not personally delivered to you within the State of New York, the verified answer must be served within thirty days after service of the summons is complete as provided by law.

    If you do not answer the attached complaint within the applicable time limitation stated above, a judgment may be entered against you by default for the relief demanded in the complaint, without further notice to you.

    This action will be heard in the Supreme Court of the State of New York, in and for the County of New York. Venue in the County of New York is proper, pursuant to



Civil Practice Law and Rules § 1311(10)(b), because a related criminal prosecution was

commenced and tried in said county.

Dated: New York, New York
July 10, 2013

CYRUS R. VANCE, JR.
District Attorney of the County of New York
Plaintiff-Claiming Authority
New York County District Attorney's Office
One Hogan Place
New York, New York 10013

By: _____

Charles King
Assistant District Attorney
212-335-4037 (direct)
212-335-9251 (facsimile)
kingc@dany.nyc.gov

Attorney for Plaintiff-Claiming Authority

Cyrus R. Vance, Jr. v. Denise Diaz

2

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

CYRUS R. VANCE, JR.,
DISTRICT ATTORNEY of the
COUNTY OF NEW YORK,

Plaintiff-Claiming Authority,

-against-

DENISE DIAZ,

Non-Criminal Defendant.

VERIFIED COMPLAINT

Index No. 451128/2013

Plaintiff, Cyrus R. Vance, Jr., District Attorney of the County of New York, by his undersigned attorney, alleges, upon information and belief, for his verified complaint against non-criminal defendant Denise Diaz ("Diaz"), as follows:

## INTRODUCTION

1.     This is a civil forfeiture action brought pursuant to Article 13-A of the Civil Practice Law and Rules ("CPLR") to forfeit approximately three hundred ten thousand dollars ($310,000.00). As detailed below, George Castro and three other men were convicted after trial of numerous felony crimes in connection with the theft of approximately $5.5 million from Columbia University and were sentenced to state prison. Therefore, this action relates to post-conviction forfeiture crimes within the meaning of CPLR 1311(1)(a).

2.     Diaz voluntarily returned approximately one hundred eighty thousand dollars ($180,000) of the total stolen proceeds to the New York County District Attorney's Office ("DANY"). DANY is holding that money in its escrow account. Diaz, however, has refused to pay back the remaining approximately one hundred thirty thousand dollars ($130,000) of stolen proceeds and used that amount to pay off her home mortgage.

## JURISDICTION AND VENUE

3.     This Court has subject matter jurisdiction over this action pursuant Article VI of the New York Constitution and Article 13-A of the CPLR.

4.     Venue is proper in the County of New York, pursuant to CPLR § 1311(10)(a), because George Castro and three other criminal defendants were convicted after trial of related felony crimes in the County of New York.

5.     Plaintiff Cyrus R. Vance, Jr., is and at all relevant times was the District Attorney of the County of New York. Plaintiff's principal place of business is One Hogan Place in Manhattan. Plaintiff brings this action in his capacity as an appropriate Claiming Authority within the meaning of CPLR § 1310(11).

6.     Non-criminal defendant Denise Diaz is a resident of Bronx County and is employed in New York County as a Sergeant in the Police Department of the City of New York.

## DEFENDANTS IN A CRIMINAL TRIAL HAVE BEEN CONVICTED OF FELONY CHARGES IN CONNECTION WITH THE THEFT FROM COLUMBIA UNIVERSITY

7.     George Castro ("Castro"), Walter Stephens, Jr. ("Stephens"), Jeremy Dieudonne ("Dieudonne"), and Joseph Pineras ("Pineras") (collectively "the Criminal Defendants") stole

2

approximately $5.5 million from Columbia University. The Criminal Defendants committed the larceny by diverting money that Columbia University intended to pay for New York Presbyterian Hospital to their own bank accounts. As discussed below, the Criminal Defendants have all been convicted after trial of numerous felony crimes in connection with the theft from Columbia and are serving terms of incarceration in state prison.

### New York County Indictment Number 2922/2011

8.     Three of the Criminal Defendants, Castro, Stephens, and Dieudonne, were charged under New York County Indictment Number 2922/2011 with various felony crimes in connection with the theft. A copy of New York County Indictment Number 2922/2011 is annexed hereto as Exhibit A. The indictment is incorporated herein by reference and made a part of this complaint.

9.     Castro, Stephens, and Dieudonne were all charged with Grand Larceny in the First Degree, in violation of Penal Law ("PL") § 155.42, and Criminal Possession of Stolen Property in the First Degree, in violation of PL § 165.54. Castro alone was charged with Money Laundering in the First Degree, in violation of PL § 470.20(1)(b)(ii)(A). Dieudonne alone was charged with Criminal Possession of Stolen Property in the Second Degree, in violation of PL § 165.52. Stephens alone was charged with Criminal Possession of Stolen Property in the Third Degree, in violation of PL § 165.50.

### New York County Indictment Number 128/2012

10.     Joseph Pineras ("Pineras") was charged under New York County Indictment Number 128/2012 with various felony crimes in connection with said theft of money from Columbia University. A copy of New York County Indictment Number 128/2012 is annexed

3

hereto as Exhibit B.   The indictment is incorporated herein by reference and made a part of this complaint.

11.      Pineras was charged with Grand Larceny in the First Degree, in violation of PL § 155.42, and Falsifying Business Records in the First Degree, in violation of PL § 175.10.

## THE TRIAL AND CONVICTIONS OF THE CRIMINAL DEFENDANTS

12.      On March 8, 2012, Justice Robert M. Stolz of the Criminal Term of this Court granted the People's motion to consolidate Indictment Numbers 2922/2011 and 128/2012 for trial.

13.      From about July 19, 2012 to about August 7, 2012, the Criminal Defendants were tried before a jury for the crimes charged in Indictment Numbers 2922/2011 and 128/2012. Justice Stolz presided over the trial. Numerous witnesses testified and scores of exhibits were introduced during the People's case. George Castro testified on his own behalf and was cross-examined.

14.      On August 7, 2012, the jury found the Criminal Defendants guilty of all the crimes charged against them in Indictment Numbers 2922/2011 and 128/2012.   In September and November 2012, the Criminal Defendants were each sentenced to indeterminate terms of incarceration in state prison.  Collectively attached to this verified complaint as Exhibit C are true copies of Certificates of Conviction for each of the Criminal Defendants.

15.      In September and November 2012, Justice Stolz entered restitution orders against each of the Criminal Defendants.

16.      Castro, Stephens, Dieudonne, and Pineras have committed acts individually and while acting in concert that make them criminally liable, under CPLR 1310(9)(a), for the felonies under the Penal Law alleged in Indictment Numbers 2922/2011 and 128/2012 of which they have been convicted after trial.

4

## FACTS UNDERLYING THE THEFT OF MONEY
## FROM COLUMBIA UNIVERSITY

17.     From approximately August 1 or October 4, 2010, to approximately November 24, 2010, the Criminal Defendants Castro, Stephens, Dieudonne, and Pineras, individually and while acting in concert, stole approximately five million five hundred thousand dollars ($5.5 million) from Columbia University.

18.     The Criminal Defendants, individually and while acting in concert, committed the larceny by causing payments that Columbia University intended for New York Presbyterian Hospital to be redirected to a TD Bank account in the name of "IT & Security Solutions LLC," account ending in 434 (hereinafter referred to as the "IT Security bank account"). These payments totaled approximately five million four hundred ninety-nine thousand seven hundred forty-eight dollars and thirty-nine cents ($5,499,748.39)("the money stolen from Columbia University").

19.     IT & Security Solutions LLC is a company owned by Castro.  Castro was the signatory on the IT Security bank account. Stephens and Dieudonne worked with Castro at IT & Security Solutions.

20.     The Criminal Defendants, individually and acting in concert, transferred the money stolen from Columbia University into various other bank accounts under the control of Castro, Stephens, and Dieudonne.

21.     The Criminal Defendants, individually and while acting in concert, gave some of the money stolen from Columbia University to their friends and family members.

22.     The Criminal Defendants, individually and while acting in concert, made cash bank withdrawals of the money stolen from Columbia University.  At the time of his arrest for the crimes

5

985x

charged in the indictment, Castro had approximately two hundred twelve thousand three hundred nine dollars and forty-three cents ($212,309.43) in cash on his person. That money was seized by the New York City Police Department ("NYPD").

23.     Castro purchased an Audi automobile for approximately eighty-three thousand twelve dollars and thirty-eight cents ($83,012.38) with the money stolen from Columbia University. That automobile was seized by the NYPD at the time of Castro's arrest for the crimes charged in the indictment.

24.     Castro purchased computer equipment from the Apple Store for approximately twenty-five thousand six hundred eighty-three dollars and three cents ($25,683.03) with the money stolen from Columbia University. Some of that computer equipment was seized by the NYPD at the time of Castro's arrest for the crimes charged in the indictment.

25.     The Criminal Defendants, individually and while acting in concert, disposed of the money stolen from Columbia University in other ways.

26.     The money stolen from Columbia University by the Criminal Defendants and transferred into various bank accounts under their control, the cash money seized from Castro's persons when he was arrested, the money transferred to other persons, including but not limited to the approximately three hundred ten thousand dollars ($310,000.00) that Castro gave to non-criminal defendant Denise Diaz, and the automobile and computer equipment purchased with the stolen money, as set forth above, as well as other property, constitutes the "proceeds," "substituted proceeds," and "instrumentalities" of the crimes charged in New York County Indictment Numbers 2922/2011 and 128/2012.

6

D628

THE NON-CRIMINAL DEFENDANT,
New York City Police Department Sergeant Denise Diaz

27.     At all times relevant to this action, including when the crimes alleged in New York County Indictment Numbers 2922/2011 and 128/2012 were committed to the present time, non-criminal defendant Denise Diaz was a Sergeant in the New York City Police Department.

28.     Diaz and Castro have two children together.  Diaz lived with or had frequent contact with Castro before, during, and after the crimes alleged in the indictments were committed.

29.     Castro gave Diaz approximately three hundred ten thousand dollars ($310,000) of the stolen proceeds.  Specifically, in fewer than thirty days, from the middle of October to the middle of November, 2010, Castro gave Diaz five checks totaling approximately three hundred ten thousand dollars ($310,000.00) of the money stolen from Columbia University.  Diaz accepted the five checks and deposited them into her own bank accounts.

30.     On or about October 14, 2010, Diaz accepted the first check from Castro.  The first check, number 113, was drawn on a TD Ameritrade bank account in the name of IT & Security Solutions (Attn: George Castro) and was made payable to Diaz in the amount of fifty thousand dollars ($50,000).  Diaz deposited the first check into her bank account.

31.     On or about October 22, 2010, Diaz accepted the second check from Castro.  The second check, number 114, was drawn on a TD Ameritrade bank account in the name of IT & Security Solutions (Attn: George Castro) and made payable to Diaz in the amount of fifty thousand dollars ($50,000).  Diaz deposited the second check into her bank account.

32.     On or about October 29, 2010, Diaz accepted a third check from Castro.  The third check, number 8000189590, was a cashier's check issued by Capital One bank and made payable to

7

Diaz in the amount of seventy-five thousand dollars ($75,000). Diaz deposited the third check into her bank account.

33.     On or about November 10, 2010, Diaz accepted a fourth check from Castro. The fourth check, number 8000562365, was a cashier's check issued by Capital One bank and made payable to Diaz in the amount of seventy-five thousand dollars ($75,000).   Diaz deposited the fourth check into her bank account.

34.     On or about November 17, 2010, Diaz accepted a fifth check from Castro. The fifth check, number 1010,  was drawn on a Capital One bank account in the name of IT & Security Solutions and made payable to Diaz in the amount of sixty thousand dollars ($60,000).  Diaz deposited the fifth check into her bank account.

35.     At the time that she accepted the five checks described above totaling approximately three hundred ten thousand dollars ($310,000.00) in less than thirty days from Castro and deposited them into her bank accounts, non-criminal defendant Denise Diaz was a Sergeant in the NYPD.

36.     Diaz knew or should have known that the approximately three hundred ten thousand dollars ($310,000.00) that she received from Castro, as described above, was obtained through the commission of a crime.

37.     Diaz used approximately one hundred twenty-nine thousand eight hundred fifty-eight dollars and sixty-six cents ($129,858.66) of the stolen proceeds that she accepted from Castro to pay off the mortgage on her home located at 109 Admiral Lane, Home Number 3-109C, Bronx, New York 10473. The stolen proceeds that Diaz converted into equity in her home is subject to forfeiture.

8

38.    After Castro's arrest and indictment, Diaz gave DANY a bank check dated April 13, 2011, number 100979497, in the amount of one hundred eighty thousand one hundred forty-one dollars and thirty-four cents ($180,141.34) ("the Partial Pay-Back Check").   That amount is proceeds or substituted proceeds that are subject to forfeiture.

39.    By giving DANY the Partial Pay-Back Check, Denise Diaz implicitly acknowledged that: a) the money she had accepted from Castro was stolen or otherwise obtained through the commission of a crime;  and b) she was not entitled to keep the stolen money that she had accepted from Castro.

40.    To this date, Diaz has refused to pay back the remaining one hundred twenty-nine thousand eight hundred fifty-eight dollars and sixty-six cents ($129,858.66) of stolen proceeds that she accepted from Castro.

41.    Diaz has refused to repay the remaining money despite the fact that she knew or should have known that all of the money she accepted from Castro was stolen or otherwise obtained through the commission of a crime.

42.    Diaz has refused to repay the funds despite the fact that she knows that Castro gave her stolen money.

## CAUSE OF ACTION

### (For Forfeiture of the Proceeds and Substituted Proceeds of the Crimes)

43.    Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 42 herein.

44.    By reason of the foregoing, non-criminal defendant Denise Diaz is liable to the plaintiff in his capacity as Claiming Authority for the forfeiture of three hundred ten thousand

9

dollars ($310,00.00) that constitutes proceeds and/or substituted proceeds of the crimes committed by the Criminal Defendants that Denise Diaz accepted from Castro.

45.     The Court should order the forfeiture of and allow plaintiff to use the one hundred eighty thousand one hundred forty-one dollars and thirty-four cents ($180,141.34) that Denise Diaz paid to the New York County District Attorney's Office to satisfy any judgment awarded to plaintiff against non-criminal defendant Denise Diaz.

46.     The Court should order Diaz to sell her home, 109 Admiral Lane, Home Number 3109C, Bronx, New York, Block 3432, Lot 1043, and forfeit the proceeds of the sale to plaintiff up to the amount of one hundred twenty-nine thousand eight hundred fifty-eight dollars and sixty-six cents ($129,858.66). That sum of stolen proceeds was converted by Diaz into equity in her home and is proceeds or substituted proceeds subject to forfeiture.

## PRAYER FOR RELIEF

47.     WHEREFORE, plaintiff demands judgment against non-criminal defendant Denise Diaz for: a) an order in favor of the plaintiff forfeiting from the non-criminal defendant three hundred ten thousand dollars ($310,000.00) that constitutes the proceeds and/or substituted proceeds of the crimes committed by the Criminal Defendants that she accepted from Castro; b) an order forfeiting and permitting plaintiff to use the one hundred eighty thousand one hundred forty-one dollars and thirty-four cents ($180,141.34) that Denise Diaz gave to DANY to partially satisfy any judgment entered against Denise Diaz in this action; c) an order directing Diaz to sell her home, 109 Admiral Lane, Home Number 3109C, Bronx, New York, Block 3432, Lot 1043, and forfeiting the proceeds of the sale to plaintiff up to the amount of one hundred twenty-nine thousand eight

10

hundred fifty-eight dollars and sixty-six cents ($129,858.66); d) an order awarding plaintiff interest, costs, and disbursements; e) an order granting the provisional remedies available under CPLR § 1312; and f) whatever further and additional relief this Court deems just and proper.

Dated: New York, New York
      July 10, 2013

<div style="margin-left:40%">

CYRUS R. VANCE, JR.
District Attorney of the County of New York
Plaintiff-Claiming Authority
New York County District Attorney's Office
One Hogan Place
New York, New York 10013

By: _____

Charles King
Assistant District Attorney
Asset Forfeiture Unit
212-335-4037 (direct)
212-335-9251 (facsimile)
kinge@dany.nyc.gov

Attorney for Plaintiff-Claiming Authority

</div>

Cyrus R. Vance Jr. v. Denise Diaz

11

D633

## VERIFICATION

STATE OF NEW YORK      )
                       )  SS.:
COUNTY OF NEW YORK     )

Charles King, an attorney admitted to practice law before the courts of the State of New York, affirms the following under the penalties of perjury:

I am an assistant district attorney in the New York County District Attorney's Office, assigned to the Asset Forfeiture Unit. I am of counsel to the plaintiff and claiming authority herein Cyrus R. Vance, Jr., District Attorney of the County of New York.

I prepared the foregoing Verified Complaint. It is based on numerous conversations with the prosecutors, paralegals, and analysts assigned to the underlying criminal cases, and a review of relevant portions of the district attorney's criminal case files. I believe that the allegations contained in the Verified Complaint are true, based upon those conversations and that review.

Dated:   New York, New York
         July 10, 2013

                                        CYRUS R. VANCE, JR.
                                        District Attorney of the County of New York
                                        Plaintiff-Claiming Authority
                                        New York County District Attorney's Office
                                        One Hogan Place
                                        New York, New York 10013

                      By:

                                        Charles King
                                        Assistant District Attorney
                                        212-335-4037 (direct)
                                        212-335-9251 (facsimile)
                                        kinge@dany.nyc.gov

                                        Attorney for Plaintiff-Claiming Authority

Cyrus R. Vance, Jr. v. Denise Diaz

                                12