



# Law Office of Ricardo A. Aguirre

Attorney & Counselor at Law
644 Soundview Avenue
Bronx, New York 10473
Tel. No. 718-542-9300
Fax No. 718-542-2244
Email: aguirreesq@aol.com



July 29, 2013

**Via Federal Express Mail**
A.D.A. Charles King
N.Y. County District Attorney's Office
One Hogan Place
New York, New York 10013

Re:   *Verified Answer*
      **Cyrus Vance Jr., N.Y. County District Attorney *v. Denise Diaz***
      *New York County Supreme Court, Index No. 451128-2013*

Dear Counselor,

Enclosed, for your review, please find one copy of Defendant's Verified Answer in the instant action.

Sincerely,

Ricardo A. Aguirre
Attorney & Counselor at Law

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
-------------------------------------------------------------------X

CYRUS R. VANCE JR.,
DISTRICT ATTORNEY of the
COUNTY OF NEW YORK

                            Plaintiff,                                  VERIFIED ANSWER

                      -against-

                                                       Index No. 451128/2013

DENISE DIAZ,

                    Non-Criminal Defendant

-------------------------------------------------------------------X

           As and for her answer to the complaint herein, the non-criminal defendant Denise

Diaz respectfully shows and alleges as follows:

      1.        Denies knowledge or information sufficient to form a belief as to the truth of the

allegations set forth in paragraph 1 of the complaint except admits that plaintiff purports to

proceed as stated herein.

      2.        Admits to allegations set forth in paragraph 2, except denies that defendant

refused to pay back approximately $130,000.00.

      3.        Denies knowledge or information sufficient to form a belief as to the truth of the

allegations set forth in paragraph 3 of the complaint except admits that plaintiff purports to

invoke the Court's jurisdiction as stated herein.

      4.        Denies knowledge or information sufficient to form a belief as to the truth of the

allegations set forth in paragraph 4 of the complaint except admits that plaintiff purports to base

venue as stated herein.

D80

5.      Admits to allegations set forth in paragraph 5, except denies knowledge or information sufficient to form a belief as to the truth that plaintiff is an appropriate Claiming Authority.

6.      Admits to allegations set forth in paragraph 6.

7.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 7 of the complaint except admits that criminal defendant George Castro was convicted and imprisoned.

8.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 8 of the complaint, except admits that plaintiff purports said indictments.

9.      Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 9 of the complaint, except admits that plaintiff purports said charges.

10.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 10 of the complaint.

11.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 11 of the complaint.

12.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 12 of the complaint.

13.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 13 of the complaint, except admits that George Castro was tried before a jury.

D81

14.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 14 of the complaint, except admits that George Castro was sentenced and imprisoned.

15.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 15 of the complaint.

16.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 16 of the complaint.

17.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 17 of the complaint.

18.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 18 of the complaint.

19.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 19 of the complaint, except admits that Castro owned a company named IT & Security Solutions.

20.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 20 of the complaint.

21.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 21 of the complaint.

22.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 22 of the complaint.

23.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 23 of the complaint, except admits Castro was in possession of an Audi automobile on or about the time of his arrest.

3

**D82**

24.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 24 of the complaint.

25.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 25 of the complaint.

26.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 26 of the complaint, except admits that Castro gave Denise Diaz approximately $310,000.00.

27.     Denies knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 27 of the complaint, except admits that Denise Diaz was a Sergeant in the New York City Police Department at all time relevant in plaintiff's action..

28.     Admits to allegations set forth in paragraph 28, except denies that Diaz lived with Castro during and after the alleged crimes.

29.     Admits to allegations set forth in paragraph 29, except denies knowledge or information sufficient to form a belief as to the truth of the allegations that said money was stolen from Columbia University.

30.     Admits to allegations set forth in paragraph 30 of the complaint.

31.     Admits to allegations set forth in paragraph 31 of the complaint.

32.     Admits to allegations set forth in paragraph 32 of the complaint.

33.     Admits to allegations set forth in paragraph 33 of the complaint.

34.     Admits to allegations set forth in paragraph 34 of the complaint.

35.     Admits to allegations set forth in paragraph 35 of the complaint.

36.     Denies allegations set forth in paragraph 36 of the complaint.

37.     Admits to allegations set forth in paragraph 37 of the complaint, except denies

D83

having knowledge that said funds were "stolen proceeds".

38.      Admits to allegations set forth in paragraph 38 of the complaint, except denies

having knowledge that said "proceeds" were stolen.

39.      Denies allegations set forth in paragraph 39 of the complaint.

40.      Denies allegations set forth in paragraph 40 of the complaint.

41.      Denies allegations set forth in paragraph 41 of the complaint.

42.      Denies allegations set forth in paragraph 42 of the complaint.

43.      Denies allegations set forth in paragraph 43 of the complaint, except those

allegations where admissions or denials due to lack of knowledge or information sufficient to

form a belief as to the truth of the allegations were made.

44.      Denies allegations set forth in paragraph 44 of the complaint.

45.      Denies allegations set forth in paragraph 45 of the complaint.

46.      Denies allegations set forth in paragraph 46 of the complaint.

47.      Denies allegations set forth in paragraph 47 of the complaint.


## AFFIRMATIVE DEFENSES

As and for their affirmative defenses, the Defendant asserts and state as follows

### First Affirmative Defense

Complaint must be rejected because it fails on its merits.

### Second Affirmative Defense

Plaintiff has failed to state a cause of action upon which relief can be granted.

D84

### Third Affirmative Defense

Plaintiff failed to provide non-criminal defendant a formal demand for a sum certain and a certified forensic accounting of George Castro's bank accounts.

### Fourth Affirmative Defense

Plaintiff commenced this cause of action in retaliation to non-criminal defendant's Notice of Claim for damages she sustained from the false arrest and unlawful imprisonment that Plaintiff's investigator initiated.

### Fifth Affirmative Defense

Violation of the U.S. Constitution's "Due Process Clause" in the Fifth and Fourteenth Amendments.

Defendants reserve the right to assert other defenses as discovery proceeds, including on the advice of counsel and others

Dated: New York, New York
       July 25, 2013

Ricardo A. Aguirre
Law Office of Ricardo A. Aguirre
Attorney for Defendant
644 Soundview Avenue – Suite 6
Bronx, New York 10473
Tel: 718-542-9300
Fax: 718-542-2244

To:    Charles King
       Assistant District Attorney
       New York County District Attorney's Office
       One Hogan Place
       New York, New York 10013

D85

<u>VERIFICATION</u>

STATE OF NEW YORK

) ss:

COUNTY OF BRONX

DENISE DIAZ, being duly sworn, deposes and say that: I am the non-criminal defendant

in this proceeding; I have read the foregoing answer and know the contents thereof; the same is

true to my own knowledge, except as to those matters therein stated to be alleged on information

and belief; and as to those matters I believe to be true.

_____

DENISE DIAZ
Plaintiff

Sworn to before me this
25th day of July, 2013

_____
NOTARY PUBLIC

RICARDO ANTONIO AGUIRRE
Notary Public, State of New York
No. 02AG6056104
Qualified in Bronx County
Commission Expires March 19, 20__

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

INDEX NO.: 451128 - 2013

CYRUS VANCE JR.,
DISTRICT ATTORNEY of the COUNTY of NEW YORK

                                        Plaintiff,

                    -against-

DENISE DIAZ,

                              Non-Criminal Defendant.

## VERIFIED ANSWER

RICARDO A. AGUIRRE, ESQ.
*Attorney for Plaintiff*
644 Soundview Avenue
Suite 6
Bronx, New York 10473
Office: (718) 542-9300
Fax: (718) 542-2244

*Pursuant to 22 NYCRR 130-1.1, the undersigned, an attorney admitted to practice in the courts of the State of New York, certifies that, upon information and belief and reasonable inquiry, the contentions contained in the annexed documents are not frivolous.*

Dated: July 25, 2013                    Signature _____
                                            RICARDO A. AGUIRRE, ESQ.

### AFFIRMATION OF SERVICE

STATE OF NEW YORK ) ss;
COUNTY OF BRONX    )

I, Ricardo A. Aguirre, an attorney admitted to practice law in the State of New York, affirms and says that: I am not a party to the within action for civil forfeiture; I am over 18 years of age; I have an office at 644 Soundview Avenue, Suite 6, Bronx, New York 10473; and on **July 29, 2013**, I served the within copy of the **Verified Answer**, upon Asst. District Attorney Charles King, at the New York County District Attorney's Office, One Hogan Place, New York, N.Y. 10013, by depositing 1 true copy thereof, enclosed in a post-paid wrapper, in an official depository under the exclusive care and custody of the U.S. Postal Service within the State of New York.



Mar 10. 2011  3 19PM    TD Ameritrade                                2545   # 3

IT & SECURITY SOLUTIONS LLC                                     113
ATTN GEORGE CASTRO
115 E 57TH ST. FL 11
NEW YORK NY 10022                          DATE  10/14/10   00-1291/213

PAY TO THE
ORDER OF   Denise Diaz                          | $ 50,000°°

Fifty thousand                                  DOLLARS

**AMERITRADE**
Payable through
TD Bank USA, N.A.
Member FDIC

MEMO    Load.

⑈021912915⑈ 7402646728⑈ 0113

**D113**

Mar 10  20``  2 19PM   TD Ameritrade



Mar 10 2011  3 19PM   TD Ameritrade                          2943  # 5

**IT & SECURITY SOLUTIONS LLC**
**ATTN GEORGE CASTRO**
118 E 57TH ST FL 11
NEW YORK NY 10022

114

PAY 10/22/10  60-1891/818
1

PAY TO THE
ORDER OF   Denise Diaz                          | $ 50,000 00

Fifty thousand                              DOLLARS

**AMERITRADE**
Payable through
TD Bank USA N.A.
See back for...

MEMO    Loans #2

⑈021912915⑈ 74026467281⑈ 0114



D116

**CapitalOne** N.A.                    STATEMENT SAVINGS/CHECKING/MMA WITHDRAWAL

NAME _IT Security Solutions_          DATE _10/28/10_

AMOUNT _Seventy Five Thousand Ten_ _____ DOLLARS

CLIENT SIGNATURE

Issue Check - Check
10/28/2010 11:48:12 88:0877 Doc 8000189590        0000007047081291
CD:B201 M Seq:46  Fee:   $10.00    Total   $75,010.00    AMOUNT WITHDRAWN
ACCOUNT NO.

*7047081291                              $  75,000  00
                                                        6C

⑆5000⑈0166⑈  ⑈7047081291⑈  1482

AccountNum: 7047081291
CheckAmt: 75,010.00
SerialNum: 0
ProcDate: 2010/10/28
MflmSeqNum: 5700903880

945 0057903880 PKT0 >0214079l2<
10/28/2010  NJ  Capitol One
                    MATTITUCK, NY

AccountNum: 7047081291
CheckAmt: 75,010.00
SerialNum: 0
ProcDate: 2010/10/28
MflmSeqNum: 5700903880

**D126**

STATEMENT SAVINGS/CHECKING/MMA WITHDRAWAL

**CapitalOne** N.A.

Issue/Check _Security Systems_ DATE 11/5/10

NAME 11/05/2010 12:43:12 0789 Doc 8000552365

AMOUNT AH/Sex 231 _Three thousand_ DOLLARS

CLIENT SIGNATURE

NYDL
485 150 946
09/05/07            02/23/11

ACCOUNT NO.

* 7047081291

AMOUNT WITHDRAWN

$ 75,000 00

⑊5000⑈0166⑈                    5492

AccountNum: 7047081291
CheckAmt: 75,000.00
SerialNum: 5492
ProcDate: 2010/11/05
MflmSeqNum: 5300240690

AccountNum: 7047081291
CheckAmt: 75,000.00
SerialNum: 5492
ProcDate: 2010/11/05
MflmSeqNum: 5300240690

**I.T. & SECURITY SOLUTIONS LLC**
116 E 57TH ST 11TH FLR
NEW YORK, NY 10022

1010

90-7817214

DATE 11/16/10

PAY TO THE ORDER OF _Denise Divon_   $ 60,000.

_Sixty Thousand_ DOLLARS

**Capital One Bank**
Capital One, N.A.

FOR _Loan #3_

⑈0010⑈⑆021407912⑆704  70 81534⑈

AccountNum: 7047081534
CheckAmt: 60,000.00
SerialNum: 1010
ProcDate: 2010/11/18
MflmSeqNum: 3100064214

AccountNum: 7047081534
CheckAmt: 60,000.00
SerialNum: 1010
ProcDate: 2010/11/18
MflmSeqNum: 3100064214

**D117**















D751



D752









D755



D756







1

2    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
3    ------------------------------------------X
     DENISE DIAZ,
4
                                    PLAINTIFF,
5
6              -against-           Case No:
                                   13 CIV 8281
7

8    CITY OF NEW YORK, JOSE FLORES, individually
     and in his official capacity as
9    Investigator for the New York County
     District Attorney's Office, JOHN DOE 1,
10   individually and in his official capacity
     as Police Officer in the NYPD, and JOHN DOE
11   2, individually and in his official
     capacity as an Officer in the NYPD or the
12   New York County District Attorney's Office,

13                                 DEFENDANTS.
     ------------------------------------------X
14                 DATE: August 27, 2015

15                 TIME: 10:14 A.M.

16

17            DEPOSITION of a Non-Party

18   Witness, ANTHONY BORELLI, taken by the

19   Respective Parties, pursuant to a Subpoena

20   and to the Federal Rules of Civil

21   Procedure, held at the office of New York

22   County District Attorney's Office, 80

23   Centre Street, New York, New York 10013,

24   before John A. Lugo, a Notary Public of the

25   State of New York.

2

```
 1

 2    A P P E A R A N C E S:

 3

 4    RICARDO A. AGUIRRE, ESQ.
        Attorney for Plaintiff
 5      DENISE DIAZ
        644 Soundview Avenue, Suite 6
 6      Bronx, New York 10473
        BY: RICARDO A. AGUIRRE, ESQ.
 7

 8

 9

10    NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE
        Attorneys for the Defendants
        CITY OF NEW YORK, JOSE FLORES,
11      individually and in his official capacity
        as Investigator for the New York County
12      District Attorney's Office, JOHN DOE 1,
        individually and in his official capacity
13      as Police Officer in the NYPD, and JOHN
        DOE 2, individually and in his official
14      capacity as an Officer in the NYPD or the
        New York County District Attorney's
15      Office
        80 Centre Street
16      New York, New York 10013
        BY: ELIZABETH N. KRASNOW, ESQ.
17               -and-
           MAUREEN O'CONNOR, ESQ.
18

19

20

        JOHN PATTEN, ESQ.
21        Attorney for Non-Party Witness
          ANTHONY BORELLI
22        30 Vesey Street
          New York, New York 10007
23      BY: JOHN PATTEN, ESQ.

24

25              *        *        *
```

```
1                        A. BORELLI
2         Q.    Who is it?
3         A.    That's the captain, the duty
4    captain.
5         Q.    Brandon DelPozo?
6         A.    Uh-huh.
7         Q.    Did you see Captain DelPozo at
8    Sergeant Diaz's home on November 24, 2010?
9         A.    I don't remember seeing him,
10   but I know I definitely saw him in the
11   precinct.
12                   MR. PATTEN:  That day?
13                   THE WITNESS:  That day.
14        Q.    Sergeant Borelli, I believe you
15   testified earlier that there came a time
16   that you left Sergeant Diaz's house and
17   went to the 43rd Precinct, correct?
18        A.    Yes.
19        Q.    What led up to you going to the
20   43rd Precinct?
21        A.    What led up to it?  We had to
22   go back there.  They told us go back to the
23   precinct.  They ordered her to go the
24   precinct.
25        Q.    Who is they?
```

```
 1                    A. BORELLI
 2        A.    Whoever the job is or -- all I
 3   know, we ended up -- we had to go back to
 4   the 43rd Precinct.
 5        Q.    Who told you that you had to go
 6   back to the 43rd Precinct?
 7              MR. PATTEN:  Are you looking
 8         for a specific name or identity by
 9         title?
10        Q.    Well, at some point you learned
11   that you had to go back to the precinct,
12   right?
13        A.    Yeah.  All -- any kind of
14   interviews or anything that gets done gets
15   done at the precinct.  So the resident
16   precinct that was the 43rd Precinct, so we
17   ended up back there.
18        Q.    And when you say interviews,
19   you mean interviews by the police
20   department?
21        A.    Correct.
22        Q.    Interviews with Sergeant Diaz?
23        A.    Yes.
24        Q.    So it was your understanding,
25   and correct me if I'm wrong, that somebody
```

```
  1                    A. BORELLI
  2     in the NYPD had directed Sergeant Diaz to
  3     report to the 43rd Precinct?
  4          A.    Correct, because they couldn't
  5     direct me to go there, they had to direct
  6     her.
  7          Q.    And what's the basis for that
  8     understanding?  Did she tell you that or
  9     did somebody else tell you that?
 10          A.    I don't know.  I don't know.
 11          Q.    But in any event, you went to
 12     the 43rd Precinct, correct?
 13          A.    Yes, we ended up in the
 14     43rd Precinct.
 15          Q.    How did you get to the 43rd
 16     Precinct?
 17          A.    I drove.
 18          Q.    You drove Sergeant Diaz?
 19          A.    I believe I did.
 20          Q.    In your personal car?
 21          A.    I might have, yes.
 22          Q.    Was anyone else in the car?
 23          A.    No.
 24          Q.    The individual from DANY that
 25     you spoke to about who you were going to
```

```
 1                    A. BORELLI
 2   showed up.
 3         Q.    At any point, did anyone ever
 4   tell you that she was under arrest?
 5         A.    No, because when I left, they
 6   weren't sure what was going on.
 7         Q.    But my question is --
 8         A.    No.  The answer is no.  Nobody
 9   ever told me she was under arrest.
10              MS. KRASNOW:  I don't have any
11          further questions.
12              MR. AGUIRRE:  I just have a
13          question for clarification.
14   EXAMINATION BY
15   MR. AGUIRRE:
16         Q.    Sergeant Borelli, my name is
17   Ricardo Aguirre.  I'm an attorney.  I
18   represent Sergeant Diaz in the civil case.
19              I'm just going to ask you some
20   questions for clarification.  If you don't
21   understand them, just ask me to repeat
22   them, okay?
23         A.    Okay.
24         Q.    So, when ADA Krasnow asked you
25   about an MOS, when the member of the
```

1                     A. BORELLI

2    sick, who is the individual that can place

3    that person back on full duty?

4         A.    The surgeon.

5         Q.    In this particular instance,

6    did you or were you aware of the fact that

7    Sergeant Diaz was out sick?

8         A.    I don't believe so, no.

9         Q.    If you know, do you know if any

10   of the supervisors from NYPD knew that she

11   was out sick at the time?

12        A.    For this incident, I don't

13   know.

14        Q.    ADA Krasnow asked whether or

15   not you heard anyone utter the words,

16   correct me if I'm wrong, "she's under."  I

17   wasn't clear with your answer, do you

18   recall hearing that?

19        A.    I do not recall hearing that,

20   no.

21             (Continued on next page to

22        include jurat.)

23

24

25



1

2    UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

3    ------------------------------------------X
DENISE DIAZ,

4                            PLAINTIFF,

5

6            -against-      Case No:
                           13 CIV 8281

7

8    CITY OF NEW YORK, JOSE FLORES, individually
and in his official capacity as

9    Investigator for the New York County
District Attorney's Office, JOHN DOE 1,

10   individually and in his official capacity
as Police Officer in the NYPD, and JOHN DOE

11   2, individually and in his official
capacity as an Officer in the NYPD or the

12   New York County District Attorney's Office,

13                         DEFENDANTS.
------------------------------------------X

14               DATE: August 27, 2015

15               TIME: 12:14 P.M.

16

17          DEPOSITION of the Defendant,

18   JOSE FLORES, taken by the Plaintiff,

19   pursuant to a Notice and to the Federal

20   Rules of Civil Procedure, held at the

21   office of New York County District

22   Attorney's Office, 80 Centre Street, New

23   York, New York 10013, before John A. Lugo,

24   a Notary Public of the State of New York.

25

2

```
 1

 2      A P P E A R A N C E S:

 3

 4      RICARDO A. AGUIRRE, ESQ.
          Attorney for Plaintiff
 5        DENISE DIAZ
          644 Soundview Avenue, Suite 6
 6        Bronx, New York 10473
          BY: RICARDO A. AGUIRRE, ESQ.
 7

 8

 9
        NEW YORK COUNTY DISTRICT ATTORNEY'S OFFICE
10      Attorneys for the Defendants
          CITY OF NEW YORK, JOSE FLORES,
11        individually and in his official capacity
          as Investigator for the New York County
12        District Attorney's Office, JOHN DOE 1,
          individually and in his official capacity
13        as Police Officer in the NYPD, and JOHN
          DOE 2, individually and in his official
14        capacity as an Officer in the NYPD or the
          New York County District Attorney's
15        Office
          80 Centre Street
16        New York, New York 10013
          BY: ELIZABETH N. KRASNOW, ESQ.
17                  -and-
              MAUREEN O'CONNOR, ESQ.
18

19

20

21

22              *           *           *

23

24

25
```

```
 1                    J. FLORES
 2    correct?
 3         A.    Yes.
 4         Q.    And you can also make a
 5    determination as to whether or not a person
 6    is eligible to be arrested based on
 7    probable cause, correct?
 8         A.    Yes.
 9         Q.    I'm sorry, your title now,
10    again, is?
11         A.    Supervising investigator.
12         Q.    And in your capacity as a
13    supervising investigator, you could also
14    direct one of your investigators to make an
15    arrest?
16              MS. KRASNOW:   Form.
17         A.    Yes.
18         Q.    So let's go back to November
19    24, 2010.
20              Who called you?
21         A.    Someone from the office, I
22    don't recall exactly who called me.
23         Q.    And what, if anything, did they
24    tell you when they called?
25         A.    They needed a supervisor to
```

```
1                    J. FLORES
2    respond to that location.
3         Q.    And what did you say to that?
4         A.    I said okay.
5         Q.    Did you ask them why you needed
6    to go over there?
7         A.    They just said they needed an
8    extra supervisor and I went directly there.
9         Q.    Did they tell you what the
10   subject of the event taking place that you
11   had to go to, did they tell you what was
12   going on, that person on the phone?
13        A.    There was possibly going to be
14   a search warrant at this location and an
15   arrest had been made, so they needed an
16   extra supervisor.
17        Q.    At the time you received that
18   phone call, were you informed which
19   investigators were on the scene?
20        A.    No.
21        Q.    So my understanding is the
22   person that spoke with you conveyed to you
23   that there was an arrest made and that
24   there was a pending search warrant that was
25   going to be executed, correct?
```

1                    J. FLORES

2          Q.    Now, at that point, did you

3    know who George Castro was when you

4    received that information?

5          A.    No.

6          Q.    So at that point, you don't

7    know whether or not George Castro was

8    arrested; is that correct?

9          A.    I know he was arrested, that I

10   know, but that's all I know.

11         Q.    So just to be clear with your

12   testimony.

13               You get out of your car, you

14   walk over to the location, prior to

15   entering in you have the shield

16   displayed --

17         A.    Yes.

18         Q.    -- on your outer garment?

19               You see a couple of NYPD

20   uniformed officers on the steps leading

21   into the house, correct?

22         A.    Yes.

23         Q.    You believe that at the door is

24   standing the duty captain.  You also

25   testified that you think you spoke to

```
 1                      J. FLORES
 2     someone from DANY's investigative team
 3     prior to speaking to the duty captain; is
 4     that correct?
 5          A.    Yes.
 6          Q.    But you cannot identify who
 7     that person is?
 8          A.    No, I don't know.
 9          Q.    And that person informed you
10     that there was a sergeant from NYPD inside?
11          A.    Yes.
12          Q.    And that she possibly could be
13     married to --
14          A.    An individual that was arrested
15     by other members of DANY.
16          Q.    But you previously said that
17     she could have been married to George
18     Castro?
19          A.    To Castro, I said that before.
20          Q.    I just want to be clear.
21          A.    And I understood that Castro
22     was under arrest already.
23          Q.    How did you understand that?
24          A.    At some point I was told that.
25          Q.    At what point; before you went
```

```
1                          J. FLORES
2          A.    Yes.
3          Q.    How many?
4          A.    Either one or two.  I don't
5     remember.  I think it was two.
6          Q.    So now, you get in, who is the
7     first person you speak to?
8          A.    The captain, the duty captain.
9          Q.    What was his name?
10         A.    I don't recall right now.
11         Q.    And when you went up to him,
12    what, if anything, did you say to him?
13         A.    We had a conversation and I
14    remember the duty captain asking me let me
15    know when you're finished here.  But at
16    that point I'm not doing anything.
17         Q.    Okay.  Let's go back a bit.
18               You come up to the duty
19    captain, did you identify yourself?
20         A.    Yes.
21         Q.    What did you say?
22         A.    I'm a supervisor with the
23    District Attorney's Office.
24         Q.    And what did he say back to
25    you?
```

1                    J. FLORES

2          A.     I don't remember.  He didn't

3     have to say anything, he was the duty

4     captain.

5          Q.     So after identifying himself,

6     did you ask him a question?

7          A.     I don't remember.

8          Q.     So let me ask you this.

9                 Upon arriving on the scene

10    seeing what you just described,

11    understanding that there was a female

12    officer in there from NYPD that could be

13    possibly related to someone arrested, and

14    not knowing anything about this case prior

15    to entering, wouldn't it be incumbent upon

16    you to ask what's going on?

17                MS. KRASNOW:  Form objection.

18         A.     At some point I asked one of

19    the investigators.  I must have asked what

20    was going on with this.  I had no idea what

21    I was walking into.

22         Q.     Let's go back to your

23    conversation with the duty captain.

24                You mentioned that he said to

25    you let us know when you're done?

1                    J. FLORES

2          A.    Yes.

3          Q.    What did you understand that to

4    mean?

5          A.    I remember saying that we were

6    waiting for a search warrant and the duty

7    captain asked me to let him know when I was

8    done.  It took a long time, it took a while

9    to get the search warrant.

10         Q.    What, if anything, did you

11   speak about concerning Sergeant Diaz?

12                MS. KRASNOW:  Form objection.

13         Q.    Well, let me ask you and I'll

14   rephrase the question.

15                Did there come a time that you

16   and the duty captain spoke about Sergeant

17   Diaz?

18         A.    Yes.

19         Q.    What, if anything, did you

20   speak about?

21         A.    He advised me -- he asked me to

22   let him know when I was done in the place

23   because he was going to have Sergeant Diaz

24   ordered over to the 43rd Precinct.

25         Q.    Did he tell you why he was

1                      J. FLORES

2    going to do that?

3          A.    No.

4          Q.    Did you talk to him about her

5    possibly being a subject in your

6    investigation?

7          A.    No.

8          Q.    Outside of that statement by

9    the duty captain, was there any further

10   conversation between you and the duty

11   captain concerning Sergeant Diaz?

12         A.    Not that I remember.

13         Q.    Did there come a time you spoke

14   with Sergeant Diaz in her residence on

15   November 24, 2010?

16         A.    Yes.

17         Q.    What, if anything, was said?

18         A.    I advised her that -- I

19   distinctly remember I advised her that I

20   didn't want to interview her, that I wanted

21   to talk to the delegate, the sergeant

22   delegate.  And I also advised her that we

23   were waiting for a search warrant for her

24   place.

25         Q.    What were you going to ask her?

1                         J. FLORES

2          A.    No.

3          Q.    Did there come a time where you

4    declared that she was associating with a

5    known felon?

6          A.    No, all I had -- I was waiting

7    for a search warrant.  It was the only

8    thing I was going to do.

9          Q.    Let me ask the question again.

10               Did there ever come a time

11   where you stated that she was associating

12   with a known felon?

13         A.    No.

14         Q.    You never said that to her?

15         A.    No.

16         Q.    You never declared that in

17   front of everybody that was there?

18         A.    No.

19         Q.    As you're leaving, tell me who

20   left the apartment at the time you were

21   leaving with your investigators.

22         A.    I don't know.  All I remember

23   we all left.  We all went outside to the

24   sidewalk.

25         Q.    Well, who was in front of you?

```
1                       J. FLORES
2          A.    I don't remember.
3          Q.    Do you remember whether or not
4    Sergeant Diaz remained or Sergeant Diaz
5    left before you?
6          A.    I don't remember.  At some
7    point she left with the NYPD people.
8          Q.    Let me ask you this.
9                When you were leaving, was
10   Sergeant Diaz in front of you as you were
11   walking down the steps?
12         A.    I don't remember.
13         Q.    Was the duty captain with you
14   as you were leaving the premises?
15         A.    We all left.  Every person that
16   was involved with law enforcement came out
17   of the house.  I don't know -- I don't
18   remember if she was in front of me or
19   behind me.  We all left, we all went
20   outside.
21         Q.    Were there any relatives, to
22   your knowledge, that Sergeant Diaz had on
23   the premises besides her two children, do
24   you recall?
25         A.    I don't recall.  Could have
```

<pre>
 1                    J. FLORES
 2    been, but I don't recall.
 3         Q.    Do you recall speaking to
 4    Sergeant Diaz about having been a member of
 5    the New York City Police Department?
 6         A.    Yes.
 7         Q.    What did you tell her?
 8         A.    I must have mentioned I was
 9    retired from NYPD.
10         Q.    So you engaged in conversation
11    with Sergeant Diaz?
12         A.    But I was in the process of
13    saying I'm waiting for your delegate and I
14    distinctly remember saying I was waiting
15    for the delegate to come.
16         Q.    So, there came a time when you
17    introduced yourself to Sergeant Diaz,
18    correct?
19         A.    Yes.
20         Q.    When you introduced yourself,
21    what did you say to her?
22         A.    That I was a supervisor from
23    the District Attorney's Office.
24         Q.    And then what did you say next?
25         A.    And I remember saying that we
</pre>

1                    J. FLORES

2   were waiting for a search warrant for the

3   house.

4        Q.    In there somewhere you

5   mentioned you were retired?

6        A.    Yes.

7        Q.    At no time you asked whether or

8   not she would consent to a warrantless

9   search of her house?

10       A.    No, I didn't ask that.  I was

11  going to get a search warrant, I was going

12  to wait for that search warrant.

13       Q.    Okay.  Who ordered the search

14  warrant, to your knowledge?

15            MS. KRASNOW:   Form.

16       A.    I don't know.

17       Q.    Did you speak to anyone else

18  besides the person you spoke on the phone

19  who told you to report to that address?

20  Did you speak to anyone else after that on

21  the phone concerning the search warrant?

22       A.    I spoke to -- I believe I spoke

23  to Investigator Wigdor, W-I-G-D-O-R.

24       Q.    What did he say to you?

25       A.    All I remember was I was told

```
1                    J. FLORES
2         A.    Under arrest.
3         Q.    I want to go back to when you
4    were leaving the apartment.
5                    To the best of your
6    recollection, when you were leaving the
7    apartment, who was in front of you when you
8    were leaving the apartment, if you recall?
9         A.    I don't recall.
10        Q.    I'm sorry if I asked this
11   question before, I apologize, besides her
12   two children, Sergeant Diaz's two children,
13   do you recall seeing any other family
14   members that were on her premises on
15   November 24, 2010?
16        A.    I don't recall.
17        Q.    Do you recall her saying that
18   she had her aunt there or a woman by the
19   name of Josephine?
20        A.    She could have been, but I
21   don't remember.
22        Q.    Did there come a time when you
23   were entering the premises that you said to
24   the duty captain, "she's under"?
25        A.    No, I never said that.
```

1                    J. FLORES

2    cooperating or not cooperating.

3         Q.    Well, was she or wasn't she

4    cooperating?

5         A.    I didn't question her.  I

6    didn't interview her.  But she was not

7    cooperating.

8         Q.    How was it that she did not

9    cooperate?

10        A.    She wanted us out of the house,

11   I remember that.  She wanted everybody to

12   get out of the house.  That was about it,

13   from what I remember.

14        Q.    You testified earlier that

15   there were various individuals, officials

16   from DANY, officials from NYPD in her

17   apartment when you walked in, correct?

18        A.    Yes.

19        Q.    When you walked in, at any

20   time, did she say get out of my house or

21   say something close to that?  Did she ask

22   people to leave when you walked in the

23   apartment?

24        A.    I don't remember.

25        Q.    You also testified earlier that

```
 1                    J. FLORES
 2    believe a copy of the warrant was
 3    either faxed or somehow sent to the
 4    attorney.
 5         Q.    How would you know that?
 6         A.    I'm trying to remember.
 7         Q.    When you were outside, did you
 8    see Sergeant Diaz leave the premises,
 9    leave outside of her premises, leave to go
10    anywhere?  Did you see her go anywhere?
11         A.    At some point I think she left
12    with members of the NYPD.
13         Q.    Do you know how she left?  Did
14    she walk?
15         A.    No, I don't remember.
16         Q.    Did you see if she got into a
17    vehicle?
18         A.    I don't remember.
19         Q.    Once she left the premises, you
20    mentioned you remained on the premises.
21              Around what time did the search
22    warrant get there?
23         A.    We remained outside the
24    premises.
25         Q.    Right, outside the premises.
```

```
 1                      J. FLORES
 2        A.      It took a while to get the
 3   warrant.
 4        Q.      Approximately, what time did it
 5   get there?
 6        A.      It's in one of the reports.  I
 7   don't remember right now.
 8        Q.      How long did the search take?
 9        A.      Probably a couple of hours.
10        Q.      Around what time did you leave?
11        A.      I think we finished somewhere
12   around after 5:30.
13        Q.      Upon the conclusion of the
14   search, what, if anything, did you do?  Did
15   you call anybody, did you document
16   anything?
17        A.      We documented whatever we took
18   from the place.  We left copies of the
19   inventory sheets of everything that we
20   took, left it at the residence.  And I
21   remember calling the delegate because I
22   understand he had the keys to the house, to
23   come back and secure the house.
24        Q.      Do you know who the delegate
25   was, do you remember his name?
```



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x

DENISE DIAZ,

                       Plaintiff,

         -against-

THE CITY OF NEW YORK, et al.,

                   Defendants.

------------------------------------------------------------------ x

**DECLARATION OF
BRANDON DEL POZO**

13 Civ. 8281 (JCF)

       **BRANDON DEL POZO**, declares pursuant to 28 U.S.C. §1746, under penalty of perjury, that the following is true and correct:

1.      I served with the New York City Police Department ("NYPD") from _APRIL 15, 1997_ through July, 2015.  On July 31, 2015, I retired from the NYPD with the rank of Deputy Inspector.

2.      As of November 24, 2010, my assignment with the NYPD was Duty Captain of Patrol Borough Bronx.

3.      On the morning of November 24, 2010, I received a notification to respond to an incident at a home on Admiral Lane within the confines of the NYPD 43rd precinct.

4.      While at the location, which I later learned to be the home of NYPD Sergeant Denise Diaz, I spoke to an investigator from the New York County District Attorney's Office ("DANY").  I no longer recall that individual's name.

5.      The DANY investigator told me, in sum and substance, as follows:

a.    DANY investigators went to the house on Admiral Lane to arrest an individual known to live there, George Castro, based on a complaint that Castro had stolen millions of dollars from Columbia University and to execute a search warrant.

b.    Upon arriving, the DANY investigators discovered that Castro's wife or common-law wife, Denise Diaz, was a Sergeant with the NYPD.

c.    Sergeant Diaz lived with Castro at the house.

6.    Pursuant to NYPD Patrol Guide §203-10, a member of the service may not knowingly associate with an individual "reasonably believed to be engaged in, likely to engage in, or to have engaged in criminal activities." A copy of the current version of Patrol Guide §203-10 is attached to this declaration as Exhibit A. A similar, if not identical, version of §203-10 was in effect in November, 2010.

7.    As the circumstances before me implicated Patrol Guide §203-10, I ordered that Sergeant Diaz be placed on-duty, that she leave the house, and that she report to the NYPD 43rd precinct so that the Police Department could investigate her relationship with George Castro and why she was present at (and lived at) a location that was the target of a search warrant.

8.    Sergeant Diaz was not charged with a criminal offense. She was placed on-duty and ordered to the precinct under the authority of the NYPD to investigate misconduct among its own officers.

9.        I have no recollection of any representative of DANY stating, to me or to

anyone else, that Sergeant Diaz was "associating with a known felon" or that

she was "under," as in, under arrest.  My decision to order that Diaz be

placed on duty, that she leave the house, and that she report to the 43rd

precinct was not based on, or otherwise influenced by, any such statements

by a representative of DANY.


Executed in _BURLINGTON_ , Vermont on September 19, 2015.
                                                    OCTOBER

BRANDON DEL POZO

3

# Exh. A

## PATROL GUIDE

| Section: General Regulations | | Procedure No: 203-10 | |
|---|---|---|---|
| **PUBLIC CONTACT - PROHIBITED CONDUCT** | | | |
| DATE ISSUED:<br>10/03/14 | DATE EFFECTIVE:<br>10/03/14 | REVISION NUMBER: | PAGE:<br>1 of 3 |

**PUBLIC CONTACT – PROHIBITED CONDUCT**

1. Using discourteous or disrespectful remarks regarding another person's ethnicity, race, religion, gender, gender identity/expression, sexual orientation, or disability.

    a. Members shall address the public using pronouns, titles of respect, and preferred name appropriate to the individual's gender identity/expression as expressed by the individual. The term "gender" shall include actual or perceived sex and shall also include a person's gender identity, self-image, appearance, behavior, or expression, whether or not that gender identity, self-image, appearance, behavior, or expression is different from that traditionally associated with the legal sex assigned to that person at birth.

2. Knowingly associate with any person or organization:

    a. Advocating hatred, oppression, or prejudice based on race, religion, gender, gender identity/expression, sexual orientation, or disability.

    b. Disseminating defamatory material.

    c. Reasonably believed to be engaged in, likely to engage in, or to have engaged in criminal activities.

    d. Preventing or interfering with performance of police duty.

3. Divulging or discussing official Department business, except as authorized.

4. Manipulating manually or electronically, transmitting in any form, or distributing any official Department recorded media or recorded media coming into possession of the Department as evidence or for investigative purposes except as authorized for official Department business. Recorded media includes videotapes, photographic images or pictures, audio recordings, electronic or internet files, or any like forms to be available in the future.

5. Engaging in conduct prejudicial to good order, efficiency, or discipline of the Department.

6. Making recommendation for or concerning any person or premises to any government agency in connection with issuance, revocation, or suspension of any license or permit, except when required in performance of duty.

7. Soliciting, collecting, or receiving money for any political fund, club, association, society, or committee.

8. Joining any political club within the precinct to which assigned.

9. Being a candidate for election to, or serving as member of a School Board, if School District is located within City of New York (see Section 2103-a, Education Law).

10. While on duty or in uniform, endorsing political candidates or publicly expressing personal views and opinions concerning the merits of:

    a. Any political party or candidate for public office;

## NEW • YORK • CITY • POLICE • DEPARTMENT

**PATROL GUIDE**

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 203-10 | 10/03/14 | | 2 of 3 |

**PUBLIC CONTACT – PROHIBITED CONDUCT (continued)**

    b.    Any public policy matter or legislation pending before any government body; <u>or</u>

    c.    Any matter to be decided by a public election,

except with the permission of the Police Commissioner.

11.    Having an interest in or association with premises engaged in illegal gambling operations, smoke shops, after hours clubs, or similar illegal activities, except in performance of duty.

12.    Patronizing unlicensed premises (social clubs, after hours clubs, etc.) where there is illegal sale of alcoholic beverages and/or use of drugs, except in performance of duty.

13.    Violating Section 1129 of the New York City Charter. This section provides that any uniformed member who shall accept any additional place of public trust or civil emolument, OR who shall be nominated for any office elective by the people, and does not decline said nomination within ten days, shall be deemed thereby to have vacated his or her position/office in the Department. This vacatur of office **shall not** apply to the following:

    a.    A member of a community board

    b.    An appointment, nomination, or election to a board of education outside the City of New York

    c.    A member, who with the written authorization of the Mayor, shall accept any additional place of public trust or civil emolument, while on leave of absence without pay from the Department.

    d.    A member who, with the written approval of the Police Commissioner, shall accept any additional place or position outside the City of New York, limited to volunteer work as a member or volunteer in, of, or for a community board, not-for-profit corporation, volunteer fire department, or other similar community-oriented entity.

14.    Smoking in public view while in uniform.

15.    Occupying seat in a public conveyance, while in uniform, to exclusion of paying passenger.

16.    Occupying seat on a train, while in uniform and assigned to train patrol duties.

17.    Using personal card describing police business, address, telephone number, or title except as authorized by Department Manual.

18.    Rendering any service for private interest, which interferes with proper performance of duty.

19.    Possessing or displaying police shield, **IDENTIFICATION CARD (PD416-091)**, or similar object except as authorized by the Police Commissioner.

20.    Failing to provide notice to the Department of an obligation or intention to perform services in any federal military branch or state militia organization.

**NEW • YORK • CITY • POLICE • DEPARTMENT**

**PATROL GUIDE**

| PROCEDURE NUMBER: | DATE EFFECTIVE: | REVISION NUMBER: | PAGE: |
|---|---|---|---|
| 203-10 | 10/03/14 | | 3 of 3 |

**PUBLIC CONTACT – PROHIBITED CONDUCT (continued)**

21. Serving on a community board's Public Safety Committee (which deals directly with Police Department and other law enforcement matters).

22. Voting on any matter that comes before the community board concerning Police Department activities in the district that the board serves.

23. Wearing any item of command-related merchandise which contains a Department logo or shield, or in any way identifies its wearer with the New York City Police Department, unless approved by the commanding officer concerned prior to being worn by a member of the service, uniformed or civilian, on or off duty.

    a.    This prohibition extends to the use of the Department logo or shield in artistic or mural form, in caricature or cartoon-like representation, or on such items that include, but are not limited to:

        (1)    Pins

        (2)    Jewelry

        (3)    Hats

        (4)    Mugs

        (5)    Clothing items

        (6)    Patches

        (7)    Writing implements

        (8)    Challenge coins

        (9)    Department property (walls, muster room entryway, watercraft, etc.)

        (10)    Any other adornment or curio.

**NEW • YORK • CITY • POLICE • DEPARTMENT**



POLICE DEPARTMENT
CITY OF NEW YORK
INTERNAL AFFAIRS BUREAU
INVESTIGATING OFFICER'S REPORT

**From:** Sergeant Tara Cruz                                **Command:** IAB Group#10

**Callout:** #10-3309                                       **IAB Log:** #10-58607

**Accompanying Investigator:** Sgt. Joseph White

**Complainant:** Columbia University

**Officer Witnesses:** Lt. Timothy Burke, Tax# 895249, 43rd Precinct

**Subject Officer:** Sgt Denise Diaz, Tax # 917536, 24th Precinct

**Allegation:** Association   Crime (Family Member)

••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••••

**Subject:** Callout#10- 3309

**Time:** 2100          **Day:** Wednesday          **Date:** 11/24/10

**Details:** On the above date at approximately 1130 hrs, the undersigned along with Sgt. White, were assigned callout # 10-3309 for investigation of the following details:

As part of the investigation the Investigators obtained the S/O's *PA-15* for 1 Police Plaza Personnel Records Unit. The PA-15 listed the S/O as *Single* upon appointment to the department on 07/18/96. There was no mention of a spouse, common law, or any family member with the name George Castro. No negative data was uncovered during her application investigation.

At 1345 hours, the S/O was present at the 43rd Pct, along with her SBA representation, Sergeant Anthony Borelli. The I/O's officially placed the S/O on *Modified Assignment*, as per Captain Andrea, CO IAB Group 10, under the authority of Chief Campisi. The I/O notified the Command Center at 1400 hours, of the S/O's change of duty status.

The Investigators conducted official department hearings under PG 206-13 and PG 203-08 of PO Finnelli and Lt. Burke of the 43rd Precinct. PO Finnelli, Tax #880894, Shield 7531, 43rd Precinct was represented by PO McGee, PBA Delegate and stated the following in sum and substance. PO Finelli was working 0705X1540 and assigned as the Lieutenants operator. PO Finnelli was in uniform and assigned to patrol in a marked RMP. At approximately 0828 he was notified by Lt. Burke to respond to 109 Admiral Lane for a job that originated from the station house. Once at the location they were met by an off-duty female MOS. The female MOS identified herself immediately and showed her department ID card to the Lieutenant. The female was visibly upset and was accompanied by a male and female child. He was informed by a Detective from the Manhattan District Attorneys Office that an arrest of a male was effected at the location prior to their arrival. PO Finnelli did not observe the male who was arrested at the location or inside any of the Manhattan DA vehicles, nor did he learn the apprehended males identity. He had no knowledge of the S/O's association or relationship to the male who had been arrested. To his knowledge the S/O did not interfere in any portion of the Manhattan DA Office arrest or search warrant proceedings. At approximately 0920 hours they left the location. PO Finnelli had no other information of investigative value to add to the investigation.

Lt. Timothy Burke, Tax# 895249, 43rd Precinct was represented by Lt. Daniel Brown, BX Director, LBA. He was officially interviewed and stated the following in sum and substance: He was working a 0650x1535 tour and was assigned as the day tour platoon commander. Lt. Burke was covering patrol with his operator, PO Finelli, in a marked RMP, when he was contacted via cell phone by the 43rd Pct. Desk Officer, Sgt. Laura

30

**D372**

Perez.  He was informed that an unidentified female sergeant called the desk crying and requested a delegate to her residence. The nature of the call was unknown at this time. Lt. Burke obtained the address and immediately responded to the location. Lt. Burke notified Central of his location and put himself on a 10-61 from the precinct. Once at the location (109 Admiral Lane) he was met by off-duty Sergeant Denise Diaz. The S/O showed Lt. Burke her NYPD Identification card and stated she works at the 24th Precinct.  The female was dressed in civilian clothes and appeared extremely upset.  She stated that her children's father had been arrested, but did not provide any further details.  At no time did the S/O make any statements to Lt. Burke. He did not over hear any statements and/or comments she made to the investigators from the Manhattan DA Office.  At the scene, Lt. Burke observed four (4) investigators from the Manhattan DA Office. He conferred with Det. Reginald Barnett who informed him that they made an arrest of one individual prior to there arrival. *To his knowledge the S/O was not a subject of there investigation and was not being held for any reason.*  The S/O left the location of her own free will with her delegate who was also present. Lt. Burke had no further involvement with the Manhattan DA Investigators and nothing of value to add to the investigation.

Copies of the Receipts from the Search Warrant executed at the S/O's residence along with copies of the 43rd Pct Second Platoon Roll Call and memo-book entries were obtained and incorporated into the call-out folder.

The undersigned conferred with Group 10 Commanding Officer, Captain Peter Andrea.  Captain Andrea recommends this case be assigned as a "C" case to Group 10.

Expenses Incurred: N/A

Investigating
Officer _____        Accompanying _____
            Sergeant Tara Cruz              Investigator      Sergeant Joseph White

Team Leader _____
              Lieutenant Anthony Henry

Commanding Officer _____
                    Captain Peter Andrea

POLICE DEPARTMENT
CITY OF NEW YORK
INTERNAL AFFAIRS BUREAU
INVESTIGATING OFFICER'S REPORT

**From**: Sergeant William Ramirez                    **Command**: IAB Group#10

**Callout**: #10-3309                                        **IAB Log**: #10-58607

**Accompanying Investigator**: Sgt. Fuentes

**Complainant**: Columbia University

**Subject Officer**: Sgt Denise Diaz, Tax # 917536, 24th Pct

**Allegation**:  Association – Crime (Family Member)

**.......................................................................**

**Subject**:  Callout#10- 3309

**Time**: 1435                    **Day**: Wednesday                    **Date**: 11/24/10

**Details**: On the above date at approximately 1435 hrs, Sergeant William Ramirez was assigned callout # 10-3309 for investigation of the following details:

On 11/24/10, at approx. 0919 hrs, reporter Lt. Burke, Tax #895249, 43rd Pct notified the command center to report the following: I/O's from the Manhattan District Attorney's office pursuant to an active investigation, apprehended the S/O's common-law husband, George Castro, M/H, DOB 02/23/62, as he was exiting the S/O's residence in possession of a bag that contained a computer and $400,000.00 U.S.C in unknown denominations.

An interview with reporter Lt. Burke revealed that S/O Sgt. Diaz was present in her residence at the time that Mr. Castro was apprehended by investigators from the NY County DA's office. The S/O exited her residence upon becoming aware of the interaction between Mr. Castro and investigators and was visibly distraught; the S/O subsequently contacted the 24th Pct. desk, prompting 24th Pct. personnel to contact the S/O's resident Pct., the 43rd Pct., who immediately dispatched the reporter to the S/O's residence. At the residence, the S/O advised that Mr. Castro had formerly resided at the location but had ceased residing there as recently as August 2010; however, a NYS DMV check revealed that Mr. Castro purchased and registered to the S/O's address a 2011 Audi Q7, White Suburban, NY Plate FFW1351 on November 18, 2010, six (6) days prior. The S/O further advised that the bag recovered from Mr. Castro was his property and that she had no access to it. Upon arrival of Bronx Duty Captain Brandon Del-Pozo Tax # 918925, the S/O was placed on duty and subsequently transported to the 43rd Pct. station house to await I/O's from the Internal Affairs Bureau. The residence was secured by DA's office investigators pending the application for obtaining and execution of a search warrant at the residence.

The S/O and Mr. Castro have (2) children in common, Ryan Castro DOB 03/30/02 and Gabriela Castro DOB 12/05/06 who were present and subsequently removed by Ms. Josephine Rodriguez (children's godmother) to 570 Gorge Road, Cliffside Park, N.Y.

Command Center I/O's contacted the NY County DA's office and conferred with Investigator Michael Wigdor, who informed that Mr. Castro was in possession of a substantial amount of money (millions of dollars), that unknown person(s) were able to unlawfully transfer into his account from Columbia University without consent or authority to do so. It is alleged that Mr. Castro did knowingly and intentionally steal money by removing said money from his account and spending an unknown amount. Investigator Wigdor also advised that prior to the time of arrest, the DA's office did **not** know that an MOS resided at Mr. Castro's residence but that at the time of arrest, the S/O did identify herself to DA's investigators as a Sergeant assigned to the 24th Pct.

38

**D374**

The u/s was informed by DI Monteleone, CO MIAB, that upon conferral with Columbia Univ. security personnel, it was revealed that on 11/22/2010 a fraud inquiry was initiated by the Columbia University Accounts Payable Dept. regarding the diversion of money out to Columbia Presbyterian Hospital in which hospital officials contacted and advised that they had not received routine required monies that are ordinarily transferred via a paper check from Columbia Univ. to Columbia Pres. Hospital. It was soon discovered that an unknown person had contacted Columbia University in an unknown manner and posed as a Columbia Pres. Official and requested that paper checks no longer be utilized to transfer these monies but that wire transfers should now be utilized. These transfers occurred between October 6, 2010 and November 22, 2010, totaling approximately $5.7 million U.S.C. and were deposited into multiple accounts one (1) of which was opened in person by Mr. Castro at a TD Bank branch (unknown branch, date, location). Mr. Castro had withdrawn $150,000.00 USC from this account yesterday, 11/23/10. At this time, the additional accounts have been frozen and approx $2 million has already been recovered. Lastly, at this time, as per NY County DA's office Deputy Bureau Chief Walter Alexander, there is (1) confirmed check in the amount of $60,000.00 USC that is believed to be made out to the S/O with the S/O listed as the payee.

On today's date at approx. 1600 hrs, a search warrant was executed by the NY DA's office investigators at the S/O's residence in the presence of investigators assigned to the Internal Affairs Bureau. The following items were recovered: (1) computer, (1) facsimile machine, $5219.00 in USC, and miscellaneous bank statements/documents. A second search warrant was conducted by I/O's assigned to the NY County DA's Office at 115 East 57th St Suite # 1107; unknown results at this time.

The undersigned performed a background check on the subject officer.

**Sergeant Denise Diaz, Tax# 917536, Shield# 01179, Precinct 24**
**PEPR**:
Appointed: 07/18/1996, Assigned to Command: 05/19/2009
Duty Status: Full/Line-of – Duty Sick Report, Active/No Restrictions
Sick Record: 34 Events/Not Chronic
Arrest Record: 81Arrests (20-Felonies, 53 -Misdemeanors & 2-Violations)
**IAPRO**: Twelve (12) Events including the current C/O; two (02) "C" cases, Four (4) 'M' cases; One (1) "CC" case; Three (3) "OG" cases; one (1) similar allegation, carried under log #99-22519, allegation DRV – Other although summary stated that "A confidential source notified IAB/Group 21 that a MOS maybe associating with known criminals"; this case was closed August 14, 2001 as UNSUBSTANTIATED; **PA-15**:
CCRB: Four (4) Events (Unsubstanited)

There are no listings of Mr. Castro or any of the six (6) names that are associated with the numerous bank accounts that have apparently received the diverted monies.

A NYS DMV Query check of the S/O revealed two (2) vehicles registered in the S/O's name: Vehicle #1: 1998 Honda Accord, Purple 4DSD, NY plate ATE4668; Vehicle #2: 2009 Honda Accord, Gray 4DSD NY plate ENJ6352; both registered at S/O's address as reflected by Dept. records

Mr. George Castro, M/H, DOB 02/23/62, NYSID #06915490M; **BCI/III** check revealed **three (3) arrests** prior to this incident: **Arrest #1**: June 17, 1991 for Conspiracy 2nd Degree with no reported corresponding court information; convicted of Conspiracy 3rd Degree and sentenced to two (2) to four (4) years in NY State prison; NYS DOCS inmate from March 6, 1992 to January 18, 1994; **Arrest #2**: December 20, 1991 for CPW 3rd Degree (Loaded Firearm)/Unlawful Wearing of A Body Vest/Resisting Arrest; convicted upon plea of guilty; no sentencing/prison information available; **Arrest #3**: January 27, 1992 CPCS 5th Degree/Prison Contraband 1st Degree/CPCS 7th Degree; convicted upon plea of guilty on April 7, 1992; no sentencing/prison information available; **RTCC**: check revealed **one (1) additional arrest** on March 8, 1990 for Grand Larceny 3rd Degree, which occurred in front of 1161 Elder Avenue, Bronx N.Y. and one (1) UF 250 prepared on January 2, 2007 for CPW in the V/O of 181 West 238th Street 52. A **Financial Query:** was conducted utilizing the Assistance of Group 2 which revealed numerous past out of state

36

residences/addresses. Additionally, Mr. Castro has an extensive credit history with several properties and/or accounts pending. At this time, it is unknown if the aforementioned accounts are directly related to his business transactions. Mr. Castro notes himself as a proprietor with "IT Security Solutions" located at 115 East 57th St. Suite # 1107. **NYS DMV:**check of Mr. Castro revealed one (1) vehicle registered in his name, a 2011 Audi Q7, White Suburban, NY Plate FFW1351; registered at S/O's address as reflected by Dept. records; **note:** purchased on November 18, 2010

The S/O's Glock 19 service firearm serial # BXT542US has been removed and safeguarded at the 26th Precinct under Property Clerk Invoice # R526024; Firearm Serial Removal Order # 10-624. As of 1345 hours, the S/O has been modified for the good order of the department, under the supervision of D.I. William Monteleone, C.O. M.I.A.B. under the authority of Chief Charles V. Campisi.

The undersigned conferred with Group 10 Commanding Officer, Captain Peter Andrea. Captain Andrea recommends this case be assigned as a "C" case to Group 10

Police Officer at the Command Center was notified at 21:30 hours.

Expenses Incurred: N/A

Investigating   _Sgt. William Ramirez_   Accompanying _____
Officer         Sergeant William Ramirez      Investigator

Team Leader _____
            Lieutenant Anthony Henry

Commanding Officer _____
                   Captain Peter Andrea

3H

**D376**

POLICE DEPARTMENT
CITY OF NEW YORK

INTERNAL AFFAIRS BUREAU

INVESTIGATING OFFICER'S REPORT

From: Sergeant Marcy Selsey                   Command: IAB Group #10

Case #: C10-0899                              IAB Log: 10-58607

Group #: 10-86                                Classification: B-2

Reporter: Lieutenant Timothy Burke [895249] 043 Precinct

Subject Officers(s): Sergeant Denise Diaz [917536/1179] 24th Precinct

Allegations(s): Association - Crime (Family Member)
                SAM – Modified Not Arrested

Subject: DMV QUERY FOR GEORGE CASTRO

Date: 05/06/11

A DMV query for George Castro shows the 2011 Audi Q7 was registered to the Subject Officer's address, 109 Admiral Lane Bronx, NY.  The plate was issued on November 18, 2010, 6 days before Mr. Castro was arrested.

Expenses:

Sergeant Marcy Selsey
Investigator

Lieutenant Keith King                         Captain Peter Andrea
Team Leader                                   Commanding Officer

Worksheet # 36
Attachments A-F



Bureau: 130-PATROL SERVICES BUREAU
Boro/Division: 162-PATROL BORO MAN NORTH
Precinct/Command: 024-024 PRECINCT

Entered by: Det Inv Kethly JEAN on Jan 02, 2010 at 18:45

**C - Corruption Case**    **IA number: 10-58607**    **Received: Nov 24, 2010 07:15**

Case number: C10-0899

Officers/subjects:

**SGT DENISE DIAZ [917536/01179]**

**Officer current info:**

Bureau:  130-PATROL SERVICES BUREAU
Boro/Division: 163-PATROL BORO BRONX
Precinct/Command:  049-049 PRECINCT

**Snapshot - officer information at time of incident:**

Badge/ID no: 917536
Bureau:  130-PATROL SERVICES BUREAU
Boro/Division:  162-PATROL BORO MAN NORTH
Precinct/Command:  024-024 PRECINCT
Borough Residence:  Bronx
Precinct  Residence:  043-043 Pct.
Rank/title: SGT
Age: 39   Years of employment: 14   Years with unit: 6
In uniform: No   Off duty: No   Off duty employed: No

Allegations:

Association - Crime (Family Member) -
SAM - Modified Not Arrested - SAM-Association Criminal
DRV-Oth Dept Rules/Procedures -
DRV-Oth Dept Rules/Procedures -

**DEFT GEORGE CASTRO [NYSID#06915490M/]**

**Officer current info:**

Bureau:
Boro/Division:
Precinct/Command:

**Snapshot - officer information at time of incident:**

Badge/ID no: NYSID#06915490M
Bureau:
Boro/Division:
Precinct/Command:
Rank/title: DEFT
Age:    Years of employment:    Years with unit:
In uniform: No   Off duty: No   Off duty employed: No

Officer witnesses:

**LT TIMOTHY BURKE [895249/00000]**

Officer current info:

Bureau:  130-PATROL SERVICES BUREAU
Boro/Division:  163-PATROL BORO BRONX
Precinct/Command:  043-043 PRECINCT

Summary:

(RSD) 11/24/10 @ 0919hrs Ext# 2234 *** CALLOUT#10-
3309//ASSOCIATION-CRIME (FAMILY MEMBER) *** LT Burke# 895249
(043 Pct) called C/C and reported the following: Manhattan ADA's
conducted a search warrant and found it to be the residence of NYPD
MOS Sgt Denise Diaz# 917536 (024 Pct). A/O Michael Wigdor
(Investigation Bureau DA's Office-212-335-8981) reported he observed
the S/O's child in common husband, George Castro leaving the S/O's
residence with a bag that contained a computer and approximately
$400,000.00 USC (Four Hundred Thousand Dollars) on his person. Sgt
Diaz is currently at her residence with her delegate and Inspector Ortiz
C.O. 43 Pct was notified in regards. (RSD)

***0925hrs After conferral with Inspector Pfister it is recommended a
Call-Out investigation be conducted by Grp 10. (RSD)

***0928hrs Operations, PO Mlekuson called C/C in regards to the above.
(RSD)

***0929hrs Ext# 2234 I/O called Grp 10, DT Johnson notified in regards
to the above Call Out. (RSD)

***0930hrs Inspector Pfister conferred with Captain Delpozo who
reported the S/O is fit for duty and is currently at the 043 Pct. (RSD)

***0931hrs DI White PBBX notified in regards. (RSD)

IAPRO check reveals 1-prior Association log in the system# 99-22519(C)
from an anonymous person alleging the S/O is associating with criminals.
3-Prior Domestic Incidents found. (RSD)

***1004hrs Ext# 8443 I/O contacted DA's office, Michael Wigdor
(Retired MOS) @ 212-335-8981 who reports that George Castro
02/23/62 NYSID# 06915490-M was in possession of a substantial
amount of money that someone was able to transfer into his account
from Columbia University in the millions of dollars. George Castro did
know and did steal money by removing the money from his account and
spending some of it. This case is either a Conspiracy or an accident
however, George Castro did know about the money being in his account
and he did knowingly begin to spend it. Michael Wigdor reports at the
time of the arrest they did not know that an MOS resided there and at
the time of the arrest, the S/O did identify herself to the DA's office by
stating she is a Sgt in the 024 Pct. The ADA's assigned are ADA Patty
O'Connor & ADA Jason Berland. (RSD)

***1025hrs E-Justice report conducted by Grp 7 (Attached) reveals prior
arrests of George Castro NYSID# 06915490-M. 7-Total Arrest charges, 5
Felony, 1-Violent Felony, 2-Firearm, 2-Misdemeanors. E-Justice check
does not list today's arrest yet. (RSD)

1400 hrs Sgt Cruz Grp 10 called with the following update : S/o was

placed on modified assignment @ 1345 hrs by Captain Andrea C.O. Grp
10 for the good order of the department.(WH)

@ 2000 hrs Sgt Ramirez Group 10 called the C/C with the following
update:  Sgt Ramirez conferred w/ Captain Andrea CO Group 10 who
recommends this case be assigned as a "C" case to Group 10.
S/O was modified @ 1345 hrs by Captain Andrea under the authority of
Chief Campisi.    (DR)

@ 2100 hrs Alpha page sent to all.  (DR) for (JP)


**When/where:**

Date/time occurred: Nov 24 2010  08:17

Primary Incident Location:  109 Admiral La   Bronx NY 10473   Precinct: 043-043 Pct:
County:  Bronx


**Linked files:**

Request to Add Allegations


**Status/assignment information:**

Status: Active    Priority: B2

Opened: 11/26/2010   Assigned:       Due:       Completed:

Disposition:


Unit assigned: Group 10
Handled at field/unit level: No
Investigator assign: Sgt Marcy SELSEY
Supervisor assign: Lt Michael DONOVAN
Source of Information: F-Clv. Reprts Non-IAB


**Organizational component(s):**

Bureau: 130-PATROL SERVICES BUREAU
Boro/Division: 162-PATROL BORO MAN NORTH
Precinct/Command: 024-024 PRECINCT
Borough Residence: Bronx
Precinct  Residence: 043-043 Pct.
Tour: Second Platoon


Entered by:  Det Inv Robert DURAN on Nov 24, 2010 at 07:13

**OG - Outside Guidelines**     **IA number: 11-02041**   **Received: Jan 15, 2011 17:09**

Case number: OG11-00027


**Complainant/victim:**



Report Under
IAB Log # 10-58607

POLICE DEPARTMENT
CITY OF NEW YORK

November 24, 2010

From:        Commanding Officer, Internal Affairs Bureau, Group 10

To:          Chief of Internal Affairs

Subject:     MODIFICATION OF SERGEANT DENISE DIAZ, TAX #917536,
             24TH PRECINCT

1.      On Wednesday, November 24th, 2010, at 1345 hours, Sergeant Denise
Diaz, Tax # 917536, 24th Precinct, was placed on Modified Assignment under the
authority of Chief Charles V. Campisi, Chief of Internal Affairs, for the good order
and efficiency of the Department. The details are as follows:

2.      On Wednesday, November 24, 2010, Mr. George Castro, M/H, DOB
02/23/62, NYSID #06915490M, was arrested in front of 109 Admiral Lane, Bronx,
N.Y. 10473 pursuant to an investigation conducted by the New York County District
Attorney's Office.   This address is the residence of Sgt. Diaz as reflected by
Department records and it was ascertained that Sgt. Diaz and Mr. Castro have a
common-law relationship and have two (2) children together.  Moreover, Sgt. Diaz
was at her residence when Mr. Castro was apprehended.  District Attorney's office
Investigator Michael Wigdor advised that he observed Mr. Castro leaving Sgt. Diaz's
residence with a bag containing a laptop computer and approximately $400,000 USC.
Moreover, it was revealed that Mr. Castro is suspected of being involved in a theft of
approximately $5.7 million from Columbia University and Columbia Presbyterian
Hospital.  On Tuesday, November 23, 2010, Mr. Castro had allegedly withdrawn
$150,000 USC from an account in his name that had been established in order to
deposit some of the proceeds of the alleged fraud.   A search warrant was
subsequently executed at the residence of Sgt. Diaz and an additional $5,219 USC, a
computer, a fax machine and miscellaneous documents were recovered.

3.      At the time of her being placed on Modified Assignment, Sgt Diaz's shield
and identification card were removed and secured in order to be forwarded to the
Employee Management Division on Friday, November 26th, 2010.  Sgt. Diaz's
firearm, which was verified via her PEPR/Force Record Card and a conferral with PO
Oyola, Tax # 913387, Firearms and Tactics Section, was removed. This firearm, a
Glock 19 9mm, serial # BXT452US, was subsequently invoiced on Property Clerk's

3A

D369

Invoice # R526024.  Sgt. Diaz was provided with a photocopy of her identification card and was advised of the availability of Department counseling services.

4.      Sergeant Diaz is a female Hispanic appointed to the Department on July 18th, 1996 and assigned to the 24th Precinct on April 24th, 2009.  At the time of the incident that precipitated the above log, Sgt. Diaz was on line-of-duty sick report for a line of duty injury sustained on November 20, 2010.

5.      The following were present:

Capt. Brandon Del Pozo          PBBX Duty Captain
Sgt. Cruz                       IAB; Group 10
Sgt. White                      IAB, Group 10


6.      The following were notified:

Chief Campisi           Chief of Internal Affairs
AC Strebel              Executive Officer, Internal Affairs Bureau
DC Mason                Commanding Officer, CHIA
DC Comodo               CO, IAB/Criminal Investigations
Inspector Thompson      CO, IAB/Zone 1
DI Monteleone           CO, Manhattan IAB
PO Connaughton          Med. Div, Firearms Removal Serial #10-624
Sgt. Haut               IAB Command Center
PO Gonzalez             Operations Unit, Log # 10-689


7.      For your information.

                                        Peter Andrea
                                        Captain

3b

D370



# COMMAND LOG

OPENED Nov. 17  2010

CLOSED Jan 13  2011

Received:                    Fax:                    Aug  5 2015 02:42pm P004/004

SATURDAY NOVEMBER 27, 2010                    89

| 0930 | O/T | PO TAYLOR REQUESTS 10HR 05MIN (CASN) |  |
|---|---|---|---|
| 0945 | O/T | PO DONATO REQUESTS 1HR 57MIN (CASN) O/T |  |
| 1000 | O/T | PO RIVERA REQUESTS 31HR 10MIN (CASN) O/T |  |
| 1000 | S HINSPECT | Sgt FORM CONDUCTED ASK. INSPECTION THERE ARE no unauthorized persons/patterns/packages in or about THE SH |  |
| 1040 | O/T | PO PEREZ I REQUESTS 13MIN (TIME) |  |
| 1230 | P/C | PO MURPHY P/C FROM 3KPOST TO MCB |  |
| 1232 | C/I | C/I LINKED OUT |  |
| 1245 | R.T.O. | MR STEPHEN HEARNEY PRESENT @ THE 3KPOST TO PICK UP HIS PROPERTY under voucher # R527903 S/NO F88749. PRES ID CARD # 6808 |  |
| 1300 | R.T.O. | MR ROBINSON STATES PRESENT @ THE 3KPOST TO PICK UP HIS PROPERTY under voucher # R527905 S/NO F88749. HIS ID CARD # 869739005 |  |
| 1300 | O/T | Sgt DIAZ REQUESTS 11HRS 00MIN O/T |  |
| 1400 | PFO | Sgt MAISONET PFD |  |
| 1435 | | MVA PASSED OR DEPT TOW RECEIVED under voucher # 3130 PF7V TO 3KPOST AS PER PBBA RESOURCE FOR PROCESSING. vehicle was involved in a hit and run |  |
| 1435 | | Sgt AMICON PFD |  |
| 1450 | | Lt FORM RELIEVED for DINNER |  |
| 1460 | | Lt FORM SER RELIEVED 62-9, Lt FORM ON DINNER |  |
| 1165 | movie #11 | Lt FORM conducting roll call for the 2nd Lt conducting of Lt VRT. MCB for Lt MCB MOVIE and reviewing PRS to run annexes with details posted positions. Lt MCB posted staff PLT on TEAM LCO enforcement and roadway carrying — Each Lt has vested + all officer with all MCB |  |
| 1165 | dispatched | Lt AMICON Lt LCO FORM MOVE 11/11 |  |



UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------x

DENISE DIAZ,

                    Plaintiff,

    -against-

THE CITY OF NEW YORK, et al.,

                  Defendants.

---------------------------------------------------------------x

**DECLARATION OF
CATHERINE C.
MONTARULI**

13 Civ. 8281 (JCF)

      **CATHERINE C. MONTARULI**, declares pursuant to 28 U.S.C. §1746, under penalty of perjury, that the following is true and correct:

    1.     I am employed with the New York City Police Department ("NYPD") and have been so employed from September 9, 1985.

    2.     I am the Deputy Director of the Payroll Section within the Payroll and Benefits Division of the NYPD. I have held this title since December 30, 2005.

    3.     The Payroll Section is responsible for maintaining, and is the custodian of, all records pertaining to payroll.

    4.     A review of the Pay Inquiry, the database used by Payroll, for Sergeant Denise Diaz, Tax Number 917536, reveals as follows:

        a.     On November 24, 2010, Sergeant Diaz earned 11:00 hours of overtime, paid at the premium rate, totaling $678.13. This was paid to Sergeant Diaz in her check from the NYPD dated December 10, 2010.

        b.     On November 24, 2010, Sergeant Diaz additionally accrued a total of $63.56 from the 11:00 hours of overtime earned on this day as an additional night

D766

rate.  This amount was also paid to Sergeant Diaz in her check from the

NYPD dated December 10, 2010.

Executed in New York, New York on August 28, 2015.

*Catherine C. Montaruli*

Catherine C. Montaruli

D767



STEERING COMMITTEE CASE

C# 10-0899
Log# 10-58607
Group 10# 10-086

From:  Executive Officer, Zone I, Internal Affairs Bureau
To:     Commanding Officer, Zone I, Internal Affairs Bureau
Date:   <u>October 8, 2014</u>. Concur with investigative findings. Recommend case be closed. Submitted for your information and consideration.

### XXX   FULL INVESTIGATION AND REPORT

#### CASE DISPOSITION

| | |
|---|---|
| _____ | Substantiated |
| _____ | Partially Substantiated |
| XXX | **Unsubstantiated** |
| _____ | Exonerated |
| _____ | Unfounded |
| _____ | Other Misconduct Noted |
| _____ | Matter Referred To _____ |
| _____ | UF49 To _____ |

Comments:   I have reviewed the investigation and concur with the Commanding Officer Group 10's investigative findings. Further investigative resources are not warranted. Investigation should be marked closed, with an overall disposition of **Unsubstantiated**

Anthony Mainolfi
Deputy Inspector

### 1ˢᵗ ENDORSEMENT

Commanding Officer, Zone I, to Commanding Officer, Criminal Investigations, Internal Affairs Bureau. Date: ___10-10-14___. Contents Noted. Concur with investigative findings.

William Monteleone
Inspector

### 2ⁿᵈ ENDORSEMENT

Commanding Officer, Criminal Investigations, to FILE.
Date: _10/23/14_____. Contents noted. Concur with investigative findings.

Alan Cooper
Deputy Chief

**D727**

INTERNAL AFFAIRS BUREAU CASE INVESTIGATIVE FINDINGS

## CASE INFORMATION

| | | | | |
|---|---|---|---|---|
| DATE OF REPORT | 10/07/14 | | CASE #: | C10-0899 |
| DATE CLOSED IN IAPRO | | | LOG #: | 10-58607 |
| GROUP CASE | 11-017 | | | |

| | | | | |
|---|---|---|---|---|
| CASE INVESTIGATOR: | Sergeant Edward Brignoni | TAX # | 905032 | |
| CASE SUPERVISOR: | Lieutenant Michael Donovan | TAX # | 903828 | |
| DATE RECEIVED: | 12/01/10 | CLASSIFICATION: | B - 2 | |
| DISPOSITION: | UNSUBSTANTIATED | | | |

INTELLIGENCE REPORTS PREPARED AND ATTACHED: Y SUPV. INITIALS M.D.

**SUBJECT:**
1. Sergeant Denise Diaz, Tax #917536, 49th Precinct (A, B, C, D)

**ALLEGATIONS:**
   A. Association – Crime (Family)
   B. SAM – Modified (Not Arrested)
   C. Criminal Possession of Stolen Property
   D. DRV – Other Department Rules/Procedures (Failed to Comply with Directives from the District Attorney's Office with Regard to Repaying the Ill-Gotten Funds)

On November 24, 2010, at approximately 0919 hours, the reporter, Lieutenant Timothy Burke, Tax #895249, called the Command Center to report that pursuant to an active investigation, Investigators from the Manhattan District Attorney's Office had apprehended Mr. George Castro, NYSID #06915490M, Arrest #M10704976L, for Grand Larceny of over One Million $1,000,000.00 dollars from Columbia University. Mr. Castro was arrested as he exited the residence of the Subject Officer, Sergeant Denise Diaz, Tax #917536, then of the 24th Precinct, who had been identified as his common-law spouse. Sergeant Diaz and Mr. Castro have two (2) children in common, Ryan Castro, D.O.B. 03/30/2002 and Gabriela Castro, D.O.B. 12/05/2006. Both children were present on the scene at the time of the arrest and were subsequently removed by their godmother. At the time of the Arrest, Mr. Castro was in possession of a bag which contained a computer and approximately $400,000.00 dollars U.S.C.

**INVESTIGATIVE STEPS:**

| | Y | N | WS# |
|---|---|---|---|
| Complainant | Y | N | WS# |
| Witnesses / Other Civilians | Y | N | WS# |
| Canvass | Y | N | WS# |
| Locations w/ Intel value | Y | N | WS# |
| Observations w/ Intel value | Y | N | WS# |
| Conferrals incl. Prosecutors / Advocates | Y | N | WS# 8,11,14,20,25, 37,44,65,67,77,83,89,96 |
| Non Subject Officers interviewed | Y | N | WS# |
| Subject Officer(s) Interrogation | Y | N | WS# 64,101,118 |
| Significant Items (note in synopsis) | Y | N | WS# |

Page 1 of 12

SYNOPSIS:

On November 24, 2010, investigators from the Manhattan District Attorney's Office arrested Mr. George Castro NYSID #06915490M, Arrest #M10704976L, for Grand Larceny, in that Mr. Castro stole over five million dollars ($5,000,000.00) from Columbia University. Mr. Castro was arrested as he exited the residence of the Subject Officer, Sergeant Denise Diaz, Tax #917536, where he was believed to reside. Sergeant Diaz and Mr. Castro have two (2) children in common, Ryan Castro and Gabriela Castro. At the time of the arrest, Mr. Castro was in possession of a bag which contained a computer and approximately $400,000.00 dollars in U.S.C. Investigator Michael Wigdor of the Manhattan District Attorney's Office was informally interviewed by I.A.B. Investigators and explained that unknown persons had been able to unlawfully transfer over five million dollars of U.S. currency from Columbia University into accounts belonging to Mr. Castro. Mr. Castro did knowingly and intentionally remove said money from his account and spend an unknown amount. Investigator Wigdor also explained that prior to the time of arrest the District Attorney's Office was unaware that a Member of the Service resided at the location of arrest. A conferral with Columbia University security personnel revealed that on November 22, 2010, a fraud inquiry was initiated by the Columbia University Accounts Payable Department regarding the diversion of money that should have been transferred from Columbia University to Columbia Presbyterian Hospital. It was discovered that an unknown person had contacted Columbia University posing as a Columbia Presbyterian Official and requested that paper checks no longer be utilized for such transfers and that instead, wire transfers should be used. Between October 06, 2010 and November 22, 2010, transfers totaling approximately $5.7 million dollars were deposited into multiple accounts belonging to Mr. Castro. A search warrant was executed by the Manhattan District Attorney's Office at the Subject Officer's residence. The reporter, Lieutenant Timothy Burke, stated that he responded to the location after being informed by the 43rd Precinct Desk Officer that a Sergeant from the 24th Precinct had called the 43rd Precinct requesting a union delegate. Upon his arrival at the scene, the Subject Officer identified herself to Lieutenant Burke and advised him that Mr. Castro did previously reside at the location however he had moved in August of 2010. Further investigation revealed that on November 18, 2010, six days prior to his arrest, Mr. Castro purchased and registered to the Subject Officer's address, a 2011 Audi Q7, White Suburban, N.Y. Registration #FFW1351. Upon arrival of the Bronx patrol Duty Captain (Brandon DelPozo, Tax #918925), Sergeant Diaz was placed on duty and subsequently transported to the 43rd Precinct to await investigators from the Internal Affairs Bureau. The residence was secured by investigators assigned to the Manhattan District Attorney's Office.

Through financial records obtained by the District Attorney's Office, investigators were able to closely track the money stolen from Columbia University and determined that a significant portion was given to the Subject Officer, Sergeant Diaz. Between October 15, 2010 and November 22, 2010, the Subject Officer received checks totaling $395,000.00 dollars from Mr. George Castro. Of the total amount, $310,000.00 dollars was deposited into the Subject Officer's personal bank accounts as follows:

D729

- The first check, in the amount of $50,000.00 was drawn from Mr. George Castro's personal account on October 15, 2010.
- The second check in the amount of $50,000.00 was drawn from ITSS, the company owned by Mr. George Castro, on October 22, 2010.
- The third check in the amount of $75,000.00 was drawn from Mr. George Castro's personal account on October 29, 2010.
- The fourth check in the amount of $75,000.00 was drawn from Mr. George Castro's personal account on November 10, 2010.
- The fifth check in the amount of $60,000.00 was drawn from ITSS, the company owned by Mr. George Castro on November 17, 2010.
- A sixth check was written to the Subject Officer, in the amount of $85,000.00, on November 22. That check was neither deposited nor cashed. The District Attorney's Office placed a hold on that check. As of this writing it has not been presented for cashing. It should be noted that the Subject Officer denies having received this check.

The Subject Officer made two payments in satisfaction of her mortgage, on November 23, 2010 and November 24, 2010 in the amounts of $30,000.00 and $130,000.00 dollars respectively. The Subject Officer was interviewed by the Manhattan District Attorney's Office on three (3) separate occasions and was informed on each occasion that the money she received from Mr. George Castro was stolen. The Subject Officer initially agreed to return the entire $310,000.00 dollars and did immediately, upon being informed by the District Attorney's Office that the money was stolen, return $180,000.00 dollars. The Subject Officer indicated on several occasions to the District Attorney's Office and during her initial Department hearing conducted by Group 10 Investigators that she was attempting to refinance her home in order to pay the remaining $130,000.00 dollars. Sergeant Diaz also indicated that she would, if necessary, borrow from her pension or 457 Deferred Compensation Plan in order to repay the money that was given to her by Mr. George Castro. To date, the Subject Officer has repaid only the $180,000.00 dollar amount and had failed to return the remaining $130,000.00 dollars.

Sergeant Diaz was interviewed under the provisions of Patrol Guide Procedure 206-13 for the first time on April 20, 2012. Regarding Mr. George Castro, Sergeant Diaz explained that he is the father of her two children and that he lived with her from the time she purchased the residence in November of 2003, until August of 2010. Sergeant Diaz explained that they met in 1997 and they started dating in 1999. Sergeant Diaz also explained that they moved in together in 2001, when she discovered that she was pregnant with her son Ryan two years prior to when she purchased her home on Admiral Lane in the Bronx. Sergeant Diaz was asked if Mr. George Castro had helped her purchase the residence on Admiral Lane and she answered "No" and also stated that they are not legally married. When asked why Mr. George Castro had moved from the residence, she explained that their relationship had been difficult since 2006 when her daughter was born. The difficulty was due to the fact that in 2006 Sergeant Diaz discovered that George Castro had fathered children, prior to the start of their relationship, about whom he had not informed her. Sergeant Diaz stated that they tried to stay together for the children however in 2010, the tension between them became unbearable and she asked him to leave her residence. After she gave birth to her daughter Gabriella, Sergeant Diaz discovered that George Castro was father to a total of four (4) children, besides hers, about whom she knew nothing.

Page 3 of 12

D730

Sergeant Diaz stated that she asked him (Mr. Castro) to move-out, to which he did.. Sergeant Diaz stated that she did not know where Mr. George Castro was currently residing. When asked regarding the 2011 Audi Q7 purchased by Mr. George Castro, Sergeant Diaz stated that she was not aware that he had purchased the vehicle and had registered it at her Admiral Lane address. Sergeant Diaz did see the car around her residence when Mr. George Castro came to visit however she did not know whether it had been leased or purchased. Sergeant Diaz stated that Mr. George Castro spent the week before his arrest at her house helping her take care of their children. Mr. Castro was driving his Audi however she did not ask any questions regarding its purchase. Sergeant Diaz was asked regarding her knowledge of Mr. George Castro's employment and finances. Sergeant Diaz provided that Mr. Castro was self-employed and owned a retail security company. She stated that the names of the companies were Unlimited Securities, Ryan Daelyn Corporation and IT Security Solutions. Sergeant Diaz stated that she was not aware of his status in any of the companies and did not know if he had any partners. Sergeant Diaz stated that she never worked for any of his companies. Sergeant Diaz also answered that she did not know how much Mr. Castro earned and she did not ask. Regarding Mr. George Castro's business names, Sergeant Diaz stated that she did not have any information about Unlimited Securities however Ryan Daelyn Corporation was changed to IT Security Solutions after she discovered that it was named for her son, Ryan and his son by another woman, George Daelyn. Regarding finances, Sergeant Diaz stated that George Castro would often borrow money from her. Sergeant Diaz estimated that over the years, Mr. Castro borrowed $50, 0000.00 from her. Mr. Castro would either ask her for money or she would allow him to use her credit cards and she would pay the bills. Sergeant Diaz stated that George Castro would contribute to the household by paying approximately $800.00 to $1,000.00 dollars per month. Sergeant Diaz stated that she and Mr. George Castro did not share a joint bank account however he had, without her permission, opened a credit card account in her name that ultimately went into default and had to be paid by her. To Sergeant Diaz' knowledge, Mr. George Castro did not have a business degree and did not have any other sources of income. Sergeant Diaz stated that she assumed that Mr. George Castro was investing in stocks because he had taken an interest in the stock market.

Regarding the $310,000.00 dollars that Sergeant Diaz received from Mr. George Castro between October 15, 2010 and November 17, 2010, Sergeant Diaz stated that when she received the first check in the amount of $50,000.00 dollars on October 15, 2010. Sergeant Diaz stated that when she asked George Castro where the money had come from, he told her that he had sold some stocks. Sergeant Diaz did not ask him what stocks nor did she ask him when he had purchased the stocks and stated that she did not have any reason not to believe him. One week later, on October 22, 2010, she received a second $50,000.00 dollar check from Mr. George Castro and stated that she was still not suspicious even though that was the most money he had ever given her at one time. Sergeant Diaz stated that when she asked him where that money had come from, Mr. George Castro answered, "I don't hold onto my stocks." When asked if it seemed odd to her that she should, within one week, receive $100,000.00 dollars from a man who had not ever been able to consistently pay his bills, she replied that it did and that's why she asked where the money had come from. When on October 29, 2010, she received a $75,000.00 dollar check from Mr. George Castro; Sergeant Diaz stated that Mr. George Castro told her that he been paid from a State job. She further stated that she had no reason not to believe him.

Page 4 of 12

D731

When on November 10, 2010, she received another $75,000.00 from George Castro, Sergeant Diaz was asked if she was at all suspicious and answered that she was, but stated that he told her just to take the money and pay-off her mortgage since she had begun the refinancing process. Sergeant Diaz stated that by the time she received the second $75,000.00 dollar check, she was more suspicious and asked George Castro if the money was legal. Sergeant Diaz stated that he (Mr. Castro) had told her that he would not do anything to put her (Sergeant Diaz) in jeopardy and she proceeded to deposit the check. On November 17, 2010, Sergeant Diaz received another $60,000.00 dollar check from Mr. George Castro and stated that she remained suspicious however she deposited the check regardless. Sergeant Diaz was asked if, given her history with Mr. George Castro, she trusted his explanation as to where the money was coming from. Sergeant Diaz responded that ultimately she didn't trust him in personal matters, but had no reason not to trust him in business matters or with money. She added, "Besides lying to me about the credit card and his other children; that was my trust issue with him." She stated that she did question receiving such a large amount of money in such a short period of time however she ultimately believed him when he told her that the money was legitimate. She stated that she took him at "face value."

Sergeant Diaz was interviewed a second time on August 15, 2013, after the Manhattan District Attorney's Office filed a civil lawsuit against her. She reiterated that she did receive approximately $310,000.00 dollars from Mr. George Castro between October 15, 2010 and November 17, 2010 and had returned approximately $180,000.00 dollars to the Manhattan District Attorney's Office after Mr. Castro was arrested. Sergeant Diaz further explained that upon the District Attorney's representation that the money received by her from Mr. George Castro was stolen from Columbia University, she returned what remained of that money to the District Attorney's Office. Sergeant Diaz explained that "something was worked-out" between her initial attorney, Andrew Quinn from the S.B.A. and the District Attorney's Office and that when she was informed by Mr. Quinn that she had to return the money to the District Attorney's Office she did so. Sergeant Diaz was asked when she first realized that the money had been stolen from Columbia University. Mr. Aguirre, her new Attorney, interjected that Sergeant Diaz had at no time stated that she believed that the $310,000.00 dollars she had been given by Mr. Castro was stolen. When asked directly if she believed that the $310,000.00 dollars given to her by Mr. Castro was stolen, Sergeant Diaz stated that she did not. When asked why she agreed to return the money to the District Attorney's Office, Sergeant Diaz stated that it was because her Attorney at the time, Mr. Quinn, told her that she had to return the money to the District Attorney's Office. Sergeant Diaz further explained that she had been informed by Mr. Castro, during a taped jailhouse telephone conversation, that he had money of his own in his personal accounts and that of the $310,000.00 dollars that he gave to Sergeant Diaz between October 15, 2010 and November 17, 2010, all but $60,000.00 dollars was money that legitimately belonged to Mr. Castro. Sergeant Diaz stated that Mr. Castro did not tell her exactly how much of his own money was in his accounts but based on her belief that Mr. Castro was telling her the truth, she informed the District Attorney's Office that she didn't have to return the money because it had been legitimately earned by Mr. Castro. When asked where she thought the balance of the $310,000.00 dollars given to her by Mr. Castro came from, Sergeant Diaz stated that she believed it came from the stock market and his job.

Page 5 of 12

Mr. Aguirre stated that there had been no formal written request from the District Attorney's Office demanding repayment from Sergeant Diaz and that that he and Sergeant Diaz had not been provided with an accounting of Mr. George Castro's bank accounts to show that the money that had been given to Sergeant Diaz had been stolen. He further offered that he had been in contact with Assistant District Attorney Charles King in order to work-out a possible agreement so that there might be a resolution to the civil proceedings. Mr. Aguirre also stated that he and Sergeant Diaz were informed via telephone that the money was stolen and needed to be repaid. Sergeant Diaz was asked if she had attempted to sell her home in order to repay the money given to her by Mr. George Castro and she answered, "No." When asked if her home was in foreclosure, Sergeant Diaz stated that it was not. When asked if she had indicated or caused to be indicated to the Manhattan District Attorney's Office that she did not intend to repay the balance of the money that had been given to her by Mr. George Castro, Sergeant Diaz stated that she had not.

The following people were arrested, tried, and sentenced in connection with the Grand Larceny from Columbia University:

- **George Castro**, Common-law spouse of Sergeant Diaz, (Arrested 11/24/10) Convicted 08/07/2012, Grand Larceny 1st degree, Sentenced 09/24/2012, to 8-24 years.
- **Jean-Paul Moise** (Arrested 12/13/11) Former Columbia Employee Pleaded guilty to Grand Larceny – No jail time due to cooperation with A.D.A.
- **Joseph Pineras** (Arrested 010/4/12) Former Columbia Employee Convicted of Fraud, - No jail time due to cooperation with A.D.A.
- **Walter Stephens** (Arrested 06/15/11) Convicted of Grand Larceny 1 – Sentenced 09/24/12, to 3-9 years.
- **Jeremy Dieudonne** (Arrested 08/02/11) Convicted of Grand Larceny 1 – Sentenced to 7-21 years.

Other than Mr. George Castro, none of the people arrested in connection with the criminal investigation into the theft from Columbia University, indicated that they were at all acquainted with the Subject Officer. Neither the District Attorney's investigation nor the Investigators queries of Department computer systems proved any connection between the Subject Officer and any of the other criminal defendants (Worksheets #32, #141, #142, #143 and #145). According to A.D.A. Kim Han, the Subject Officer did not attend the trial of Mr. George Castro.

Although there was *no written agreement* between the Subject Officer and the District Attorney's Office, Sergeant Diaz admitted that she initially agreed to repay all of the money that had been given to her by Mr. George Castro. The District Attorney's Asset Forfeiture Unit initiated civil litigation against Sergeant Diaz after it became clear that Sergeant Diaz did not intend to repay the balance of the stolen money.

A.D.A. Charles King of the Asset Forfeiture Unit of the Manhattan District Attorney's Office, ultimately agreed to settle with the Subject Officer for the amount of money that she had already repaid ($180,000.00 dollars) in satisfaction of the entire amount received ($310,000.00 dollars). No evidence of the Subject Officer's involvement in the theft was ever uncovered and no criminal charges were ever filed.

Page 6 of 12

D733

BACKGROUND OF THE SUBJECT OFFICER:

**SERGEANT DENISE DIAZ, TAX #917536, 49th Precinct**
Appointed: 07/18/1996
Duty Status: Full, Active/No Restrictions
Sick Record: 34 Events/Not Designated Chronic
Arrest Record: (20-Felonies, 53 -Misdemeanors and 02-Violations)
**IAPRO**: Twelve (12) Events including the current Call-Out (1); two (02) "C" cases, Four (04) "M" cases; One (1) "CC" case; Three (3) "OG" cases; One (1) IXLO Conversion
**ICIS**: Four (4) Incidents, None Similar

ALLEGATIONS: (A, B, C, D)

A.      There was insufficient evidence to prove that Subject Officer Diaz was aware of or complicit in the criminal activities of her common-law husband, Mr. George Castro. Therefore, recommend that Allegation "A" Association – Crime (Family), be closed with a disposition of **INFORMATION AND INTELLIGENCE**.

B.      Sergeant Diaz was placed on Modified Assignment, at the time of Mr. George Castro's arrest, due to the ongoing investigation that was conducted by the Manhattan District Attorney's Office. Therefore, recommend that Allegation "B" SAM -- Modified (Not Arrested) be closed with a disposition of **INFORMATION AND INTELLIGENCE.**

C.      Through financial records obtained by the District Attorney's Office, investigators were able to track the currency stolen from Columbia University and determined that a portion was given to the Subject Officer, Sergeant Diaz. Between October 15, 2010 and November 22, 2010, the Subject Officer received checks totaling $395,000.00 dollars from Mr. George Castro. Of the total amount, $310,000.00 dollars was deposited into the Subject Officer's personal bank accounts as follows: the first check, in the amount of $50,000.00 dollars was drawn from Mr. George Castro's personal account on October 15, 2010. The second check in the amount of $50,000.00 dollars was drawn from ITSS, the company owned by Mr. George Castro, on October 22, 2010. The third check in the amount of $75,000.00 dollars was drawn from Mr. George Castro's personal account on October 29, 2010. The fourth check in the amount of $75,000.00 dollars was drawn from Mr. George Castro's personal account on November 10, 2010. The fifth check in the amount of $60,000.00 dollars was drawn from ITSS, the company owned by Mr. George Castro on November 17, 2010. A sixth check was written to the Subject Officer, in the amount of $85,000.00 dollars, on November 22. That check was neither deposited nor cashed. The District Attorney's Office placed a hold on that check. As of this writing, it has not been presented for cashing. It should be noted that the Subject Officer denies having received this sixth check. Recommend that Allegation "C" Criminal Possession of Stolen Property be closed with a disposition of **UNSUBSTANTIATED**. The Manhattan District Attorney's Office waived criminal prosecution and subsequently settled a civil lawsuit noting that the Subject Officer does not have to repay any additional monies regarding this matter. It was never clearly proven if and how much currency was ill-gotten.

D.    Sergeant Diaz was informed on at least three (3) separate occasions, by the Manhattan District Attorney's Office, that the $310,000.00 dollars of the money that she received from Mr. George Castro had been stolen from Columbia University.    After initially agreeing to return all of the money received from George Castro, Sergeant Diaz did not cooperate with the District Attorney in that she determined that she was not responsible to return the remaining $130,000.00 dollars.  The District Attorney's Office responded by commencing a civil lawsuit against Sergeant Diaz that was ultimately settled and no further action (re-payment of additional funds) was required on the part of Sergeant Diaz.   Therefore, recommend that Allegation "D" DRV – Other Department Rules/Procedures (Failed to Comply with Directives from the District Attorney's Office with Regard to Repaying the Ill-Gotten Funds) be closed with a disposition of **UNSUBSTANTIATED.**

THE OVERALL CASE DISPOSITION IS **UNSUBSTANTIATED.**

10/07/14
_____
Date

_____
Investigator's signature

10/07/14
_____
Date

_____
Supervisor's signature

Page 8 of 12

COMMANDER'S REVIEW – APPROVAL AND RECOMMENDATION

This case investigation commenced with the arrest and subsequent conviction of the Subject Officer's (Sergeant Denise Diaz) common-law spouse, Mr. George Castro. Upon his arrest, Sergeant Diaz was placed on Modified Assignment. Mr. Castro was arrested with four (4) co-defendants for stealing monies from Columbia Hospital/ University. Mr. Castro was sentenced to serve between eight and twenty-four years in prison. A portion of the criminal proceeds ($310,000.00 dollars) was given to Sergeant Diaz. The Sergeant did agree and pay the Manhattan District Attorney's Office $180,000.00 dollars. This amount was the remaining money after Sergeant Diaz paid her existing home mortgage. During the course of this case investigation, Sergeant Diaz admitted to knowing that $60,000.00 dollars (of the $310,000.00 dollars) may have been fraudulently obtained by Mr. Castro during a taped jailhouse conversation.

Sergeant Diaz was never arrested for the actions committed by Mr. George Castro and his co-defendants. The Manhattan District Attorney's Office did not enter into any signed agreement with Sergeant Diaz in order to obtain the remaining $130,000.00 dollars (Worksheet #86). Although the Manhattan District Attorney's Office prepared a lawsuit in order to obtain the remaining money from Sergeant Diaz (Worksheet #98), the suit was ultimately dismissed (Worksheet #121) and Sergeant Diaz was under no obligation to pay the remaining money to the Manhattan District Attorney's Office. Sergeant Diaz was ultimately restored to full-duty (Worksheet #126). Based upon the facts presented above, the Department Advocate's Office did not believe that it would be in the best interests of the Department to file Charges and Specifications against Sergeant Diaz.

It should be noted that the co-defendants were not debriefed, at the request of the Manhattan District Attorney's Office, due to the criminal appeal process being undertaken. The undersigned personally conferred with Inspector Luciani, Commanding Officer of the Department Advocate's Office, who stated that Charges and Specifications are not filed against Members of the Service who are (were) being sued civilly. It should also be noted that Sergeant Diaz did file a lawsuit against the City of New York (Attachment #111) which remains currently active (Worksheets #139 and #145).

Review of Supervisory Responsibilities (check one):

____X____   Supervisory responsibilities were reviewed and investigated.   No deficiencies were identified.

_____   Supervisory deficiencies were identified and addressed, as indicated within the contents of this Case Closing/Final Report.

10/07/2014
Date

IAB Group Commander's Signature
James G. Winslow
Deputy Inspector

Page 9 of 12

D736

**COMPLAINANT NOTIFICATION:**

Was complainant notified re: Final Disposition of Case?     Yes X     No ___

How was notification made?   In Person_____     Mail X

If no notification was made, why not?   N/A


FINAL DISPOSITIONS WILL BE PROVIDED TO THE COMPLAINANT ONLY IF IT IS REASONABLE, PRACTICAL AND APPROPRIATE (I.E., FINAL DISPOSITIONS WILL NOT BE DIVULGED TO COMPLAINANT IF IT WILL COMPROMISE FUTURE / ONGOING INVESTIGATIONS.


10/07/14
Date

Investigator's Signature


Page 10 of 12

## INVESTIGATIVE SUPPLEMENT
## ADDITIONAL INFORMATION

C# 0899          s. 2010
M#_____       s._____
Log # 58607     s.2010

Control Pad # _____   s._____
Bribery # _____       s._____
Civilian Arrest _____   Charges _____
MOS Arrest(s) # _____   Charges _____
Prosecutors Name  ADA Han   Bureau  N.Y. County
                            District Attorney
Telephone #                 _____
Charges and Specs # _____   _____
Advocates Name:

*Enter additional MOS under details*

Details:

_____

_____

Investigator's Initials: M.S.       Supervisor's Initials: M.D.

Page 11 of 12

D738

ADDITIONAL COMMANDER'S COMMENTS

**SEE ATTACHED PAGE 09.**

Commanding Officer Group 10
James G. Winslow
Deputy Inspector

Page 12 of 12

D739



HOLD DOCUMENT UP TO THE LIGHT TO VIEW TRUE WATERMARK

**HSBC** ⟨X⟩
Branch : 985

US DOLLAR DRAFT
(OFFICIAL CHECK)

No. 100979497

50-125
223

DENISE DIAZ
REMITTER

13Apr2011
DATE

PAY

USD ONE HUNDRED AND EIGHTY THOUSAND ONE HUNDRED AND FORTY ONE
.34 ONLY

$ USD180,141.34**
U.S. DOLLARS

TO
THE
ORDER
OF

MANHATTAN DA'S OFFICE*

Drawer: HSBC Bank USA, N.A.
TWO SIGNATURES REQUIRED FOR AMOUNT $50,000 AND ABOVE

AUTHORIZED SIGNATURE

AUTHORIZED SIGNATURE

Payable through HSBC Bank USA, N.A.

⑈100979497⑈ ⑆022301253⑈ 713011556⑈

D155



SUPREME COURT OF THE STATE OF NEW YORK          NO FEE
NEW YORK COUNTY
100 CENTRE STREET
NEW YORK, NY 10013

CERTIFICATE OF DISPOSITION INDICTMENT

DATE: 05/09/2014                    CERTIFICATE OF DISPOSITION NUMBER: 37847

PEOPLE OF THE STATE OF NEW YORK        CASE NUMBER:              02922-2011
            VS.                        LOWER COURT NUMBER(S):    2010NY087230
                                       DATE OF ARREST:          11/24/2010
                                       ARREST #:                M10704976
                                       NYSID #:                 6915490M
                                       DATE OF BIRTH:           02/23/1962
                                       DATE FILED:              06/03/2011
CASTRO,GEORGE
            DEFENDANT

I HEREBY CERTIFY THAT IT APPEARS FROM AN EXAMINATION OF THE RECORDS
ON FILE IN THIS OFFICE THAT ON 08/07/2012 THE ABOVE NAMED DEFENDANT WAS
CONVICTED OF THE CRIME(S) BELOW BEFORE JUSTICE  STOLZ,R THEN A
JUSTICE OF THIS COURT.

GRAND LARCENY 1st DEGREE PL  155.42 00 BF
CRIMINAL POSSESSION OF STOLEN PROPERTY 1st DEGREE PL  165.54 00 BF
MONEY LAUNDERING 1st DEGREE PL  470.20 00 BF

THAT ON 09/24/2012, UPON THE AFORESAID CONVICTION BY TRIAL THE HONORABLE
STOLZ,R  THEN A JUDGE OF THIS COURT, SENTENCED THE DEFENDANT
TO

GRAND LARCENY 1st DEGREE PL  155.42 00 BF
IMPRISONMENT = 7 YEAR(S)  TO 21 YEAR(S)

CRIMINAL POSSESSION OF STOLEN PROPERTY 1st DEGREE PL  165.54 00 BF
IMPRISONMENT = 7 YEAR(S)  TO 21 YEAR(S)

MONEY LAUNDERING 1st DEGREE PL  470.20 00 BF
IMPRISONMENT = 7 YEAR(S)  TO 21 YEAR(S)

RESTITUTION = $1,997,311
DNA  = $50 (PAID)

IN WITNESS WHEREOF, I HAVE HEREUNTO SET MY HAND AND AFFIXED MY
OFFICIAL SEAL ON THIS DATE 05/09/2014

                                    COURT CLERK



REPORT UNDER
I.A.B. LOG #10-58607

POLICE DEPARTMENT
CITY OF NEW YORK

June 13, 2014

From:    Commanding Officer, Internal Affairs Group 10

To:    First Deputy Commissioner

Subject:    **REQUEST CHARGES AND SPECIFICATIONS AGAINST SERGEANT DENISE DIAZ, TAX #917536, 49TH PRECINCT**

1.    It is requested that Charges and Specifications be preferred against Sergeant Denise Diaz, Tax #917536, assigned to the 49th Precinct. This request is in connection with I.A.B. Log # 10-58607. The details are as follows:

2.    Pursuant to an active investigation, Investigators from the Manhattan District Attorney's Office arrested George Castro, NYSID #06915490M, Arrest #M10704976L, for Grand Larceny of approximately $5,500,000 U.S.C. from Columbia University. Mr. Castro was arrested on November 24, 2010, as he exited the residence of the Subject Officer, Sergeant Denise Diaz, Tax #917536, currently of the 49th Precinct, who was identified as the common-law spouse of Mr. Castro. Mr. Castro, at the time of his arrest, was in possession of a bag which contained a computer and approximately $400,000.00 U.S.C, in various denominations.

3.    Sergeant Denise Diaz was interviewed by the Manhattan District Attorney's Office on at least three (3) separate occasions. During these meetings, Sergeant Diaz confirmed that over a period of five (5) weeks, between October 15, 2010 and November 22, 2010, she had received five (5) checks from Mr. Castro, totaling $310,000 U.S.C. Sergeant Diaz was informed by the District Attorney's Office that the money she received was ill-gotten gains and was a portion of the money that had been stolen from Columbia University. The prosecuting A.D.A. and Investigators also explained the circumstances of the theft. Sergeant Diaz agreed to repay the money which had been given to her by George Castro and did in fact immediately repay approximately $180,000.00 to the District Attorney's Office. Sergeant Diaz informed the assigned A.D.A. that she would need to refinance her home in order to repay the remainder of the money she received, approximately $130,000 U.S.C., as she had used it to pay-off her mortgage. Sergeant Diaz also informed the A.D.A. that if she were unable to refinance her home, she would use her savings and take a pension loan in order to repay the money. The District Attorney's Office agreed to her terms.

When first    viewed pursuant to PG 206-13 in April of 2012    ‿geant Diaz indicated that she was in the process of applying to refinance her home and re‿‿‿ated that she would use her savings or take a pension loan if necessary to complete the repayment.

4.    In October of 2012, after all of the defendants in the criminal case against George Castro were sentenced, Sergeant Diaz indicated to the Manhattan District Attorney's Office, through her attorney, Ricardo Aguirre, that she did not believe she should have to repay the balance of the money that was given to her by George Castro and that she did not believe the money given to her was stolen. The D.A.'s Office, after having been unable to reach Sergeant Diaz and being unable to reach an equitable settlement with Sergeant Diaz, in July of 2013, filed a Civil Lawsuit against Sergeant Diaz and placed a notice of pendency on her residence. Sergeant Diaz subsequently filed a civil rights lawsuit against the City of New York, the New York County District Attorney's Office and two unidentified Officers who executed the search warrant at her residence. A.D.A. Charles King, who is handling the civil case, was interviewed and stated that if Sergeant Diaz had simply maintained contact, the D.A.'s Office would have been happy to make payment arrangements with her and a lawsuit would not have been necessary.

5.    In light of Sergeant Diaz' continuous course of conduct and failure to cooperate with the directive of the Manhattan District Attorney's Office that she repay the balance of the ill-gotten gains that she received from George Castro, it is requested that Charges and Specifications be preferred against Sergeant Diaz for the above misconduct (DRV — Other Conduct Prejudicial to the Good Order of the Department). Sergeant Diaz was informed at the initial "proffer" with the Manhattan District Attorney's Office that the money given to her by Mr. Castro was stolen. Sergeant Diaz was personally informed by Mr. Castro, during a taped jailhouse conversation, that a portion of the money was stolen. During an initial Official Department Hearing, the Attorney for Sergeant Diaz informed I.A.B. investigators that Sergeant Diaz had been previously informed by the District Attorney's Office that the money was stolen from Columbia Hospital/University.

6.    On June 13, 2014, Agency Attorney David Green, Tax #354411, Department Advocate's Office, was conferred with regarding the request for Charges and Specifications.

7.    Sergeant Marcy Selsey, Tax #905032, IAB/Group 10 is the assigned investigator. Her regular days off are Sunday and Monday and she can be contacted at (212) 694-3082.

8.    Submitted for your **CONSIDERATION**.

James G. Winslow
Deputy Inspector

128 B



Number: 9178638736
Name:
Subject: Yes, girlfriend I will get it for U . Desired a great
Date: 10/4/2010 10:08:26 AM
Folder: Outbox

Yes, girlfriend I will get it for U . Desired a great birthday pleasant for
being a greatest mom, woman, and friend.... I mean that.:) have a great day!



Number: 9178638736
Name:
Subject: U mean present?
Date: 10/4/2010 10:09:28 AM
Folder: Inbox

U mean present?

**Number:** 9178638736
**Name:**
**Subject:** Yes. Daaa.
**Date:** 10/4/2010 10:11:25 AM
**Folder:** Outbox

Yes. Daaa.

**Number:** 9178638736
**Name:**
**Subject:** You need at least 80g's
**Date:** 10/4/2010 11:04:09 AM
**Folder:** Inbox

You need at least 80g's

```
Number: 9178638736
Name:
Subject: I soon get money. I will give u the money.
Date: 10/4/2010 12:23:13 PM
Folder: Outbox
```

I soon get money. I will give u the money.