UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DENISE DIAZ,

Plaintiff,

-against-

CITY OF NEW YORK, *et al.*,

Defendants.

13 Civ. 8281 (JCF)

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT JOSE FLORES' MOTION FOR SUMMARY JUDGMENT**

CYRUS R. VANCE, JR.
District Attorney of New York County, as
Special Assistant Corporation Counsel
*Attorney for Defendant Jose Flores*
One Hogan Place
New York, New York 10013
(212) 335-9000

Elizabeth N. Krasnow
Assistant District Attorney

# TABLE OF CONTENTS

Page

**TABLE OF AUTHORITIES** ..... ii

**STATEMENT OF FACTS** ..... 2

**PROCEDURAL HISTORY** ..... 9

**STANDARD OF REVIEW** ..... 10

**ARGUMENT** ..... 10

I. Investigator Flores was not personally involved in Sergeant Diaz's detention ..... 10

II. Sergeant Diaz's detention was permitted in connection with an NYPD internal investigation ..... 12

**CONCLUSION** ..... 15

# TABLE OF AUTHORITIES

*Biehunik v. Felicetta*, 441 F.2d 228 (2d Cir. 1971) .......... 12

*Cerrone v. Brown*, 246 F.3d 194 (2d Cir. 2001) .......... 12

*DeMaine v. Samuels*, 29 Fed. Appx. 671 (2d Cir. 2002) .......... 12, 13

*Gonzalez v. City of New York*, 38 Fed Appx. 62 (2d Cir. 2002) .......... 12

*Jenkins v. City of New York*, 478 F.3d 76 (2d Cir. 2007) .......... 10

*Miner v. Clinton County, N.Y.*, 541 F.3d 464 (2d Cir. 2008) .......... 10

*Muehler v. Mena*, 544 U.S. 93 (2005) .......... 14

*Sanchez v. City of New York*, 2000 U.S. Dist. LEXIS 9833 (S.D.N.Y. July 17, 2010) .......... 13

*Savino v. City of New York*, 331 F.3d 63 (2d Cir. 2003) .......... 11

*SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133 (2d Cir. 2009) .......... 10

*Spontino v. City of New York*, 1986 U.S. Dist. LEXIS 24966 (S.D.N.Y. May 28, 1986) .......... 13

*Wright v. Smith*, 21 F.3d 496 (2d Cir. 1994) .......... 11

**PRELIMINARY STATEMENT**

Plaintiff Denise Diaz is a Sergeant with the New York City Police Department. She alleges that she was falsely arrested by Investigator Jose Flores of the New York County District Attorney's Office ("DANY") on November 24, 2010. On that date, Flores and other DANY investigators were present at Sergeant Diaz's home to arrest her common-law husband, George Castro, and to execute a search warrant in connection with DANY's investigation into a larceny complaint filed by Columbia University. Castro stole over $5,000,000 from Columbia by hacking their accounts payable system. He was apprehended leaving Sergeant Diaz's home while in possession of $400,000 in cash and a copy of her NYPD shield bearing the designation "Sergeant's Family Member."

Sergeant Diaz was not arrested; by her own admission, she was placed on duty by NYPD Captain Brandon del Pozo and directed to report the 43rd precinct in connection with an investigation by the Internal Affairs Bureau ("IAB"). Captain del Pozo's decision to place Sergeant Diaz on duty was not influenced by any of the alleged statements that Diaz attributes to Investigator Flores, i.e., accusing Diaz of "associating with a known felon" or announcing that she was "under" – statements which no witness besides Diaz recalls. Sergeant Diaz's claim that she was arrested is further belied by the fact that she requested and received 11 hours of overtime payment in connection with the time that she spent on duty pursuant to Captain del Pozo's order. To the extent Diaz was detained, it was on the authority of the NYPD to investigate the fitness of its own officers and she was compensated accordingly. In the absence of any evidence to support Sergeant Diaz's false arrest claim, Investigator Flores now moves for summary judgment.

## STATEMENT OF FACTS

On November 22, 2010, Columbia University contacted DANY with a larceny complaint. ¶1.[1] Columbia reported that someone had accessed its accounts payable system and changed the process of how Columbia paid one of its vendors such that funds were wired to a TD Bank account as opposed to the vendor. ¶2.

TD Bank records obtained by DANY revealed that the account belonged to IT & Security Solutions and was opened in July, 2010 by an individual named George Castro. ¶3. Approximately $5,700,000 was transferred from Columbia to the TD Bank account in October and November, 2010. ¶4. Over $3 million of the stolen funds were then wired from the TD Bank account to other banks, including Capital One. ¶5.

IT & Security Solutions had three accounts with Capital One, all of which were opened by Castro. ¶6. Capital One records listed Castro's personal address as 109 Admiral Lane in the Bronx. ¶7. Capital One records showed numerous cash withdrawals from the IT & Security Solutions accounts with driver's license number 485150946 written on the withdrawal slips. ¶8. DANY confirmed with the Department of Motor Vehicles ("DMV") that driver's license 485150946 belonged to Castro and that his address of record was 109 Admiral Lane. ¶9.

DANY identified plaintiff Denise Diaz as the owner of 109 Admiral Lane. ¶10. Diaz had purchased the home in 2003. ¶11. 109 Admiral Lane is within the confines of the NYPD's 43rd precinct. ¶12.

Capital One records showed a check issued from one of the IT & Security Solutions accounts to Diaz on November 18, 2010 in the amount of $60,000. ¶13. Capital

[1] All citations are to Investigator Flores' Local Rule 56.1 Statement.

One records showed several other checks issued from the IT & Security Solutions accounts to other persons believed by DANY to be Castro's relatives and associates. ¶14.

In addition to the November 18th check known to DANY, Castro issued Diaz four other checks in October and November, 2010 for a total of $310,000. ¶15. Diaz deposited all five checks into her personal bank account. Exh. C, 237:4-9; Exh. D, ¶¶30-34; Exh. E; ¶¶30-34. ¶16. She used approximately $130,000 of the $310,000 to make the final payment on the mortgage for 109 Admiral Lane. ¶17.

In the early morning hours of November 24, 2010, DANY investigators went to 109 Admiral Lane to arrest Castro for grand larceny. ¶18. Although DANY had identified Diaz as the homeowner and a recipient of one of the checks, the investigators did not know that she was an officer with the New York City Police Department. ¶19. As of November 24, 2010, Diaz held the rank of Sergeant and was assigned to the 24th precinct as a patrol supervisor. ¶20.

Sergeant Diaz dated Castro from 2000 through 2008 and considered him to be her "common law husband" from 2002 through 2008. Exh. C, 99:11-100:0, 101:21-103:17. ¶21. Castro had three prior convictions dating back to 1991 and had spent time incarcerated in State prison. ¶22. During the course of their relationship, Sergeant Diaz and Castro had two children together; the eldest was born in 2002 and the youngest was born in 2006. ¶23. Castro moved into 109 Admiral Lane with Sergeant Diaz when she purchased the house in 2003. ¶24.

According to Sergeant Diaz, she ended her relationship with Castro in 2008 after she discovered that he had lied to her about the number of children he had and the fact that he had been previously married. ¶25. Castro continued to live with Sergeant Diaz and their two children at 109 Admiral Lane until August, 2010. ¶26. In August, 2010, Sergeant Diaz discovered that the mother of one of Castro's other children had been calling Castro on his personal phone. ¶27. According to Sergeant Diaz, Castro then moved out of 109 Admiral Lane and moved in with his mother. ¶28.

As far as Sergeant Diaz was aware, Castro was self-employed installing burglar alarms for the entirety of their relationship. ¶29. Sergeant Diaz never inquired as to Castro's income and he "didn't like for [her] to look at any papers, to ask questions." ¶30. Casto would give Sergeant Diaz cash each month to contribute to the family's expenses. ¶31. Prior to the series of checks in October and November, 2011, the most money Castro gave to Sergeant Diaz at any given time was $5,000. ¶32.

On October 4, 2010, Castro and Sergeant Diaz exchanged a series of text messages wherein Castro said he would give Diaz $80,000 for her birthday so that she could get plastic surgery. ¶33. On November 12, 2010, Castro purchased a brand new Audi for $81,000 with funds believed to have been stolen from Columbia. ¶34. The Audi, purchased two months after Castro supposedly moved out, was registered to Sergeant Diaz's address at 109 Admiral Lane. ¶35.

On November 23, 2010, Castro spent the night at 109 Admiral Lane. ¶36. At approximately 8:00 a.m. the following morning, DANY investigators arrested Castro as he exited Sergeant Diaz's house and headed to the Audi, which was parked nearby. ¶¶37-38. Castro was carrying a backpack and a brown cardboard box at the time of his arrest. ¶39.

The backpack and cardboard box contained $400,000 in cash, a leather case with Diaz's NYPD shield and the inscription "Sergeant's Family Member," and Diaz's Sergeants Benevolent Association ("SBA") card. ¶40.

Diaz purchased the shield for Castro after she was promoted to Sergeant, at some point in 2009. ¶41. Sergeant Diaz also gave Castro the SBA card. ¶42. The purpose of the shield and the SBA card was to alert others that Casto was related to a member of the service. ¶43.

Sergeant Diaz was inside the house when Castro was arrested. ¶44. She came outside and spoke to DANY Investigator Michael Wigdor, who was restraining Castro. ¶45. Sergeant Diaz identified herself to Investigator Wigdor as a member of the New York City Police Department. ¶46. Diaz and Wigdor went into the house so that Diaz could show Wigdor her NYPD identification. ¶47. Investigator Wigdor told Sergeant Diaz that that Castro was suspected of being involved in the theft of a large sum of money and that DANY intended to get a search warrant for Diaz's house. ¶48.

Sergeant Diaz called Chief Kathleen O'Reilly, the commanding officer of Diaz's assigned precinct, and told O'Reilly that the father of her children had been arrested. ¶49. O'Reilly told Sergeant Diaz that she would "make the notification to everyone." ¶50. After speaking with Chief O'Reilly, Diaz made several phone calls in an attempt to find an SBA delegate. ¶51. It is "common practice" in the NYPD for an officer to be represented by an SBA delegate in connection with internal investigations by the Police Department. ¶52. At approximately 8:30 a.m., SBA delegate Sergeant Anthony Borelli arrived to Sergeant Diaz's home. ¶53.

While on his way to work, DANY Investigator Jose Flores received a phone call requesting that he respond to 109 Admiral Lane for the possible execution of a search warrant. ¶54. Upon arriving to the address, Investigator Flores spoke to another member of DANY's team and learned that Sergeant Diaz was inside the house and that she was possibly married to Castro, who had been arrested by DANY investigators earlier that morning. ¶55. Investigator Flores entered the house and introduced himself to Sergeant Diaz, who was with Sergeant Borelli. ¶56.

Minutes later, Bronx Duty Captain Brandon del Pozo entered the house with Platoon Commander Lieutenant Timothy Burke of the 43rd precinct. ¶57. Lieutenant Burke called the Command Center of the Internal Affairs Bureau ("IAB") to report that (i) DANY responded to 109 Admiral Lane to conduct a search warrant and found it to be Sergeant Diaz's residence and (ii) Castro, believed to be Diaz's husband, was apprehended leaving the house with $400,000 on his person. ¶58. The Internal Affairs Bureau ("IAB") is division within the NYPD that investigates allegations against uniformed and civilian members of the service. ¶59. At 9:25 a.m., the investigation into Sergeant Diaz's association with Castro was assigned to IAB Group 10. ¶60.

Sergeant Diaz observed Investigator Flores and Captain del Pozo in conversation in the kitchen and then in the dining room, although she could not overhear what they were saying. ¶61. Captain del Pozo told Investigator Flores that he was going to order Sergeant Diaz to report to the 43rd precinct and asked Flores to let him know when DANY was done executing the search warrant. ¶62. According to Sergeant Diaz, Investigator Flores then stood the doorway of the dining room and said, "Ha, you were associating with a known felon." ¶63.

Andrew Quinn, an attorney from the SBA, called Sergeant Diaz on her cell phone. ¶64. Sergeant Diaz activated the speaker function on her phone and Quinn directed everyone to leave the house. ¶65.

Captain del Pozo ordered that Sergeant Diaz be placed on duty, leave 109 Admiral Lane, and report to the 43rd precinct to await investigators from IAB. ¶66. Captain del Pozo told Sergeant Diaz that she "was not being accused of anything." ¶67. Captain del Pozo, Sergeant Diaz, Investigator Flores, and Sergeant Borelli exited the house, in that order. ¶68. According to Sergeant Diaz, once outside the house Investigator Flores said to the Captain, "She's under." ¶69.

Captain del Pozo has no recollection of a DANY investigator stating that Sergeant Diaz was "associating with a known felon" or that she was "under," as in, under arrest. ¶70. Captain del Pozo's decision to order that Sergeant Diaz be placed on duty, leave the house, and report to the 43rd precinct was not based on, or otherwise influenced by, any such statements by a DANY investigator. ¶71. Rather, his decision was based on the belief that Sergeant Diaz's relationship with Castro and her presence at the location of a search warrant implicated Patrol Guide §203-10, which prohibits officers from knowingly associating with individuals "reasonably believed to be engaged in, likely to engage in, or to have engaged in criminal activities." ¶72.

Sergeant Borelli drove Sergeant Diaz to the 43rd precinct in his personal car. ¶73. Investigator Flores remained in the vicinity of 109 Admiral Lane to await the arrival of the search warrant. ¶74.

Once at the 43rd precinct, Sergeant Diaz was directed to an office where she waited with Sergeant Borelli. ¶75. Captain del Pozo sent a female police officer to speak to

Sergeant Diaz to "try to find out the series of events that happened that day." ¶76. Sergeant Diaz told the female officer to "get the fuck out of here." ¶77. Sergeant Diaz was "very irate" at the precinct; she was "screaming" and "cursing everyone out." ¶78.

Sergeant Diaz and Sergeant Borelli were instructed, possibly by Captain del Pozo, to go upstairs to the detective squad where they continued to wait in another room for representatives of IAB to arrive. ¶79. At some point between 10:00 a.m. and 12:00 p.m., two sergeants from IAB entered the room and introduced themselves to Sergeant Diaz. ¶80. The IAB sergeants told Diaz that she had to stay in the room. ¶81.

At approximately 2:30 p.m., Sergeant Diaz was placed on modified duty for the good of the Police Department. ¶82. The IAB sergeants conducted interviews of Lieutenant Burke and his driver for the day. ¶83. The IAB sergeants also conducted background checks on Sergeant Diaz and Castro, as well as a DMV check on Castro, which uncovered the 2011 Audi purchased days before Castro's address and registered to Diaz's address. ¶84.

At approximately 4:30 p.m., DANY investigators executed the search warrant at Sergeant Diaz's home in the presence of investigators from IAB. ¶85. The execution of the search warrant lasted a couple of hours. ¶86. Sergeant Diaz remained at the precinct until 7:00 p.m., at which point Sergeant Borelli told her that she could leave. ¶87. Diaz was never charged with a crime. ¶88.

On November 24, 2010, Sergeant Diaz was scheduled to be out sick in connection an illness she contracted on November 20th. ¶92. The NYPD can change an officer's schedule depending on the needs of the Department. ¶93. When an officer is placed on duty on a date she is not scheduled to work, she is paid overtime; similarly, when

an officer is ordered to remain on duty beyond her tour, she is paid overtime. ¶94. In November, 2010, Diaz normally worked a tour of eight hours and fifty-seven minutes, usually from 2:50 p.m. to 11:47 p.m. ¶91. Sergeant Diaz requested and received eleven hours of overtime payment, for a total of $741.69, as compensation for the time she spent on duty on November 24, 2010. ¶¶89, 95.

IAB continued to investigate Sergeant Diaz's association with Castro and her receipt of the $310,000. ¶96. On April 13, 2011, Sergeant Diaz wrote DANY a check for approximately $180,000, representing the remainder of the $310,000 that was left after Diaz completed the payments on the mortgage for 109 Admiral Lane. ¶97. On September 24, 2012, Castro was sentenced to serve seven to twenty-one years and pay $1,997,311 in restitution upon a jury verdict finding him guilty of Grand Larceny in the First Degree and related felony offenses. ¶98. Despite a recommendation from the Commanding Officer of Group 10 that Sergeant Diaz be issued Charged and Specifications, IAB ultimately closed its investigation as "unsubstantiated" in October, 2014. ¶99.

## PROCEDURAL HISTORY

Sergeant Diaz filed this lawsuit on November 20, 2013 and filed an amended complaint on April 11, 2014 naming as defendants the City of New York, the NYPD, DANY, former-Police Commissioner Raymond Kelly, Investigator Flores, John Doe 1, and John Doe 2. Docket Nos. 1, 8. On February 2, 2015, the Honorable Paul A. Crotty issued an Opinion and Order dismissing all claims in the amended complaint with the exception of Sergeant Diaz's §1983 claim for false arrest against Investigator Flores and John Doe 1, presumed to be an NYPD Captain and identified during discovery as Brandon del Pozo. Docket Nos. 53, 69. On October 7, 2015, Your Honor issued a Memorandum and Order

denying Sergeant Diaz's motion to amend the complaint further to add Captain del Pozo as a defendant. Docket No. 69. Investigator Flores now moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. A fact is material if it might affect the outcome of the suit under the governing law." *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009) (quotation omitted). "Although the burden of demonstrating that no material fact exists lies with the moving party, [u]nless the nonmoving party offers some hard evidence showing that its version of the events is not wholly fanciful, summary judgment is granted to the moving party." *Miner v. Clinton County, N.Y.*, 541 F.3d 464, 471 (2d Cir. 2008) (quotation omitted).

## ARGUMENT

### I. Investigator Flores was not personally involved in Sergeant Diaz's detention

A claim for false arrest under §1983 is substantially the same as that under New York law. *Jenkins v. City of New York*, 478 F.3d 76, 84 (2d Cir. 2007). Under New York law, to prove the elements of false arrest, a plaintiff must establish that: "(1) the defendant intended to confine the plaintiff, (2) the plaintiff was conscious of the confinement, (3) the plaintiff did not consent to the confinement, and (4) the confinement was not otherwise

privileged." *Savino v. City of New York*, 331 F.3d 63, 75 (2d Cir. 2003). "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under §1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (quotation omitted).

The record is clear that Investigator Flores never directly detained Sergeant Diaz and that the decision to do so was made by the NYPD. Immediately upon learning of the circumstances surrounding Castro's arrest at Sergeant Diaz's home, the Police Department opened an IAB investigation into Diaz's association with him. ¶¶58-59. Before Investigator Flores allegedly (and accurately) observed that Sergeant Diaz was "associating with a known felon," Captain del Pozo had already determined that he would order Diaz to report to the 43rd precinct. ¶¶61-63. Similarly, Captain del Pozo informed Sergeant Diaz of his order before Investigator Flores allegedly stated, as Diaz was leaving the house to head to the precinct, "She's under." ¶¶66-69. Captain del Pozo has no recollection of Investigator Flores' alleged comments, and neither does any other witness deposed in this case. ¶70. His decision to place Sergeant Diaz on duty and order her to report to the precinct was not based on any comments by Flores, but rather, on del Pozo's belief that Diaz's presence at the location of a search warrant implicated the Patrol Guide. ¶¶71-72. Sergeant Diaz had no interaction with Investigator Flores at the precinct and her continued detention was at the direction of the IAB sergeants. ¶¶74-84.

As Investigator Flores was not personally involved in Sergeant Diaz's detention, he cannot be held liable for false arrest.

## II. <u>Sergeant Diaz's detention was permitted in connection with an NYPD internal investigation</u>

Alternatively, summary judgment is warranted on Sergeant Diaz's false arrest claim because she was detained in connection with an internal investigation by the NYPD. The Second Circuit has "permitted seizures of police officers based upon less than probable cause in connection with internal administrative or disciplinary proceedings." *DeMaine v. Samuels*, 29 Fed. Appx. 671, 675 (2d Cir. 2002) (quotation omitted); *see also Biehunik v. Felicetta*, 441 F.2d 228, 230-232 (2d Cir. 1971) (upholding police commissioner's order that sixty-two officers report to the Police Academy and stand in lineups, upon threat of discharge and without probable cause, in response to civilian complaints of police brutality), *Gonzalez v. City of New York*, 38 Fed. Appx. 62, 64 (2d Cir. 2002) ("Even without probable cause, it would have been reasonable for the officers to detain [the plaintiff, an NYPD officer] as part of an internal investigation into the fitness of one of its own officers"). "The crucial question is not whether the investigation involves actions arising out of a police officer's duties, but whether the investigation's objective is to discipline the officer within the department or to seek criminal prosecution." *DeMaine*, 29 Fed. Appx. at 675, citing *Cerrone v. Brown*, 246 F.3d 194, 198, 201 (2001) (distinguishing *Biehunik* where the plaintiff officer, who was not the subject of an internal investigation, was seized on his way home from work, transported "in the felony position" in an unmarked police car to a hotel room, read his *Miranda* rights, and subjected to a six-hour "custodial interrogation").

*DeMaine*, for example, involved a Fourth Amendment challenge to the actions of the Connecticut State Police in detaining a detective for over two hours while searching his desk and office in connection with an investigation into overtime abuses committed by other officers. *Id.*, 674. The Second Circuit held that such actions were

appropriate as "the defendants reasonably believed [the detective] had information pertinent to the ongoing overtime investigation" and the circumstances of the seizure – "for two hours while the search was conducted, during a period when [the detective] was on duty and thus compensated for his time" – were neither overly intrusive nor unreasonable. *Id.*, 675. In a similar case, *Sanchez v. City of New York*, the plaintiff was detained after police responded to the home of his brother to arrest the brother and execute a search warrant and encountered the plaintiff who, unbeknownst to the police, was a fellow NYPD officer. 2000 U.S. Dist. LEXIS 9833, *2-3 (S.D.N.Y. July 17, 2000). After the plaintiff identified himself as an officer and refused to comply with a sergeant's subsequent order to surrender his firearm, the plaintiff was placed on duty, suspended, taken to IAB headquarters where he spoke to a supervisor and union delegate, taken to his residence, and then taken to his assigned precinct to retrieve and surrender his remaining firearms. *Id.*, *5-6. The district court entered summary judgment for the defendants, reasoning that the sergeant's decision to place the plaintiff on duty and suspect him was a reasonable seizure given the plaintiff's disregard of the sergeant's order in violation of police protocol. *Id.*, *9-12.

Here, the information available suggested that Sergeant Diaz was involved in, or at least aware of, Castro's theft of $5,700,000 from Columbia University. Diaz and Castro had been involved in each other's lives, in a close capacity, for ten years and had two children together. ¶¶21, 23. Although the full extent of the money transferred from Castro to Diaz was not known initially, in the least, DANY was aware of a check in the amount of $60,000 issued to Diaz on November 18, 2010. ¶13. Castro was arrested leaving Diaz's home at 109 Admiral Lane while heading to a vehicle believed to have been purchased with stolen funds just days earlier that was registered to Diaz's address. ¶¶10-11, 34-38. At the

time of his arrest, Castro was in possession of $400,000 in cash, a copy of Diaz's NYPD shield bearing the inscription "Sergeant's Family Member," and Diaz's SBA card. ¶40.

As soon as the Police Department learned of the circumstances of Castro's arrest, an investigation into Sergeant Diaz's association with Castro was opened and assigned to Group 10 of the Internal Affairs Bureau. ¶¶58-60. Captain del Pozo, who ordered that Sergeant Diaz be placed on duty and report to the 43rd precinct, acted on the basis of his belief that Diaz's presence at the location implicated the Patrol Guide's prohibition on associating with known felons. ¶72. IAB sergeants responded to the precinct and commenced an investigation into Sergeant Diaz's association with Castro that would continue for years. ¶¶80-86, 96, 99. Later that afternoon, DANY obtained a search warrant for Sergeant Diaz's home and executed the warrant in the presence of IAB investigators, ¶¶85-85, providing even further justification for Diaz's already legitimate detention at the precinct. *Demaine*, 29 Fed. Appx. at 675; *see also Spontino v. City of New York*, 1986 U.S. Dist. LEXIS 24966, *6-9, 15-16 (S.D.N.Y. May 28, 1986) (dismissing Fourth Amendment claim where two officers were reassigned, placed on overtime, and detained from 11:30 a.m. to 7:25 p.m. in connection with an internal investigation, reasoning that the "plaintiffs were merely required to remain on duty, within a superior officer's view, pending the issuance of the search warrant").[2] Sergeant Diaz's contention that the time she spent at the precinct constituted an "arrest" is undermined by the fact that she immediately requested, and

---

[2] Apart from the fact that Sergeant Diaz is a police officer subject to the authority of the NYPD to "place[ ] [officers] on overtime and reassign[ ] them," *Spontino*, *supra*, *15, in the ordinary course officers executing a search warrant for contraband may "detain the occupants of the premises while a proper search is conducted." *Muehler v. Mena*, 544 U.S. 93, 98-100 (2005) (upholding two-to-three hour detention in handcuffs).

received, overtime payment from the Police Department for the full eleven hours she spent on duty on November 24, 2010. ¶¶89-95.

In sum, as was the case in *Demaine*, *Sanchez*, and *Spontino*, *supra*, requiring Sergeant Diaz to wait at the precinct throughout the course of the day's investigation was reasonable and, therefore, summary judgment is warranted on Diaz's claim that she was falsely arrested.

**CONCLUSION**

For the above reasons, it is respectfully requested that the Court enter an Order pursuant to Federal Rule of Civil Procedure 56 granting summary judgment in favor of Investigator Flores.

Dated: New York, New York
October 29, 2015

CYRUS R. VANCE, JR.
District Attorney of New York County, as
Special Assistant Corporation Counsel
*Attorney for Defendant Jose Flores*
One Hogan Place
New York, New York 10013
(212) 335-9000

By: /s
Elizabeth Norris Krasnow
Assistant District Attorney