UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------ X

DENISE DIAZ,

                                                  Plaintiff,

                                      -against-

CITY OF NEW YORK, et al.,

                                                 Defendants.

**STATEMENT OF INVESTIGATOR JOSE FLORES PURSUANT TO LOCAL CIVIL RULE 56.1**

13 Civ. 8281 (JCF)

------------------------------------------------------------------------ X

        Defendant Investigator Jose Flores, for his statement pursuant to Local Civil Rule 56.1, for purposes of this summary judgment motion only and no other purpose, including trial of this matter, states as follows:

        1.      On November 22, 2010, Columbia University contacted the New York County District Attorney's Office ("DANY") with a larceny complaint. Exh. A [DANY Investigations Bureau reports], D1; Exh. B [search warrant materials], ¶8(b).[1]

        2.      Columbia reported that someone had accessed its accounts payable system and changed the process of how Columbia paid one of its vendors such that funds were wired to a TD Bank account as opposed to the vendor. Exh. A, D1; Exh. B, ¶8(b).

        3.      TD Bank records obtained by DANY revealed that the account belonged to IT & Security Solutions and was opened in July, 2010 by an individual named George Castro. Exh. A, D1; see also Exh. B, ¶8(f).

        4.      TD Bank records showed that approximately $5,700,000 was transferred from Columbia to the IT & Security Solutions account in October and November, 2010. Exh. A, D1.

---

[1] All references are to the exhibits attached to the Declaration of Elizabeth N. Krasnow ("EK Decl."), submitted in support of Investigator Flores' motion.

1

5.  Over $3 million of the stolen funds were then wired from the TD Bank account to other banks, including Capital One.  Exh. B, ¶8(c).

6.  IT & Security Solutions had three accounts with Capital One, all of which were opened by Castro.  Exh. B, ¶8(d).

7.  Capital One records listed Castro's personal address as 109 Admiral Lane in the Bronx.  Exh. B, ¶8(d).

8.  Capital One records showed numerous cash withdrawals from the IT & Security Solutions accounts with driver's license number 485150946 written on the withdrawal slips.  Exh. B, ¶8(b).

9.  DANY confirmed with the Department of Motor Vehicles ("DMV") that driver's license 485150946 belonged to Castro and that his address of record was 109 Admiral Lane.  Exh. B, ¶8(f).

10.  DANY identified plaintiff Denise Diaz as the owner of 109 Admiral Lane.  Exh. B, ¶8(g).

11.  Diaz purchased the home in 2003.  Exh. C [Diaz dep.], 108:10-16, 111:9-12.

12.  109 Admiral Lane is within the confines of the NYPD's 43rd precinct.  Exh. C, 147:12-20.

13.  Capital One records showed a check issued from one of the IT & Security Solutions accounts to Diaz on November 18, 2010 in the amount of $60,000.  Exh. B, ¶8(d); Exh. C at 229:19-234:24; Exh. D [A.F. complaint], ¶¶30-34; Exh. E [A.F. verified answer], ¶¶30-34; Exh. F [Diaz checks].

14.   Capital One records showed several other checks issued from the IT & Security Solutions accounts to other persons believed by DANY to be Castro's relatives and associates.  Exh. B, ¶8(d) and (g).

15.   In addition to the November 18th check known to DANY, Castro issued Diaz four other checks in October and November 2010 for a total of $310,000.  Exh. C, 237:4-9; Exh. D, ¶¶30-34; Exh. E; ¶¶30-34; Exh. F.

16.   Diaz deposited all five checks into her personal bank account.  Exh. C, 237:4-9; Exh. D, ¶¶30-34; Exh. E; ¶¶30-34.

17.   Diaz used approximately $130,000 of the $310,000 to make the final payment on the mortgage for 109 Admiral Lane.  Exh. C, 111:9-23, 243:7-17.

18.   In the early morning hours of November 24, 2010, DANY investigators went to 109 Admiral Lane to arrest Castro for grand larceny.  Exh. A, D3; Exh. C [Diaz dep.], 145:8-146:9.

19.   Although DANY had identified Diaz as the homeowner and a recipient of one of the checks, the investigators did not know that she was an officer with the New York City Police Department.  Exh. A, D3; Exh. C, 169:7-15, 172:20-173:7.

20.   As of November 24, 2010, Diaz held the rank of Sergeant and was assigned to the 24th precinct as a patrol supervisor.  Exh. C, 36:8-11, 39:2-14, 146:10-19.

21.   Sergeant Diaz dated Castro from 2000 through 2008 and considered him to be her "common law husband" from 2002 through 2008.  Exh. C, 99:11-100:0, 101:21-103:17.

22.   Castro had three prior convictions dating back to 1991 and had spent time incarcerated in State prison.  Exh. K [IAB Investigating Officer's Reports], D375; *see also* Exh. L [IAB log], D162.

3

23. During the course of their relationship, Sergeant Diaz and Castro had two children together; the eldest was born in 2002 and the youngest was born in 2006. Exh. C, 121:15-122:3.

24. Castro moved into 109 Admiral Lane with Sergeant Diaz when she purchased the house in 2003. Exh. A, D20; Exh. C, 106:17-107:13.

25. According to Sergeant Diaz, she ended her relationship with Castro in 2008 after she discovered that he had lied to her about the number of children he had and the fact that he had been previously married. Exh. C, 103:8-17, 105:14-21; 134:17-23.

26. Castro continued to live with Sergeant Diaz and their two children at 109 Admiral Lane until August, 2010. Exh. C, 103:18-24, 105:14-21.

27. In August, 2010, Sergeant Diaz discovered that the mother of one of Castro's other children had been calling Castro on his personal phone. Exh. C, 103:25-104:23, 129:7-9.

28. According to Sergeant Diaz, Castro then moved out of 109 Admiral Lane and moved in with his mother. Exh. C, 103:18-22; 155:3-9.

29. As far as Sergeant Diaz was aware, Castro was self-employed installing burglar alarms for the entirety of their relationship. Exh. C, 114:6-23, 115:20-116:8, 119:16-4.

30. Sergeant Diaz never inquired as to Castro's income and he "didn't like for [her] to look at any papers, to ask questions." Exh. C, 117:24-118:19, 120:5-20.

31. Casto would give Sergeant Diaz cash each month to contribute to the family's expenses. Exh. C, 122:4-14.

32. Prior to the series of checks in October and November, 2011, the most money Castro gave to Sergeant Diaz at any given time was $5,000. Exh. C, 128:3-9.

33. On October 4, 2010, Castro and Sergeant Diaz exchanged a series of text messages wherein Castro said he would give Diaz $80,000 for her birthday so that she could get plastic surgery. Exh. C, 247:6-249:17; Exh. T [text messages].

34. On November 12, 2010, Castro purchased a brand new Audi for $81,000 with funds believed to have been stolen from Columbia. Exh. A, D3, D8; Exh. B, ¶8(j) and (k); Exh. C, 160:19-161:17; Exh. D, ¶23; Exh. E, ¶23; Exh. G [photos], D747.

35. The Audi, purchased two months after Castro moved out, was registered to Sergeant Diaz's address at 109 Admiral Lane. Exh. B; ¶8(b); Exh. K, D376, D445.

36. On November 23, 2010, Castro spent the night at 109 Admiral Lane. Exh. C, 156:2-4.

37. At approximately 8:00 a.m. on November 24th, DANY investigators arrested Castro as he exited 109 Admiral Lane and headed to his car. Exh. A, D3; Exh. C, 164:14-165:8, 166:6-13.

38. The Audi was parked on the street near 109 Admiral Lane. Exh. A, 160:19-24; Exh. G, D747.

39. Castro was carrying a backpack and a brown cardboard box at the time of his arrest. Exh. A, D3; Exh. G, D747, D748.

40. The backpack and cardboard box contained $400,000 in cash, a leather case with Diaz's NYPD shield and the inscription "Sergeant's Family Member," and Diaz's Sergeants Benevolent Association ("SBA") card. Exh. A, D3; Exh. C, 216:24-218:5, 219:23-220:14; Exh. G, D749-D758.

41. Diaz purchased the shield for Castro after she was promoted to Sergeant, at some point in 2009. Exh. C, 39:2-4, 218:6-24.

5

42. Sergeant Diaz also gave Castro the SBA card.  Exh. C, 220:15-17.

43. The purpose of the shield and the SBA card was to alert others that Casto was related to a member of the service.  Exh. C, 218:25-219:22, 220:15-21.

44. Sergeant Diaz was inside the house when Castro was arrested.  Exh. C, 164:12-165:8.

45. Sergeant Diaz came outside and spoke to DANY Investigator Michael Wigdor, who was restraining Castro.  Exh. C, 168:6-169:2.

46. Sergeant Diaz identified herself to Investigator Wigdor as a member of the New York City Police Department.  Exh. C, 169:4-6.

47. Sergeant Diaz and Investigator Wigdor went into the house so that Diaz could show Wigdor her NYPD identification.  Exh. C, 169:7-15.

48. Investigator Wigdor told Sergeant Diaz that that Castro was suspected of being involved in the theft of a large sum of money and that DANY intended to get a search warrant for Diaz's house.  Exh. C, 175:8-13.

49. Sergeant Diaz called Chief Kathleen O'Reilly, the commanding officer of Diaz's assigned precinct, and told O'Reilly that the father of her children had been arrested.  Exh. C, 180:25-182:10.

50. Chief O'Reilly told Sergeant Diaz that she would "make the notification to everyone."  Exh. C, 181:14-17, 182:8-10.

51. After speaking with Chief O'Reilly, Sergeant Diaz made several phone calls in an attempt to find an SBA delegate.  Exh. C, 182:11-185:19.

52. It is "common practice" in the NYPD for an officer to be represented by an SBA delegate in connection with internal investigations by the Police Department.  Exh. C, 184:19-185:10.

53. At approximately 8:30 a.m., SBA delegate Anthony Borelli arrived to Sergeant Diaz's home. Exh. C, 185:20-186:14; Exh. H [Borelli dep.], 15:12-23, 35:15-36:8, 40:19-24.

54. While on his way to work, DANY Investigator Jose Flores received a phone call requesting that he respond to 109 Admiral Lane for the possible execution of a search warrant. Exh. I [Flores dep.], 23:18-24:16.

55. Upon arriving to 109 Admiral Lane, Investigator Flores spoke to another member of DANY's team and learned that Sergeant Diaz was inside the house and that she was possibly married to Castro, who had been arrested by DANY investigators earlier that morning. Exh. I, 32:11-33:34:5.

56. Investigator Flores entered the house and introduced himself to Sergeant Diaz, who was with Sergeant Borelli. Exh. C, 187:5-22, 198:4-13; Exh. I, 48:16-49:6.

57. Minutes later, Bronx Duty Captain Brandon del Pozo entered the house with Platoon Commander Lieutenant Timothy Burke of the 43rd precinct. Exh. C, 187:23-188:9, 197:18-198:25, 199:14-21; Exh. J [del Pozo declaration], ¶3; Exh. I, 58:14-18.; Exh. K, D372.

58. Lieutenant Burke called the Command Center of the Internal Affairs Bureau ("IAB") to report that (i) DANY responded to 109 Admiral Lane to conduct a search warrant and found it to be Sergeant Diaz's residence and (ii) Castro, believed to be Diaz's husband, was apprehended leaving the house with $400,000 on his person. Exh. K, 374; Exh. L, D162.

7

59. The Internal Affairs Bureau ("IAB") is division within the NYPD that investigates allegations against uniformed and civilian members of the service. Exh. C, 55:16-56:15.

60. At 9:25 a.m., the investigation into Sergeant Diaz's association with Castro was assigned to IAB Group 10. Exh. L, D162.

61. Sergeant Diaz observed Investigator Flores and Captain del Pozo in conversation in the kitchen and then in the dining room, although she could not overhear what they were saying. Exh. C, 189:25-190:9, 200:4-14; *see also id.*, 205:20-206:2.

62. Captain del Pozo told Investigator Flores that he was going to order Sergeant Diaz to report to the 43rd precinct and asked Flores to let him know when DANY was done executing the search warrant. Exh. I, 39:6-42:7.

63. According to Sergeant Diaz, Investigator Flores then stood the doorway of the dining room and said, "Ha, you were associating with a known felon." Exh. C, 189:25-190:9.

64. Andrew Quinn, an attorney from the SBA, called Sergeant Diaz on her cell phone. Exh. C, 191:7-16.

65. Sergeant Diaz activated the speaker function on her phone and Quinn directed everyone to leave the house. Exh. C, 191:13-16, 201:11-13.

66. Captain del Pozo ordered that Sergeant Diaz be placed on duty, leave the house, and report to the 43rd precinct to await investigators from IAB. Exh. C, 201:20-203:24, 204:11-24; Exh. H, 50:14-52:6, 60:19-23; Exh. J, ¶¶7-8; Exh. K, D374; Exh. P [IAB closing report], D729.

67. Captain del Pozo told Sergeant Diaz that she "was not being accused of anything." Exh. C, 202:19-203:5.

68.     Captain del Pozo, Sergeant Diaz, Investigator Flores, and Sergeant Borelli exited the house, in that order.  Exh. C, 191:23-192:2, 203:25-204:5.

69.     According to Sergeant Diaz, once outside the house Investigator Flores said to the Captain, "She's under."  Exh. C, 192:12-18.

70.     Captain del Pozo has no recollection of a DANY investigator stating that Sergeant Diaz was "associating with a known felon" or that she was "under," as in, under arrest.  Exh. J, ¶9; see also Exh. H, 64:3-9, 66:14-20; Exh. I, 46:3-18, 53:22-25.

71.     Captain del Pozo's decision to order that Sergeant Diaz be placed on duty, leave the house, and report to the 43rd precinct was not based on, or otherwise influenced by, any such statements by a DANY investigator.  Exh. J, ¶9.

72.     Rather, Captain del Pozo's decision was based on his belief that Sergeant Diaz's relationship with Castro and her presence at the location of a search warrant implicated Patrol Guide §203-10, which prohibits officers from knowingly associating with individuals "reasonably believed to be engaged in, likely to engage in, or to have engaged in criminal activities."  Exh. J, ¶¶5-7.

73.     Sergeant Borelli drove Sergeant Diaz to the 43rd precinct in his personal car.  Exh. C, 204:25-205:6; Exh. H, 52:15-21; Exh. I, 47:3-7; Exh. K, D374.

74.     Investigator Flores remained in the vicinity of 109 Admiral Lane to await the arrival of the search warrant.  Exh. C, 205:13-19; Exh. I, 62:19-63:12.

75.     Sergeant Diaz was directed to an office within the 43rd precinct where she waited with Sergeant Borelli.  Exh. C, 193:1-24; Exh. L, D162.

76.     Captain del Pozo sent a female police officer to speak to Sergeant Diaz to "try to find out the series of events that happened that day."  Exh. C, 194:3-195:16, 206:21-207:9.

77. Sergeant Diaz told the female officer to "get the fuck out of here." Exh. C, 195:17-18.

78. Sergeant Diaz was "very irate" at the precinct; she was "screaming" and "cursing everyone out." Exh. C, 207:16-18.

79. Sergeant Diaz and Sergeant Borelli were instructed, possibly by Captain del Pozo, to go upstairs to the detective squad where they waited in another room for representatives of IAB to arrive. Exh. C, 195:17-196:8, 208:7-17.

80. At some point between 10:00 a.m. and 12:00 p.m., two sergeants from IAB entered the room and introduced themselves to Sergeant Diaz. Exh. C, 196:5-8, 208:15-24.

81. The IAB sergeants told Diaz that she had to stay in the room. Exh. C, 209:5-12, 213:7-22.

82. At approximately 2:30 p.m., Sergeant Diaz was placed on modified duty for the good of the Police Department. Exh. C, 211:8-12; Exh. M [modification report]; Exh. K, D372.

83. The IAB sergeants conducted interviews of Lieutenant Burke and his driver for the day at the 43rd precinct. Exh. K, D372-373.

84. The IAB sergeants also conducted background checks on Sergeant Diaz and Castro and a DMV check on Castro, which uncovered the 2011 Audi registered to Diaz's address. Exh. P, D375-376.

85. At approximately 4:30 p.m., DANY investigators executed the search warrant for Sergeant Diaz's house in the presence of investigators from IAB. Exh. A, D6-7; Exh. P, D375.

86. The execution of the search warrant lasted a couple of hours. Exh. I, 63:4-12.

87. Sergeant Diaz remained at the precinct until approximately 7:00 p.m., at which point Sergeant Borelli told her that she could leave. Exh. C, 211:6-7, 215:17-19.

88. Diaz was never charged with a crime. Exh. P, D733.

89. Sergeant Diaz requested eleven hours of overtime payment in connection with the events of November 24, 2010. Exh. C, 221:19-20; Exh. N [24th precinct command log].

90. The hours of a police officer are referred to as her "tour" and the days the officer is not scheduled to work are referred to as her "regular days off," or "RDOs." Exh. C, 81:7-23.

91. In November, 2010, Sergeant Diaz normally worked a tour of eight hours and fifty-seven minutes, usually from 2:50 p.m. to 11:47 p.m., and had rotating RDOs. Exh. C, 82:3-83:14, 85:17-24.

92. On November 24, 2010, Sergeant Diaz was scheduled to be out sick in connection an illness she contracted on November 20th. Exh. C, 148:4-150:7.

93. The NYPD can change an officer's tour or her RDOs depending on the needs of the Department. Exh. C, 87:4-17.

94. When an officer is placed on duty on a date scheduled to be her RDO, she is paid overtime; similarly, when an officer is ordered to remain on duty beyond her tour, she is paid overtime. Exh. C, 87:18-21.

95. Sergeant Diaz received eleven hours of overtime payment, for a total of $741.69, as compensation for the time she spent on duty on November 24, 2010. Exh. O, [Montaruli decl.], ¶4.

11

96. IAB continued to investigate Sergeant Diaz's association with Castro and her receipt of the $310,000. *See* Exh. P, D727, D730, D732.

97. On April 13, 2011, Sergeant Diaz wrote DANY a check for approximately $180,000, representing the remainder of the $310,000 that was left after Diaz completed the payments on the mortgage for 109 Admiral Lane. Exh. C, 246:16-25; Exh. Q [DANY check].

98. On September 24, 2012, Castro was sentenced to serve seven to twenty-one years and pay $1,997,311 in restitution upon a jury verdict finding him guilty of Grand Larceny in the First Degree and related felony offenses. Exh. P, D733; Exh. R [certificate of disposition].

99. Despite a recommendation from the Commanding Officer of IAB Group 10 that the NYPD issue Charges and Specifications against Sergeant Diaz, Exh. S [charges & specs memo], IAB ultimately closed its investigation as "unsubstantiated" in October, 2014. Exh. P, D727.

Dated:   New York, New York
         October 29, 2015

                                        CYRUS R. VANCE, JR.
                                        District Attorney of New York County, as
                                        Special Assistant Corporation Counsel
                                        *Attorney for Defendant Jose Flores*
                                        One Hogan Place
                                        New York, New York 10013
                                        (212) 335-9000

                                        By:         /s
                                            Elizabeth Norris Krasnow
                                            Assistant District Attorney