UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ECF Case - 13 CV 08281 (JCF)

-------------------------------------------------------------------------------------------------------------------

DENISE DIAZ,

*Plaintiff,*

-against-

CITY OF NEW YORK, et al
,

*Defendants*.

-------------------------------------------------------------------------------------------------------------------

PLAINTIFF'S LOCAL RULE 56.1(B)(3) RESPONSE TO DEFENDANT'S
STATEMENT OF UNDISPUTED MATERIAL

Plaintiff, by and through her attorney, Ricardo A. Aguirre, hereby submits her Local Rule

56.1(b)(3) Response to Defendant's Statement of Undisputed, Material Facts as follows:

1.      On November 22, 2010, Columbia University contacted DANY with a

larceny complaint.

**Response:**      Undisputed.  Solely for the purpose of responding to Defendant's motion

for summary judgment.

2.      Columbia reported that someone had accessed its accounts payable system and

changed the process of how Columbia paid one of its vendors such that funds were wired to a TD

Bank account as opposed to the vendor.

**Response:**      Undisputed.  Solely for the purpose of responding to Defendant's motion

for summary judgment.

1

3.      TD Bank records obtained by DANY revealed that the account belonged to IT & Security Solutions and was opened in July, 2010 by an individual named George Castro.

**Response:**      Undisputed.  Solely for the purpose of responding to Defendant's motion for summary judgment.

4.      Approximately $5,700,000 was transferred from Columbia to the TD Bank account in October and November, 2010.

**Response:**      Undisputed.  Solely for the purpose of responding to Defendant's motion for summary judgment.

5.      Over $3 million of the stolen funds were then wired from the TD Bank account to other banks, including Capital One.

**Response:**      Undisputed.  Solely for the purpose of responding to Defendant's motion for summary judgment.

6.      IT & Security Solutions had three accounts with Capital One, all of which were opened by Castro.

**Response:**      Undisputed.  Solely for the purpose of responding to Defendant's motion for summary judgment.

7.      Capital One records listed Castro's personal address as 109 Admiral Lane in the Bronx.

**Response:**      Undisputed.  Solely for the purpose of responding to Defendant's motion for summary judgment.

8.      Capital One records showed numerous cash withdrawals from the IT & Security Solutions accounts with driver's license number 485150946 written on the withdrawal slips.

**Response:** Undisputed.  Solely for the purpose of responding to Defendant's motion for summary judgment.

9.      DANY confirmed with the Department of Motor Vehicles ("DMV") that driver's license 485150946 belonged to Castro and that his address of record was 109 Admiral Lane.

**Response:** Undisputed.  Solely for the purpose of responding to Defendant's motion for summary judgment.

10.     DANY identified plaintiff Denise Diaz as the owner of 109 Admiral Lane.

**Response:** Undisputed.

11.     Diaz had purchased the home in 2003.

**Response:** Undisputed.

12.     109 Admiral Lane is within the confines of the NYPD's 43rd precinct.

**Response:** Undisputed.

13.     Capital One records showed a check issued from one of the IT & Security Solutions accounts to Diaz on November 18, 2010 in the amount of $60,000.

**Response:** Undisputed.

14.     One records showed several other checks issued from the IT & Security Solutions accounts to other persons believed by DANY to be Castro's relatives and associates.

**Response:** Undisputed.

15.     In addition to the November 18th check known to DANY, Castro issued Diaz four other checks in October and November, 2010 for a total of $310,000.

**Response:** Undisputed.

16.     Diaz deposited all five checks into her personal bank account.

**Response:** Undisputed.

3

17.     She used approximately $130,000 of the $310,000 to make the final payment on the mortgage for 109 Admiral Lane.

**Response:**     Undisputed.

18.     In the early morning hours of November 24, 2010, DANY investigators went to 109 Admiral Lane to arrest Castro for grand larceny.

**Response:**     Undisputed

19.     Although DANY had identified Diaz as the homeowner and a recipient of one of the checks, the investigators did not know that she was an officer with the New York City Police Department.

**Response:**     Disputed.

Throughout discovery proceedings, Defendant never stated nor proffered documentation proving they were aware Plaintiff was the homeowner and that she had received a check prior to Castro's arrest. But for Plaintiff's disclosure to DANY Investigator Wigdor that she was a police officer, her home would have never been searched and she would not have been arrested.

20.     As of November 24, 2010, Diaz held the rank of Sergeant and was assigned to the 24th precinct as a patrol supervisor.

**Response:**     Undisputed.

21.     Sergeant Diaz dated Castro from 2000 through 2008 and considered him to be her "common law husband" from 2002 through 2008.

**Response:**     Undisputed.

22.     Castro had three prior convictions dating back to 1991 and had spent time incarcerated in State prison.

**Response:**     Undisputed.

23.     During the course of their relationship, Sergeant Diaz and Castro had two children together; the eldest was born in 2002 and the youngest was born in 2006.

**Response:**     Undisputed.

24.     Castro moved into 109 Admiral Lane with Sergeant Diaz when she purchased the house in 2003.

**Response:**     Undisputed.

25.     According to Sergeant Diaz, she ended her relationship with Castro in 2008 after she discovered that he had lied to her about the number of children he had and the fact that he had been previously married.

**Response:**     Undisputed.

26.     Castro continued to live with Sergeant Diaz and their two children at 109 Admiral Lane until August, 2010.

**Response:**     Undisputed

27.     In August, 2010, Sergeant Diaz discovered that the mother of one of Castro's other children had been calling Castro on his personal phone.

**Response:**     Undisputed.

28.     According to Sergeant Diaz, Castro then moved out of 109 Admiral Lane and moved in with his mother.

**Response:**     Undisputed.

29.     As far as Sergeant Diaz was aware, Castro was self-employed installing burglar alarms for the entirety of their relationship.

**Response:**     Undisputed.

5

30.     Sergeant Diaz never inquired as to Castro's income and he "didn't like for [her] to look at any papers, to ask questions."

**Response:**     Undisputed.

31.     Castro would give Sergeant Diaz cash each month to contribute to the family's expenses.

**Response:**     Undisputed.

32.     Prior to the series of checks in October and November, 2011, the most money Castro gave to Sergeant Diaz at any given time was $5,000.

**Response:**     Undisputed.

33.     On October 4, 2010, Castro and Sergeant Diaz exchanged a series of text messages wherein Castro said he would give Diaz $80,000 for her birthday so that she could get plastic surgery

**Response:**     Dispute.

During her deposition, Plaintiff explained to A.D.A. Krasnow that the comments concerning her "tummy tuck" plastic surgery was an on-going joke between Castro and Plaintiff. *(see Exh. A [Diaz dep.] 249: 18-25,250: 1-20)*

34.     On November 12, 2010, Castro purchased a brand new Audi for $81,000 with funds believed to have been stolen from Columbia.

**Response:**     Undisputed.

35.     The Audi, purchased two months after Castro supposedly moved out, was registered to Sergeant Diaz's address at 109 Admiral Lane.

**Response:**     Disputed.

Again Defendant attempts to characterize Plaintiff as a liar when they state "…Castro supposedly moved out…", when in fact he did move out and lived with his mother. *(see Exh. A [Diaz dep.] 155: 3-9)*   Plaintiff explained that the sole reason Castro was at her home that day was to attend to their children being that she was out sick. *(see Exh. A [Diaz dep.] 156:1-19).* Plaintiff asserts that this statement is immaterial to the fact that Defendant lacked probable cause when he ordered Plaintiff's arrest and subsequent unlawful imprisonment. Plaintiff also states that this statement is immaterial to resolution of Defendant's motion for summary judgment.

36.     On November 23, 2010, Castro spent the night at 109 Admiral Lane.

**Response:**     Undisputed.

37.      At approximately 8:00 a.m. on November 24th, DANY investigators arrested Castro as he exited 109 Admiral Lane and headed to his car.

**Response:**     Undisputed.

38.     The Audi was parked on the street near 109 Admiral Lane.

**Response:**     Undisputed.

39.     Castro was carrying a backpack and a brown cardboard box at the time of his arrest.

**Response:**     Undisputed.

40.     The backpack and cardboard box contained $400,000 in cash, a leather case with Diaz's NYPD shield and the inscription "Sergeant's Family Member," and Diaz's Sergeants Benevolent Association ("SBA") card.

**Response:**     Disputed.

Castro did not have Plaintiff's Sergeant Shield at the time of his arrest.

Plaintiff requests the Court take judicial notice of the fact that "mini" shields (not regulation sized shields) and Sergeant Benevolent Association Cards are routinely distributed by members of the service to their relatives and friends.

41.     Diaz purchased the shield for Castro after she was promoted to Sergeant, at some point in 2009.

**Response:**     Disputed.

Plaintiff did not purchase a regulation Sergeant's shield for Castro. She purchased a mini-shield for Castro.

42.     Sergeant Diaz also gave Castro the SBA card.

**Response:**     Undisputed.

43.     The purpose of the shield and the SBA card was to alert others that Castro was related to a member of the service.

**Response:**     Undisputed.

44.     Sergeant Diaz was inside the house when Castro was arrested.

**Response:**     Undisputed.

45.     She came outside and spoke to DANY Investigator Michael Wigdor, who was restraining Castro.

**Response:**     Undisputed.

However, Plaintiff identified an Investigator Reid that was also holding Castro. *(see Exh. A [Diaz dep.] 171: 20-22)*

46.     Sergeant Diaz identified herself to Investigator Wigdor as a member of the New York City Police Department.

**Response:**     Undisputed.

47.     Diaz and Wigdor went into the house so that Diaz could show Wigdor her NYPD identification.

**Response:**     Undisputed.

48.     Investigator Wigdor told Sergeant Diaz that that Castro was suspected of being involved in the theft of a large sum of money and that DANY intended to get a search warrant for Diaz's house.

**Response:**     Disputed.

Initially, Investigator Wigdor did not inform Plaintiff that DANY intended to get a search warrant for her house. Wigdor first called A.D.A. Patricia O'Connor to inform her that Plaintiff was a member of the NYPD and that they would need a search warrant. Wigdor made the comment "Oh shit, we got a cop!" *(see Exh. A [Diaz dep.] 172: 20-25, 173:1-7).* A fact not mentioned is that Plaintiff stated she would give them permission to search the room Castro stayed in because she had nothing to hide. *(see Exh. A [Diaz dep.] 174: 9-12)*

49.     Sergeant Diaz called Chief Kathleen O'Reilly, the commanding officer of Diaz's assigned precinct, and told O'Reilly that the father of her children had been arrested.

**Response:**     Undisputed.

50.     O'Reilly told Sergeant Diaz that she would "make the notification to everyone."

**Response:**     Undisputed.

51.     After speaking with Chief O'Reilly, Diaz made several phone calls in an attempt to find an SBA delegate.

**Response:**     Undisputed.

52.     It is "common practice" in the NYPD for an officer to be represented by an SBA delegate in connection with internal investigations by the Police Department.

**Response:**     Undisputed.

However, Defendant did not offer any evidence to prove Plaintiff was under an internal NYPD investigation. NYPD knew nothing of the Castro arrest and Plaintiff's relation to him until they were informed by DANY representatives.

53.     At approximately 8:30 a.m., SBA delegate Sergeant Anthony Borelli arrived to Sergeant Diaz's home.

**Response:**     Undisputed.

54.     While on his way to work, DANY Investigator Jose Flores received a phone call requesting that he respond to 109 Admiral Lane for the possible execution of a search warrant.

**Response:**     Disputed.

Defendant Flores produced no evidence (phone record, etc.) to prove he did receive a phone call to respond to Plaintiff's home. Nor was he able to recall who called and dispatched him to Plaintiff's home. He first stated "they need a supervisor to respond to that location; then he said "they need an extra supervisor" on the scene, but there is no evidence of another DANY supervisor at 109 Admiral Lane that day. *(see Exh. B [Flores dep.] 23:18-25, 24:1-20))*

55.     Upon arriving to the address, Investigator Flores spoke to another member of DANY's team and learned that Sergeant Diaz was inside the house and that she was possibly married to Castro, who had been arrested by DANY investigators earlier that morning.

**Response:**     Undisputed.  Solely for the purpose of responding to Defendant's motion for summary judgment.

56.     Investigator Flores entered the house and introduced himself to Sergeant Diaz, who was with Sergeant Borelli.

**Response:**     Undisputed.

However, he made it clear to her that he did not want to interview her, he only wanted to speak to her delegate Anthony Borelli. *(see Exh. B [Flores dep.] 42: 13-24).*

57.     Minutes later, Bronx Duty Captain Brandon del Pozo entered the house with Platoon Commander Lieutenant Timothy Burke of the 43rd precinct.

**Response:**     Disputed.

Defendant stated the Duty Captain was outside Plaintiff's home when he arrived, and he was sure he got into a conversation with him. *(see Exh. B [Flores dep.] 29: 11-13)*

Undisputed as to the arrival of the two NYPD officials at Plaintiff's home.

58.     Lieutenant Burke called the Command Center of the Internal Affairs Bureau ("IAB") to report that (i) DANY responded to 109 Admiral Lane to conduct a search warrant and found it to be Sergeant Diaz's residence and (ii) Castro, believed to be Diaz's husband, was apprehended leaving the house with $400,000 on his person.

**Response:**     Disputed.

DANY did not go to Plaintiff's home to conduct a search warrant. DANY went to Plaintiff's home to arrest Castro. (*see Paragraph 18 above*). Plaintiff does not dispute Lt. Burke called the Command Center, but Defendant's own statement clearly shows Lt. Burke was misinformed by DANY representatives.

59.     The Internal Affairs Bureau ("IAB") is division within the NYPD that investigates allegations against uniformed and civilian members of the service.

**Response:**     Undisputed.

Plaintiff requests that the Court take judicial notice of the fact that the NYC.Gov website states the Internal Affairs Bureau is responsible for investigating allegations of police corruption and serious misconduct department-wide.

60.     At 9:25 a.m., the investigation into Sergeant Diaz's association with Castro was assigned to IAB Group 10.

**Response:**     Undisputed.

Prior to I.A.B. being notified, Investigator Flores stated Plaintiff was associating with a known felon. *(see Exh. A [Diaz dep.] 190: 2-22)*     Plaintiff states that this statement is material to the fact that Defendant lacked probable cause when he ordered Plaintiff's arrest and subsequent unlawful imprisonment.

61.     Sergeant Diaz observed Investigator Flores and Captain del Pozo in conversation in the kitchen and then in the dining room, although she could not overhear what they were saying.

**Response:**     Undisputed.

62.     Captain del Pozo told Investigator Flores that he was going to order Sergeant Diaz to report to the 43rd precinct and asked Flores to let him know when DANY was done executing the search warrant.

**Response:**     Undisputed. Solely for the purpose of responding to Defendant's motion for summary judgment. Plaintiff was not privy to what Del Pozo told the Defendant.

63.     According to Sergeant Diaz, Investigator Flores then stood the doorway of the dining room and said, "Ha, you were associating with a known felon."

**Response:**     Undisputed.

64.     Andrew Quinn, an attorney from the SBA, called Sergeant Diaz on her cell phone.

**Response:**     Undisputed.

65.     Sergeant Diaz activated the speaker function on her phone and Quinn directed everyone to leave the house.

**Response:**     Undisputed.

66.     Captain del Pozo ordered that Sergeant Diaz be placed on duty, leave 109 Admiral Lane, and report to the 43rd precinct to await investigators from IAB.

**Response:**     Undisputed.

However, Plaintiff was on official sick leave and could only go back to work without the clearance and authorization of the Police Surgeon. Captain Del Pozo failed to request authorization to put Plaintiff back on duty (*see NYPD Patrol Guide Procedure 202-18*).

67.     Captain del Pozo told Sergeant Diaz that she "was not being accused of anything."

**Response:**     Undisputed.

Interestingly, for someone not being accused of anything Plaintiff was subjected to a false arrest and unlawful imprisonment.

68.     Captain del Pozo, Sergeant Diaz, Investigator Flores, and Sergeant Borelli exited the house, in that order.

**Response:**     Undisputed.

69.     According to Sergeant Diaz, once outside the house Investigator Flores said to the Captain, "She's under."

**Response:**     Undisputed.

70.     Captain del Pozo has no recollection of a DANY investigator stating that Sergeant Diaz was "associating with a known felon" or that she was "under," as in, under arrest.

**Response:**    Disputed.  In fact–statement #61, it states Del Pozo and Defendant were speaking in Plaintiff's kitchen. Upon entering Plaintiff's home Del Pozo was unaware of what was going on with DANY's investigation. Failure of one's recollection does not disprove a fact.

71.    Captain del Pozo's decision to order that Sergeant Diaz be placed on duty, leave the house, and report to the 43rd precinct was not based on, or otherwise influenced by, any such statements by a DANY investigator.

**Response:**    Disputed.

Del Pozo's decision to invoke Patrol Guide procedure §203-10 had to be influenced from information he received from Defendant. Whether it was the statements he did not recall hearing or other information he received from Defendant, either way he treated Plaintiff in the manner he did because he was influenced to believe Plaintiff had committed a crime.

72.    Rather, his decision was based on the belief that Sergeant Diaz's relationship with Castro and her presence at the location of a search warrant implicated Patrol Guide §203-10, which prohibits officers from knowingly associating with individuals "reasonably believed to be engaged in, likely to engage in, or to have engaged in criminal activities."

**Response:**    Undisputed. However, Defendant fails to mention the basis of Del Pozo's decision was the information Defendant fed him.

73.    Sergeant Borelli drove Sergeant Diaz to the 43rd precinct in his personal car.

**Response:**    Undisputed.

74.    Investigator Flores remained in the vicinity of 109 Admiral Lane to await the arrival of the search warrant.

**Response:**    Undisputed.

75.    Once at the 43rd precinct, Sergeant Diaz was directed to an office where she

waited with Sergeant Borelli.

> **Response:**    Undisputed.

76.    Captain del Pozo sent a female police officer to speak to Sergeant Diaz to "try to find out the series of events that happened that day."

> **Response:**    Undisputed.

Internal Affairs investigators investigate allegations of serious misconduct and corruption.

77.    Sergeant Diaz told the female officer to "get the fuck out of here."

> **Response:**    Undisputed.

78.    Sergeant Diaz was "very irate" at the precinct; she was "screaming" and "cursing everyone out."

> **Response:**    Undisputed.

79.    Sergeant Diaz and Sergeant Borelli were instructed, possibly by Captain del Pozo, to go upstairs to the detective squad where they continued to wait in another room for representatives of IAB to arrive.

> **Response:**    Undisputed.

80.    At some point between 10:00 a.m. and 12:00 p.m., two sergeants from IAB entered the room and introduced themselves to Sergeant Diaz.

> **Response:**    Undisputed.

81.    The IAB sergeants told Diaz that she had to stay in the room.

> **Response:**    Undisputed

82.    At approximately 2:30 p.m., Sergeant Diaz was placed on modified duty for

the good of the Police Department.

>    **Response:**    Undisputed.

>    To the extent Plaintiff was placed on modified assignment but not

necessarily for the good of the Department. Defendant and Del Pozo never produced evidence to

show how placing Plaintiff on modified duty was good for the department.

83.    The IAB sergeants conducted interviews of Lieutenant Burke and his driver for

the day.

>    **Response:**    Undisputed.  Solely for the purpose of responding to Defendant's motion

for summary judgment.

84.    The IAB sergeants also conducted background checks on Sergeant Diaz and

Castro, as well as a DMV check on Castro, which uncovered the 2011 Audi purchased days

before Castro's address and registered to Diaz's address.

>    **Response:**    Undisputed.  Solely for the purpose of responding to Defendant's motion

for summary judgment.

85.    At approximately 4:30 p.m., DANY investigators executed the search

warrant at Sergeant Diaz's home in the presence of investigators from IAB

>    **Response:**    Undisputed.  Solely for the purpose of responding to Defendant's motion

for summary judgment.

86.    The execution of the search warrant lasted a couple of hours.

>    **Response:**    Undisputed.

87.    Sergeant Diaz remained at the precinct until 7:00 p.m., at which point Sergeant

Borelli told her that she could leave.

>    **Response:**    Undisputed.

88.     Diaz was never charged with a crime.

**Response:**     Undisputed.

89.     Sergeant Diaz requested eleven hours of overtime payment in connection with the events of November 24, 2010.

**Response:**     Disputed.

Though Plaintiff did submit an overtime slip for the time she worked, she was unable to verify the hours she worked without seeing the overtime slip she submitted. *(see Exh. A [Diaz dep.] 223:6-25)*

90.     The hours of a police officer are referred to as her "tour" and the days the officer is not scheduled to work are referred to as her "regular days off," or "RDOs."

**Response:**     Undisputed.

91.     In November, 2010, Sergeant Diaz normally worked a tour of eight hours and fifty-seven minutes, usually from 2:50 p.m. to 11:47 p.m., and had rotating RDOs.

**Response:**     Undisputed.

92.     On November 24, 2010, Sergeant Diaz was scheduled to be out sick in connection an illness she contracted on November 20th

**Response:**     Disputed.

93.     The NYPD can change an officer's tour or her RDOs depending on the needs of the Department.

**Response:**     Undisputed.  Solely for the purpose of responding to Defendant's motion for summary judgment.

94.     When an officer is placed on duty on a date scheduled to be her RDO, she is paid overtime; similarly, when an officer is ordered to remain on duty beyond her tour, she is paid overtime.

**Response:**     Undisputed.

95.     Sergeant Diaz received eleven hours of overtime payment, for a total of $741.69, as compensation for the time she spent on duty on November 24, 2010.

**Response:**     Undisputed.

However, Del Pozo failed to attain the Police Surgeon's authorization to place a sick member of the service back on full duty. This fact is immaterial.

96.     IAB continued to investigate Sergeant Diaz's association with Castro and her receipt of the $310,000.

**Response:**     Undisputed.  Solely for the purpose of responding to Defendant's motion for summary judgment.

Plaintiff was subjected to several I.A.B. interviews that lasted many hours. And though they tried very hard to find a way to charge Plaintiff with some form of misconduct, they could not.

97.     On April 13, 2011, Sergeant Diaz wrote DANY a check for approximately $180,000, representing the remainder of the $310,000 that was left after Diaz completed the payments on the mortgage for 109 Admiral Lane.

**Response:**     Undisputed.

However, upon information and belief, Plaintiff was the only recipient of the cash gifts Castro distributed to his family that had to return money.

98.     On September 24, 2012, Castro was sentenced to serve seven to twenty-one years and pay $1,997,311 in restitution upon a jury verdict finding him guilty of Grand Larceny in the First Degree and related felony offenses.

**Response:**     Undisputed.

99.     Despite a recommendation from the Commanding Officer of IAB Group 10 that the NYPD issue Charges and Specifications against Sergeant Diaz, IAB ultimately closed its investigation as "unsubstantiated" in October, 2014.

**Response:**     Undisputed.

Dated:  Bronx, New York
        February 14, 2016

                                        Respectfully submitted,


                            By:     _____/s/_____
                                    Ricardo A. Aguirre (RAA 7086)

                                    Law Office of Ricardo Aguirre
                                    *Attorney for Plaintiff*
                                    644 Soundview Avenue, Suite 6
                                    Bronx, New York 10019
                                    Telephone (718) 542-9300
                                    Facsimile (718) 542-2244
                                    Email: aguirreesq@aol.com


To:     Elizabeth Krasnow
        Assistant District Attorney
        Office of District Attorney
        Of New York County