G318DIAC

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------x

DENISE DIAZ,

                Plaintiff,

           v.                          13 Cv. 8281 (JCF)

CITY OF NEW YORK, et al.,

                Defendants.

------------------------------x
                                       March 1, 2016
                                       11:10 a.m.
Before:

                  HON. JAMES C. FRANCIS

                                       Magistrate Judge

                       APPEARANCES

RICARDO A. AGUIRRE
     Attorney for Plaintiff

CYRUS R. VANCE, JR.
     District Attorney of New York County
BY:  ELIZABETH NORRIS KRASNOW
     MAUREEN T. O'CONNOR
     Assistant District Attorneys
```

G318DIAC

   1       (Case called)

   2       THE DEPUTY CLERK:  Counsel, please state your name for

   3  the record, starting with the plaintiff.

   4       MR. AGUIRRE:  For plaintiff, Denise Diaz, Ricardo

   5  Aguirre, 644 Soundview Avenue, Bronx, New York.  Good morning,

   6  your Honor.

   7       THE COURT:  Good morning.

   8       MS. KRASNOW:  Good morning, your Honor.  Assistant

   9  District Attorney Elizabeth Krasnow of the New York County

  10  District Attorney's Office, on behalf of Jose Flores.

  11       THE COURT:  Good morning.

  12       MS. O'CONNOR:  Assistant District Attorney Maureen

  13  O'Connor for New York County, on behalf of Jose Flores.

  14       THE COURT:  Good morning.

  15       As you folks know, we are here for oral argument on

  16  Defendant Flores's motion for summary judgment.

  17       So I am happy to hear first from defendant.

  18       MS. KRASNOW:  Sure.

  19       Your Honor, Plaintiff Denise Diaz, a sergeant with the

  20  New York City Police Department, alleges that she was falsely

  21  arrested by Investigator Flores of the New York County District

  22  Attorney's Office on November 24, 2010.

  23       That morning, Investigator Flores and other

  24  investigators from our office were present at Sergeant Diaz's

  25  home to arrest her common-law husband, George Castro, in

G318DIAC

connection with a larceny complaint filed by Columbia University.  Mr. Castro, over several months, stole over $5 million from Columbia by hacking into their accounts receivable system.

Bank records that were subpoenaed by my office before we went to Sergeant Diaz's house showed that Castro had issued Sergeant Diaz a check in the amount of $60,000 in the days leading up to his arrest.  Castro was apprehended leaving Sergeant Diaz's house while in possession of $400,000 in cash and a copy of Sergeant Diaz's New York City Police Department shield bearing the inscription sergeant's family member.

Your Honor, Sergeant Diaz was not arrested.  By her own admission, she was placed on duty by Bronx Duty Captain Brandon del Pozo, who responded to the scene after Sergeant Diaz called her precinct to report that her husband had been arrested.

THE COURT:  Is it your position then that at no point was she in custody, that is, at no point was she not free to go?

MS. KRASNOW:  Your Honor, at no point was she in DANY custody.  That's our position.

So what happened, your Honor, and what the evidence shows, is that Captain del Pozo ordered her to report to the 43rd Precinct, under the authority of the police department, to investigate the activities of its own officers.  There is no

1   evidence, your Honor, that my office took any action with
2   respect to her custodial situation.  I really couldn't comment
3   on whether or not she was free to leave once she got to the
4   precinct.  That's for the New York City Police Department to
5   decide.  There is no evidence that my office had any
6   involvement.
7            THE COURT:  Well, perhaps you can't comment on the
8   intent of the police officers, but legally do you take a
9   position with respect to whether or not Sergeant Diaz was free
10  to go after del Pozo told her to accompany him to the precinct?
11           MS. KRASNOW:  Your Honor, I am not sure there is any
12  evidence in the record one way or the other.  She was placed on
13  duty.  So in order to answer that question, we would have to
14  know what the NYPD's policy is with respect to when an officer
15  is on duty.  Are they free to leave their post or are they free
16  to disobey the order of a superior officer that they report to
17  a certain location?
18           I don't know, your Honor.  But if the purpose of
19  asking the question is, was she under arrest, then our position
20  is no.  She was not in custody in the sense that she was
21  arrested.  She was not arrested.
22           THE COURT:  Go ahead.
23           MS. KRASNOW:  So to continue, your Honor, the evidence
24  shows that Captain del Pozo's decision to issue the order that
25  Sergeant Diaz be placed on duty was not in any way influenced

by anyone from my office, let alone Investigator Flores.  And Diaz's claim that she was arrested is further undermined by the fact that she requested and received overtime payment in connection with each and every hour that she spent on duty in connection with Captain del Pozo's order, showing her subjective understanding that the reality of the situation was that she had been placed on duty and not arrested.

THE COURT:  I am not sure I follow that.  If she were not free to go at that point, why does the fact that she was paid for that time undermine any claim of false arrest?  I guess I would be a little surprised if she turned back the money and said, I'm sorry, I was not under arrest at that time, or, I was under arrest at that time so I am giving you back the money.

MS. KRASNOW:  Your Honor, assuming she wasn't free to leave -- which, again, as I already explained to the Court, there is no evidence in the record one way or the other as to what the position of the police department is once somebody has been placed on duty.  But to the extent she felt she was not free to leave, it was under the authority of the police department to place her on duty.  So it wasn't an arrest.  So the fact that she requested this overtime shows her understanding that the reason that she was at the precinct was because she was on duty.

Let's take Castro out of the equation, and let's say

1   that it was Sergeant Diaz stealing this money from Columbia and
2   she was taken to the precinct. She wouldn't have requested an
3   overtime payment in connection with her arrest. She understood
4   the reason that she was at the precinct was because she was on
5   duty, and that's why she requested and received the overtime,
6   your Honor.
7           Your Honor, unless there are any further questions,
8   that sums up my argument. In essence, she simply wasn't
9   arrested, and to the extent she was taken into custody, as your
10  Honor phrased it, it was on the authority of the police
11  department to investigate its own officers, and it had nothing
12  to do with my office.
13          THE COURT: Do you have a view as to at what point in
14  time that occurred relative to Investigator Flores's appearance
15  on the scene?
16          MS. KRASNOW: I'm sorry. Do I have a view as to what
17  period of time the order was issued in relation to Investigator
18  Flores's arrival?
19          THE COURT: Yes.
20          MS. KRASNOW: Your Honor, I believe the record shows
21  that Investigator Flores arrived to the scene either shortly
22  before or shortly after del Pozo, it's really immaterial, but
23  that they were both on the scene in the house and then Del Pozo
24  issued the order. So Flores was present when the order was
25  issued, if that's your question. And I would just refer your

G318DIAC

1  Honor to page 8 of my 56.1 statement for the relevant timeline.
2          THE COURT:  Good.
3          Before I hear from Mr. Aguirre, I have one request,
4  which is I have gotten bits and pieces of depositions.  It
5  would be really helpful for you to supply me with the full
6  depositions of the individuals for whom you have given me
7  pieces.
8          MS. KRASNOW:  Sure.  I am sorry, your Honor.  I know
9  some judges appreciate the excerpts and some don't.
10          THE COURT:  I understand.  That's fine.
11          MS. KRASNOW:  I will get you the full transcripts.
12          THE COURT:  Thank you.
13          Mr. Aguirre.
14          MR. AGUIRRE:  Good morning, your Honor.
15          I would like to begin by first reading from the
16  transcript of a witness that DANY deposed.  His name is
17  Sergeant Anthony Borelli.
18          Now, Sergeant Anthony Borelli was the union delegate
19  that was summoned to go to Plaintiff Diaz's home because of
20  some type of activity involving the District Attorney's Office
21  of New York.
22          He stated:  "I'm talking about DANY."
23          He was asked about what was the sum and substance of
24  what was going on there and what was going on with the
25  investigation.

1    He stated: "I'm talking about DANY. They -- I will
2    refer to them as DANY. They, I guess, were running the
3    investigation and everything on the police department side was
4    on hold until they finished the side that DANY was going to
5    do."
6         Then while at the precinct with Sergeant Diaz --
7    remind you, over eight hours they sat in a room, and then she
8    was moved to an office. And her godmother was there with her.
9    They wouldn't allow her to go in. Only Sergeant Borelli could
10   be there. And two officers from Internal Affairs were not
11   asking her any questions at all.
12        Sergeant Borelli stated -- the question was -- this is
13   page 56 of this transcript, line 12 -- "did you have any
14   conversations with anyone besides Sergeant Diaz while you were
15   at the precinct?"
16        He responded, "I spoke to IAB" -- Internal Affairs
17   Bureau -- "and I asked them, Do you know what's going on here?
18   And they said, they were waiting to get determination. They
19   were on standby, just like we are on standby, and we sat around
20   and waited."
21        I understand that defendants' position is to shift the
22   blame to Captain del Pozo because Captain del Pozo is not here.
23   I understand that it appears that Captain del Pozo acted in a
24   vacuum; that he came in, got some information from somewhere,
25   and immediately decided to send Sergeant Diaz to the 43

Case 1:13-cv-08281-JCF   Document 89   Filed 03/17/16   Page 9 of 18    9
G318DIAC

Precinct and modify her eventually.

In the record, it shows that upon arrival to 109 Admiral Lane, Sergeant Diaz's home, Investigator Flores testified that one of the first people he saw when he walked in was Captain del Pozo, and he had a conversation, whether it was in front of the door or inside. They were there for a while.

There is testimony on behalf of Sergeant Diaz to the point where they were having conversations in and out of the kitchen. It came to some point where it was alleged that Investigator Flores made the statement "you're associating with a known felon."

Affidavit by Josephine Rodriguez basically said that he said to her that she had been associating with very, very bad people, this is very bad, where Sergeant Diaz then exploded.

Shortly thereafter, her attorney gets on the phone and tells everybody you have to leave, you don't have a search warrant. But prior to that, Sergeant Diaz got up and said, Listen, you can go upstairs and you can search wherever you want because I have nothing to hide.

Upon information and belief, Investigator Flores basically said, No, I've got this.

When they were on their way to the 43 Precinct, apparently someone asked Investigator Flores something to the effect of her status, whether she was arrested or not. And he

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   said, No, she's under.  That's where Sergeant Diaz exploded and
2   started screaming, What the -- you mean I'm under?  And she had
3   a conversation with Captain del Pozo, who pulled her to the
4   side and tried to calm her down, don't worry, take it easy.
5   She ended up going to the precinct.
6          What is interesting is a modification of assignment in
7   the police department, a person would either have to be
8   indicted, arrested, intoxicated to the point where they can't
9   perform their duty, or have visited a licensed premises.  If
10  there is no discipline involved, but it's for something for an
11  administrative purpose, sometimes they go ahead and modify the
12  person for the good of the department.  It's never been
13  explained why, but that's what happened to her, and her career
14  then went downhill from there.
15         But to stand here and say that Captain del Pozo made
16  this unilateral decision to go ahead and send Sergeant Diaz to
17  the precinct, to sit for eight hours in a closed room, she
18  couldn't get up, she couldn't use the phone, she couldn't go to
19  the bathroom by herself, couldn't do anything, and treated her
20  as if she was a perpetrator just like a regular prisoner.
21         THE COURT:  Captain del Pozo says that, doesn't he?
22         MR. AGUIRRE:  Captain del Pozo says that in an
23  affidavit after discovery was done and after he was approached
24  to go ahead and send in an affidavit.
25         THE COURT:  I must say that's the kettle calling the

1   pot black if you're talking about after-the-fact affidavits.  I
2   just got one last night.
3           MR. AGUIRRE:  That's correct, your Honor.  I stand
4   accused.
5           Based on the totality of the circumstances here,
6   looking at what happened, the police officers from NYPD that
7   arrived on that scene knew nothing until they were informed by
8   either the investigators from DANY or by Sergeant Flores.
9   Sergeant Flores made it very clear in his testimony he was the
10  only sergeant from DANY that was there.
11          Ms. Rodriguez stated that he acted as if this was a
12  big arrest for him, or something to that effect.
13          Well, if they claim that she went ahead and had gotten
14  a check from Mr. Castro, a $60,000 check, prior to them going,
15  what is baffling then is, why didn't you come with a search
16  warrant in the first place?  Why didn't you contact -- which is
17  supposed to be the way to do it between different agencies --
18  contact the Internal Affairs Bureau and have them start an
19  investigation as to the allegation that she might possibly be
20  involved with a known felon?
21          Lastly, in their memorandum of law, defense counsel
22  mentioned something to the effect that Investigator Flores
23  allegedly -- and then in parentheses accurately -- observed
24  Sergeant Diaz associating with a known felon.  Well, he said he
25  didn't say that.  There is no proof, no evidence to show that

1   from his observation he was able to tell that she knew that
2   Castro was a criminal.
3           And on top of that, Sergeant Diaz told Captain del
4   Pozo she wanted to see Inspector Charlie Ortiz.  Charlie Ortiz
5   is the first cousin of Mr. Castro.  Sergeant Felix Ortiz, from
6   joint terrorism task force, first cousin of George Castro.  The
7   mother of his first child was working as an SPAA at the 40
8   Precinct.  Retired Sergeant Eugene Tapia, first cousin of
9   George Castro.  None of them were investigated, none of them
10  were called in by IAB for investigation, and none of them were
11  modified.
12          THE COURT:  Did any of them get a $60,000 check from
13  him?
14          MR. AGUIRRE:  Your Honor, upon information and belief,
15  and I have nothing to support this, George Castro donated money
16  to everyone in his family.  I can't say they received money
17  from him because I don't know.  So I won't stand here and say
18  yes.  But my client has gone through four different interviews
19  with the District Attorney's Office.  She was told she is going
20  to have to come and get the money there to pay her cable bill.
21  She was told, oh, you're going to get collared.
22          The second they told her that money was stolen, she
23  turned it over, without even a forfeiture hearing.  The lawyer
24  told her you could object.  She tried to get loans to be able
25  to get the money back that she had paid her mortgage off with,

1   but requesting -- and I know this from personal knowledge --
2   requesting a letter from DANY to take to the bank as to why she
3   needed the money, never got it. It was after the fact. So she
4   made every attempt to give back that money. And she went
5   through four different interviews with DANY and four different
6   interviews with Internal Affairs.
7           Your Honor, if they had something, they would have
8   indicted her or arrested her.
9           THE COURT: Let me ask the question that I asked Ms.
10  Krasnow. At what point in time do you contend that Sergeant
11  Diaz was arrested?
12          MR. AGUIRRE: I believe it started when Sergeant Diaz
13  was going to go upstairs to allow the investigators to go in
14  and search her apartment and Investigator Flores said, no, stay
15  there, we got this. And then from there on to -- because she
16  wasn't free to go; she wasn't free to go anywhere. It was
17  like, no, no, no, let's get her over to the 43 so that way we
18  can make sure she is in that one place. Because when we are
19  done with our search, and we find inculpatory evidence, we will
20  be able to arrest her. We will be on the five o'clock news
21  walking around with handcuffs.
22          That didn't happen. She was sitting in that precinct
23  while DANY searched her home, did not hand her a search
24  warrant, and came up with nothing. They said, OK, you can go,
25  but we're still looking at you.

1    THE COURT:  What is the evidence that Investigator
2    Flores was responsible for motivating her being placed on duty
3    and removed to the 43rd Precinct?
4    MR. AGUIRRE:  Captain del Pozo made a major error in
5    putting her back on duty.  She was out sick, regular sick, with
6    a gastro problem.  In order for an officer to go back to full
7    duty, authorization must be granted by a NYPD police surgeon; a
8    captain cannot put a person back to full duty.  Captain del
9    Pozo was not aware of that.  He put her on full duty because
10   that's just the standard procedure of NYPD when you start the
11   investigation on a person or when you have to detain someone to
12   look into stuff.  That's just the procedure.  But he was wrong
13   in doing so because he didn't get permission from the police
14   surgeon.  Sergeant Anthony Borelli also testified to that.
15   So it should never have happened.  Actually, what
16   should have happened is Sergeant Diaz should have been able to
17   stay in her home -- if they wanted to confine her to her living
18   room that's fine -- while the search was being conducted.
19   There was no reason for her to have to go to the 43 Precinct
20   and not be allowed to leave, move around, or go to the
21   bathroom.
22   THE COURT:  Let me ask that question again.  What
23   evidence is there that Investigator Flores was in any way
24   responsible for placing Sergeant Diaz back on duty and removing
25   her to the 43rd Precinct?

1        MR. AGUIRRE:  By giving the information to Captain del
2    Pozo about what the situation was and what their suspicion was
3    about her.  And that's tied directly to the allegation that he
4    said the words "you're associating with a known felon" and,
5    also, that she's under.
6        That was his mind-set, and that information was
7    conveyed to Captain del Pozo.  I think an intelligent inference
8    can be drawn from that, your Honor.  NYPD arrived on that scene
9    and they were not in charge of that investigation.  And, again,
10   I stress, at no time was Sergeant Diaz ever asked a question at
11   NYPD's 43rd Precinct.  She was never read her rights as to an
12   internal investigation, an interrogation, as they usually do.
13   They call it GO-15.
14       She sat and she waited.  And as I read Sergeant
15   Borelli's testimony, they were waiting for word from DANY as to
16   whether or not she was going to continue through processing --
17   fingerprinted, photographed, and taken to central booking.
18   That didn't happen.
19       THE COURT:  Thank you.
20       Ms. Krasnow.
21       MS. KRASNOW:  Your Honor, I just want to raise the
22   issue of this affidavit that was submitted last night.  While
23   it's our position that it doesn't detract from the points that
24   we have raised for summary judgment, because it more or less
25   echos the testimony of the plaintiff that we relied on in our

1  56.1 statement, it also should not be considered by the Court,
2  your Honor.
3         Plaintiff's counsel never served with me any initial
4  disclosures, let alone identifying this witness.  He didn't
5  identify any witnesses.  This person is Sergeant Diaz's
6  godmother.  There is no explanation as to why he was unable to
7  depose her or give me contact information so that I would know
8  in advance to take a deposition.
9         He then opposed my motion for summary judgment, and
10 even though it would have been too late at that time, he still
11 didn't submit an affidavit.  Then the Court gave him another
12 opportunity sua sponte to fix the deficiencies in his 56.1
13 statement, and he still didn't submit it; and, instead, waited
14 until 3:30 in the afternoon, the day before the oral argument,
15 without explanation, to just file an affidavit, with no
16 explanation as to why it's late, why he couldn't get it
17 earlier, how it plays into his argument, an affidavit that is
18 completely full of hearsay that I have had no opportunity to
19 object to its consideration by the Court, let alone the
20 consideration of evidence in it that is inadmissible and can't
21 be considered on summary judgment.
22        So, your Honor, this affidavit should not be
23 considered in resolving the motion, and if the Court would
24 like, I can submit a letter as to why with further elaboration.
25        THE COURT:  That's sufficient.

1           Is there anything else you would like to say with
2    respect to the substantive argument?
3           MS. KRASNOW:  Yes, your Honor.
4           The Court asked opposing counsel what evidence he had
5    as to why my client was responsible for Captain del Pozo's
6    decision to order that Sergeant Diaz be placed on duty.  In
7    response, opposing counsel indicated that Flores is responsible
8    because he gave Del Pozo information as to what the situation
9    was.
10          Now, your Honor, that took place in a conversation in
11   Sergeant Diaz's kitchen, which Sergeant Diaz has admitted she
12   could not overhear and has no idea what was said.  And I would
13   just refer your Honor again to page 8 of my 56.1 statement for
14   the substance of that conversation, where Flores simply
15   communicated to Del Pozo the fact that DANY had responded to
16   the house because Castro had been arrested, and they discovered
17   that Sergeant Diaz had some association with him.  That's it.
18   Nothing was said:  And you should take her into the precinct.
19   She is under arrest.  No direction to Captain del Pozo as to
20   how the situation should be handled.  Just the plain undisputed
21   facts as to what occurred when DANY responded to the house that
22   morning.
23          That's it, your Honor.
24          THE COURT:  Anything further?
25          MR. AGUIRRE:  Your Honor, Josephine Rodriguez was made

1  known the first day that we submitted the complaint.  She has
2  been a witness they could have called a long time ago.  Ms.
3  Rodriguez was in New York.  She lives in Virginia now.  And I
4  took that opportunity to have her give me a statement and an
5  affidavit.  I meant no harm in not informing counsel about
6  that.  I take full responsibility for that.  But I just felt it
7  was important to make sure that the Court have it.
8           THE COURT:  Thank you all.  I will get a decision out
9  as soon as I can.
10          (Adjourned)